# SHER TREMONTE LLP

March 17, 2020

**VIA EMAIL AND ECF**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007-1312

The Government is directed to respond by 12:00 p.m. on March 20, 2020.

SO ORDERED.

*[signature]*

Paul G. Gardephe
United States District Judge
March 18, 2020

Re: *United States v. Jean-Claude Okongo Landji et al.*,
Case No. 18 Cr. 601 (PGG)

Dear Judge Gardephe:

We write on behalf of our client, Jean-Claude Okongo Landji, a defendant in the above-referenced case, having been duly appointed to represent him pursuant to the Criminal Justice Act ("CJA"), Title 18 U.S.C. § 3006A(b) to request that Mr. Landji be released on conditions pending trial. Based on the exigent circumstances discussed below, this request is made on an urgent basis.

Mr. Landji, an American citizen with family ties to the United States, poses no danger to the community. Combined with an appropriate bail package, his family ties are sufficient to ensure his appearance in court. Pretrial release is also warranted under the extraordinary conditions resulting from the novel coronavirus pandemic, for at least two reasons. First, the BOP has responded to the spread of this deadly virus by cancelling all outside visitation – including legal visits – to the Metropolitan Correctional Center ("MCC"), where Mr. Landji is incarcerated. Accordingly, pretrial release is required to prevent the abrogation of his Sixth Amendment right to counsel. Second, it is imperative to spare Mr. Landji from needless exposure to the novel coronavirus, which disproportionately kills older individuals in poor health. Mr. Landji is both. At nearly sixty years of age, he is at a significantly heightened risk of dying if he contracts COVID-19, the infectious disease that is caused by the coronavirus. And he is in declining health. Because the inmates are constantly transferred within the jail and often made to sleep without proper bedding, Mr. Landji is sleep deprived, and because they are not fed properly, Mr. Landji has suffered a dramatic loss in weight. In his current condition, Mr. Landji is particularly vulnerable to serious illness. Accordingly, pretrial release is also warranted because "exceptional circumstances" exist such that Mr. Landji's continuing detention at the MCC "would not be appropriate" within the meaning of 18 U.S.C. § 3145(c).

The Honorable Paul G. Gardephe
March 17, 2020
Page 2

For these reasons, discussed more fully below, we propose the following bail package as sufficient to ensure Mr. Landji's appearance in court: (a) a personal recognizance bond in the amount of $150,000 co-signed by three financially responsible persons, including Mr. Landji's brother and niece, both of whom reside in Atlanta, Georgia; (b) home detention, except that Mr. Landji be permitted to travel within (and between) the Southern District of New York and the District of Georgia (if necessary)[1] for court appearances and attorney meetings; (c) electronic monitoring; and (d) any additional requirements that the court deems necessary.

**Charges, Arrest and Arraignment**

Mr. Landji is charged with one count of Narcotics Conspiracy on Board a U.S. Aircraft, in violation of 21 U.S.C. § 959(c), (d) and § 963, and one count of Narcotics Distribution on Board a U.S. Aircraft, in violation of 21 U.S.C. § 959(c), (d), § 960(a)(3) and (b)(1)(c). Mr. Landji was arrested on or about October 17, 2019, and arraigned that same day before Magistrate Judge Stewart D. Aaron. At the arraignment, Mr. Landji consented to detention without prejudice to move for release on bail at a future date. *See* ECF. No. 151 (Oct. 17, 2019). Prior to his arraignment in the Southern District of New York, Mr. Landji had been detained in a Croatian jail for over one year.

**Legal Standards**

"[I]t is only a limited group of offenders who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (citation and internal quotation marks omitted); *see also United States v. Valerio*, 9 F. Supp. 3d 283, 288 (E.D.N.Y. 2014) (quoting same). Under the Bail Reform Act of 1984, pretrial detention may be ordered, following a hearing in accordance with 18 U.S.C. § 3142(f), only if "no condition or combination of conditions will reasonably assure the appearance of the person [at trial] and the safety of any other person and the community." *Id.* § 3142(e)(1). The facts supporting a court's conclusion that no condition or combination of conditions will reasonably assure the safety of the community "shall be supported by clear and convincing evidence." *Id.* § 3142(f)(2). "To find danger to the community under this standard of proof requires that the evidence support such a conclusion with a high degree of certainty." *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985).

In some cases, as here, the standard for pretrial detention is "presumed" to have been met. 18 U.S.C. § 3142(e)(3). However, this presumption is only a production burden; the burden of persuasion is always on the government. *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *United States v. Chimurenga*, 760 F.2d 400, 405-06 (2d Cir. 1985); it is also "subject to rebuttal." 66 F.3d at 542. Indeed, all the defendant must do to rebut the presumption is to "com[e] forward with evidence that he does not pose a

---

[1] We are exploring the possibility that Mr. Landji may be able to reside, if released, in New York City. However, as our ability to communicate with our client has been severely curtailed, as discussed below, we lack details at this time and are not yet in a position to confirm this option.

The Honorable Paul G. Gardephe
March 17, 2020
Page 3

danger to the community or a risk of flight.'" *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)). The government retains the burden of persuasion even where the statutory presumption has been invoked. *See United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991). Once rebutted, though the presumption "remains a factor" to be considered by the court, it is merely one of several relevant considerations. *Mercedes*, 254 F.3d at 436; s*ee United States v. Valdez*, 426 F. Supp. 2d 180, 183 (S.D.N.Y. 2006) (granting bail to defendant charged with crimes in violation of 18 U.S.C. § 1951 and 18 U.S.C. § 924(c)). As the Second Circuit has explained, "to determine whether pretrial detention is warranted," the court must consider: "(1) the nature and circumstances of the offense charged; (2) the weight of the evidence supporting the charges; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release." *United States v. Jacobson*, 502 F. App'x 31, 32 (2d Cir. 2012) (citing 18 U.S.C. § 3142(g)).

Separately, section 3145(c) provides that "a person subject to detention pursuant to section 3143(a)(2) or (b)(2) . . . may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate." 18 U.S.C. § 3145(c). Such "exceptional reasons" exist where there is "a unique combination of circumstances giving rise to situations that are out of the ordinary." *United States v. DiSomma*, 951 F.2d 494, 497 (2d Cir. 1991). The test is "necessarily a flexible one, and district courts have wide latitude to determine whether a particular set of circumstances qualifies as 'exceptional.'" *United States v. Lea*, 360 F.3d 401, 403–04 (2d Cir. 2004)(citing *Disomma*, 951 F.2d at 497); *see also United States v. Schlesinger*, No. 02-CR-485, 2005 WL 1657043, at *3 (E.D.N.Y. June 8, 2005)("What exactly qualifies as 'exceptional reasons' depends upon a case by case analysis of the unique facts and circumstances that each defendant presents.").

**The Proposed Conditions Will Reasonably Assure Mr. Landji's Appearance in Court and the Safety of the Community**

Mr. Landji does not present a danger to the community. He is not charged with a violent offense and has no criminal history. At fifty-eight years of age, holding a commercial pilot's license, and having spent his entire adult life gainfully employed in the airline industry, the statistical likelihood that he would engage in violence while on pretrial release is vanishingly small. Accordingly, there is no basis for concluding that Mr. Landji poses a danger to the community. With respect to risk of flight, the Second Circuit has "required more than evidence of the commission of a serious crime and the fact of a potentially long sentence to support a finding of risk of flight." *United States v. Friedman*, 837 F.2d 48, 50 (2d Cir. 1988). The Circuit has noted that evidence of the defendant's "record of attendance in . . . state criminal proceeding[s], family ties, and other matters," can be sufficient to rebut the risk-of-flight presumption. *United States v. Martir*, 782 F.2d 1141, 1146 (2d Cir. 1986); *see also United States v. Vasconcellos*, 519 F. Supp. 2d 311, 319 (N.D.N.Y. 2007) (affirming grant of bail where, even though defendant was "a risk of flight and danger," he "offered evidence in contravention of

The Honorable Paul G. Gardephe
March 17, 2020
Page 4

those risks; namely, ties to the community and conditions of release that would ameliorate those risks"). Here, Mr. Landji is an American citizen with family ties to his brother and niece, who reside in Atlanta, Georgia, and his daughter, who resides in Los Angeles, California. Under the proposed bail package, these ties are buttressed by the financial commitment of sureties who have long known Mr. Landji and trust him not to undermine their economic stability. Moreover, as an aviation professional, Mr. Landji's livelihood depends on his ability to travel freely, in the United States and elsewhere, which he could not do if he were a fugitive. Thus, in addition to the moral suasion arising from Mr. Landji's family and personal ties to his suretors, Mr. Landji's need to earn a living in the future provides a powerful incentive for him to appear in court.

**Release is Required As a Consequence of the Continuing Violation of**
**Mr. Landji's Sixth Amendment Right to Counsel**

Beginning on Thursday, February 27, all outside visits at the MCC were cancelled, including legal visits. The closure remains in effect, and there is no timetable for reopening. Nor is there any plan in place that could reasonably ensure the ability of Mr. Landji (or any other prisoner at the MCC) to communicate with his counsel to the extent required for the preparation of his defense at trial in June. Under these circumstances, immediate pretrial release is required to vindicate Mr. Landji's Sixth Amendment right to counsel.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. The Sixth Amendment right to counsel, which is the central constitutional protection ensuring fairness in our adversarial criminal justice system, plays an especially important role before the commencement of trial. To "deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself," because what happens at the "earlier, critical stages in the criminal justice process . . . might well settle the accused's fate and reduce the trial itself to a mere formality." *Maine v. Moulton,* 474 U.S. 159, 170 (1985) (internal quotations marks omitted). BOP regulations formally recognize the importance of the right to counsel and the agency's role in upholding it. These regulations instruct that detention center wardens "*shall provide* the opportunity for pretrial inmate-attorney visits on a seven-days-a-week basis." 28 C.F.R. § 551.117(a) (emphasis added).

A detention facility thus violates the Sixth Amendment where it "unreasonabl[y] interfere[s] with the accused person's ability to consult counsel." *Benjamin v. Fraser,* 264 F.3d 175, 185 (2d Cir. 2001). Unreasonable interference requires a showing far less alarming than the one present here. In *Benjamin,* for example, the Second Circuit held that New York City correctional facilities violated the right to counsel where defense attorneys "routinely face[d] unpredictable, substantial delays in meeting with clients" and were "forced to wait between 45 minutes and two hours, or even substantially longer, after arriving at a facility to see a client." 264 F.3d at 179. Although legal visiting was still available, delays sometimes forced defense attorneys "to abandon efforts to meet with clients," particularly for appointed lawyers who shouldered a significant caseload.

The Honorable Paul G. Gardephe
March 17, 2020
Page 5

*Id.* at 180.  On that basis, the Second Circuit refused to dissolve a consent decree that provided for judicial supervision of legal visiting in the City facilities.  *Id.* at 188.  Similarly, in *Wolfish v. Levi,* the Second Circuit held that the MCC had "severely constrained" an inmate's "access to legal counsel" where dedicated attorney visiting hours were limited to two hours a day, and most attorneys visits were thus "made in the general visiting rooms during visiting hours thereby entailing long delays, limiting the attorney's time with his client, and totally vitiating confidentiality."  573 F.2d 118, 133 (2d Cir. 1978), *rev'd on other grounds,* 441 U.S. 520 (1979).  The right to counsel may be violated even where prison officials impose no restrictions on visits by attorneys, but rather bar visitation by attorneys' paralegal staff.  *See Smith v. Coughlin,* 748 F.2d 783, 789 (2d Cir. 1984).

Here, the MCC's continuing blanket denial of direct access to counsel represents interference far more disruptive to the attorney-client relationship than that seen in *Benjamin, Wolfish,* and *Smith.*  Mr. Landji's case is scheduled to proceed to trial three months from now, on June 15, 2020; pretrial motions are currently due on March 31, 2020, motions *in limine*, *voir dire* requests and requests to charge are due in approximately six weeks, on May 1, 2020.  *See* ECF No. 242 (Feb. 25, 2020).  Without meaningful access to his counsel – which was severely curtailed beginning on February 27 and now, as a result of the coronavirus outbreak, has for all practical purposes been suspended – Mr. Landji cannot prepare for trial in this complex, multi-defendant, document-intensive case.  Pretrial release on conditions is further warranted to remedy the continuing violation of Mr. Landji's Sixth Amendment right to counsel.

Pretrial release in this case is also proper under 18 U.S.C. § 3142(i), according to which a "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."  There is no greater necessity for the preparation of a person's defense than access to counsel.  Furthermore, the MCC's canceling of all social visits constitute "another compelling reason" for temporary release within the language of § 3142(i).

Regarding an accused's need to consult with counsel, "Section 3142(i)(3) reaches above the minimum" standards set by the Sixth Amendment.  *United States v. Rodriguez*, 2014 WL 4094561, at *4 (W.D.N.Y. 2014) (Scott, M.J.) ("*Rodriguez I*").  The subsection's plain text "mandates the removal of any impediment to 'private consultations' [between attorney and client] that are qualitatively and quantitatively 'reasonable.'"  *Id.* (internal citations omitted); *cf. Falcon v. U.S. Bureau of Prisons*, 52 F.3d 137, 139 (7th Cir. 1995) ("Section 3142(i)(3) is designed to protect a defendant's Sixth Amendment right to counsel, and if that right is being infringed, [the court] has the statutory authority to protect [defendant's] access to counsel.").

The Honorable Paul G. Gardephe
March 17, 2020
Page 6

**Pretrial Release is Further Warranted Because Conditions at the MCC Are Likely to Become a Humanitarian Crisis**

      The spread of coronavirus within the MCC's walls poses a potentially mortal threat to Mr. Landji.  He will be particularly vulnerable "when, not if" coronavirus comes to the MCC[2], an "incubator" for the disease[3] with "petri-dish-like conditions."[4] According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" as "infection control is challenging in these

---

[2]    Rich Schapiro, *Coronavirus Could 'Wreak Havoc' on U.S. Jails, Experts Warn*, NBC NEWS (Mar. 12, 2020), https://www.nbcnews.com/news/us-news/coronavirus-could-wreak-havoc-u-s-jails-experts-warn-n1156586 ("We're in a very perilous stage right now," said Dr. Homer Venters, the former chief medical officer of the New York City jail system. "It's just a matter of time before we see cases inside jails and prisons.").

[3]    Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

[4]    P. Leila Barghouty, *U.S. Prisons Are Not Ready for Coronavirus*, THE OUTLINE (Mar. 6, 2020), https://theoutline.com/post/8770/prison-coronavirus-covid-19-outbreak?zd=1&zi=oixu2i52; *see also* Kaiser Health News, *Could Coronavirus Cause a National Prison Lockdown?*, U.S. NEWS & WORLD REPORT (Mar. 13, 2020), https://www.usnews.com/news/healthiest-communities/articles/2020-03-13/could-coronavirus-cause-a-national-prison-lockdown ("Though small by comparison, the federal system sheds light on issues many state, county and local officials are grappling with now.  Because the facilities are typically dense and crowded, they could become prime breeding grounds for the highly contagious coronavirus."); Chris Strohm, *Prisons' Coronavirus Risk Puts Justice Department Under Pressure*, BLOOMBERG (Mar. 12, 2020) (noting concerns that coronavirus outbreak "could spark riots"); Courtney Bublé, *Federal Prison Employees and Others Question BOP's Readiness for Coronavirus*, GOV. EXEC. (MAR. 11, 2020), https://www.govexec.com/management/2020/03/federal-prison-employees-and-others-question-bops-readiness-coronavirus/163692/ ("History has shown time and time again that the Federal Bureau of Prisons has never been a proactive agency, but instead a reactive agency."); Joshua Eaton, *Federal Prisons Don't Have Coronavirus Test Kits for Inmates*, ROLL CALL (Mar. 6, 2020), https://www.rollcall.com/2020/03/06/federal-prisons-dont-have-coronavirus-test-kits-for-inmates/ ("Federal prisons, whose inmates may be a high-risk population for a coronavirus outbreak, do not have kits to test for the disease available.").

The Honorable Paul G. Gardephe
March 17, 2020
Page 7

settings."[5]  Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[6]  In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases as of February.[7]  Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons."[8]  Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[9]  Brooklyn District Attorney Eric Gonzalez, joined by public health experts, has asked Governor Cuomo to grant emergency clemencies to elderly and sick prisoners.[10]

Detainees at the MCC face especially high risk.  The majority of the approximately 700 individuals imprisoned there are housed in small two-man cells with a shared toilet and sink, and eat meals and have recreation in groups of seventy or more.  Other units are open dormitories that house seventy or more inmates without the ability to separate.  The medical care at the MCC has repeatedly failed to adequately address inmates' needs,[11] and sanitary problems at the facility in the past year have included the

---

[5]  "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[6]  *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at*  https://bit.ly/2TNcNZY.

[7]  Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020) *at* https://bit.ly/2vSzSRT.

[8]  Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020) *at*   https://cnn.it/2W4OpV7.

[9]  Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020) *at* https://apnews.com/af98b0a38aaabedbcb059092db356697.

[10]  *Coronavirus: Sentenced to COVID-19*, THE DAILY APPEAL (Mar. 12, 2020) at https://theappeal.com

[11]  *See, e.g.,* Jeanne Theoharis, *I Tried to Tell the World About Epstein's Jail.  No One Would Listen*, THE ATLANTIC (Aug. 16, 2019)*, at* https://www.theatlantic.com/ideas/archive/2019/08/real-scandal-mcc/596257/; Arun Kundnani, *The Guantánamo in New York You're Not Allowed to Know About*, THE INTERCEPT (Feb. 5, 2016), *at* https://theintercept.com/2016/02/05/mahdi-hashi-

The Honorable Paul G. Gardephe
March 17, 2020
Page 8

spillage of raw sewage into inmates' living quarters, besides perennial and severe rodent infestations.[12]

These dangerous conditions exacerbate what is already a frightening and dire situation for the general population, and raise constitutional concerns of cruel and unusual punishment, especially for prisoners who are at greater risk of contracting lethal infections such as the novel coronavirus due to factors such as age or pre-existing medical conditions.  *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.") (citation and internal quotation marks omitted).

Attorneys at the Federal Defenders of New York have been negotiating with the BOP for days, without success, in an attempt to ameliorate prison conditions.  On March 12, 2020, members of the CJA Panel were informed by the Federal Defenders that BOP precautionary measures, including "scree[n]ing/testing, plans for a positive test, continued attorney access, and video conferencing" were "close to non-existent."[13]  On March 13, counsel for the MCC advised by email that the BOP had closed all legal visitation nationwide for a minimum of 30 days.  Since then, the undersigned has requested that the MCC make Mr. Landji available to meet with us by telephone, as other defense lawyers with clients in the MCC have requested telephone or in-person visits pursuant to the BOP's assertion that it would allow such meetings on a case-by-case basis.  However, the Federal Defenders, which has been tracking these requests, noted in a letter to Chief Judges Katzmann, Mauskopf and McMahon that, "so far, not a single [attorney-client meeting] has been scheduled by the BOP."[14]  Although some calls have reportedly been allowed between inmates and clients beginning today, they are, at best, sporadic and unscheduled.  Our efforts to speak to Mr. Landji have still been unsuccessful.

---

metropolitan-correctional-center-manhattan-guantanamo-pretrial-solitary-confinement/; Seth Freed Wessler, *Inside the US Marshals' Secret, Deadly Detention Empire*, MOTHER JONES (Nov./Dec. 2019), *at* https://www.motherjones.com/crime-justice/2019/10/inside-the-us-marshals-secretive-deadly-detention-empire/.

[12]     Lauren Aratani, *Rats and Raw Sewage:  Jeffrey Epstein Jail Blighted by 'Horrible' Conditions*, THE GUARDIAN (Aug. 17, 2019), *at* https://www.theguardian.com/us-news/2019/aug/17/jeffrey-epstein-new-york-metropolitan-correctional-center-jail

[13]     Email from David Patton to Eastern District Criminal Justice Act Panel, dated Mar. 12, 2020.

[14]     Letter from David Patton to Chief Judge Robert M. Katzmann, *et al.*, dated Mar. 15, 2020, attached hereto as **Exhibit A**.

The Honorable Paul G. Gardephe
March 17, 2020
Page 9

      Given these intolerable conditions, which will likely give rise to a humanitarian crisis in the coming days as the coronavirus begins to infect individuals imprisoned at the MCC, "exceptional circumstances" clearly exist within the meaning of 18 U.S.C. § 3145(c) such that Mr. Landji's continuing detention is not appropriate. Given his age and poor health, Mr. Landji faces a heightened risk of dying if he contracts COVID-19, as is likely should he remain imprisoned at the MCC.

**Conclusion**

      For the foregoing reasons, we respectfully request that the Court immediately grant Mr. Landji bail pending trial on the conditions described above.

Respectfully submitted,

   /s/ Michael Tremonte

Michael Tremonte
James DeVita


Attachment

cc:    All counsel of record

# Exhibit A

# Federal Defenders
## OF NEW YORK, INC.

52 Duane Street - 10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

**David Patton**
*Executive Director and Attorney-in-Chief*

March 15, 2020

**VIA EMAIL**

Chief Judge Robert A. Katzmann
United States Court of Appeals for the Second Circuit
40 Foley Square
New York, New York 10007

Chief Judge Roslynn R. Mauskopf
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Chief Judge Colleen McMahon
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: Federal Defenders' Operations**

Dear Chief Judges Katzmann, Mauskopf, and McMahon:

I write to apprise you of Federal Defenders of New York's change in operations in light of COVID-19 and how it may impact our work with the Courts. I ask that you share this letter with your colleagues.

On Saturday morning, one of our secretarial support staff was told by her doctor that she has likely contracted COVID-19. She was administered a test, but the results will not be available until Wednesday. Another employee who is in close contact with that employee is symptomatic and will be tested tomorrow. I have learned from the United States Attorney's Office in the Southern District of New York that an agent with the Joint Terrorism Task Force and a security officer at the front desk of St. Andrews have tested positive. Apparently, one other agent and an AUSA likely have contracted the virus but have not yet received test results.

In light of this news and guidance from public health officials, we cannot continue with normal, in-person office operations. Beginning Monday, our offices will begin operating remotely. We will do our best to serve our clients as we always have. Certain tasks cannot be accomplished remotely, notably in-court appearances or the filing of hard-copy submissions, and

Chief Judges Katzmann, Mauskopf, and McMahon                              March 15, 2020
**Re:  Federal Defenders' Operations**

we will do our best to appear and file as we have.  But to the extent that we seek accommodations in individual cases, we would greatly appreciate the Courts' consideration.  In many cases we will seek to adjourn all non-essential conferences and proceedings.  In some cases, we will seek an extension of filing deadlines until after the emergency, and in others we will likely ask to file electronically without the provision of hard copies. For those cases involving detained clients and reasons to proceed promptly, we may request remote proceedings where appropriate.  Indeed, in some cases involving detained clients we may seek expedited proceedings.

With respect to new cases, we will plan to implement a duty schedule (similar to our Saturday schedules) whereby attorneys will only come to the office or court as necessary.  We will assure that all of the relevant courthouse actors have the appropriate contact information for those attorneys.  Please keep in mind that for all cases, new or old, we will be restricted in the work we can do.  We will not have staff like paralegals, investigators, social workers, and secretarial and clerical support staff available to do the many tasks they normally do in-person.

I have written to the United States Attorneys' Offices asking that they not engage in business as usual with respect to new cases.  Absent extraordinary circumstances, namely cases that involve an imminent threat of violence, it does not advance public safety to add more people to our local jails.  On Thursday last week Judge Orenstein found that putting people in the MDC now presents a danger to the community, including the community of people in the jail.  He is right. I truly believe the jails are ticking time bombs. I hope I am being alarmist and that a few months from now everyone will have a good laugh at my expense recalling how I overreacted to this situation. But the jails are not sanitary or safe in the best of times.  They do not provide adequate medical care in the best of times. They are surely about to experience a dramatic staffing shortage (on top of their baseline staffing shortages).  There are many in those jails (and GEO and Valhalla) who are older or medically compromised as defined by the CDC, and they are in grave danger.  My lawyers and CJA already are starting to seek bail for certain high risk people under the Bail Reform Act's provision for temporary release for any "compelling reason."  I cannot imagine a more compelling reason than the situation we face now.

In addition, because of the BOP's nationwide lockdown, on top of the health issues, people in the jails will have an extraordinarily difficult time speaking with counsel, much less meaningfully preparing a defense (which may be time-sensitive from the defense perspective and not solved by simply adjourning matters).   Over the last two days, lawyers have been asking BOP attorney Nicole McFarland to set up legal calls or visits for clients with upcoming trials or proffers or serious medical conditions; so far, not a single one has been scheduled by the BOP.

Chief Judges Katzmann, Mauskopf, and McMahon							March 15, 2020
**Re:  Federal Defenders' Operations**

      I thank you for your leadership in these challenging times.  I will keep you updated as we continue to evaluate our operations.  I hope you stay safe and healthy.

                Respectfully submitted,

                /s
                David Patton

cc:    Second Circuit Judges
       EDNY District and Magistrate Judges
       SDNY District and Magistrate Judges
       Richard Donoghue, EDNY United States Attorney
       Geoffrey Berman, SDNY United States Attorney