UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-against-

JIBRIL ADAMU, and JEAN-CLAUDE
OKONGO LANDJI,

Defendants.

**ORDER**

(S1) 18 Cr. 601 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

  Defendants Jibril Adamu and Jean-Claude Okongo Landji ("Defendants") are charged in (S1) Indictment 18 Cr. 601 (PGG) with conspiring to distribute and possess with intent to distribute five kilograms and more of cocaine on board a U.S.-registered and U.S.-owned aircraft. ((S1) Indictment (Dkt. No. 39)) Landji and Adamu are also charged with distributing and possessing with intent to distribute five kilograms and more of cocaine while on board a U.S.-registered and U.S.-owned aircraft. (Id.)

  In their pre-trial motions, Defendants seek a severance from their co-defendants in the (S1) Indictment, and Landji seeks a severance from Adamu. (Adamu Br. (Dkt. No. 354) at 4-5; Landji Br. (Dkt. No. 352) at 3-9)[1] Defendants also complain that the Government has improperly retained documents – originally seized by Croatian authorities – that contain privileged communications. They seek the return of these documents. (Adamu Br. (Dkt. No. 354) at 3-4; Landji Br. (Dkt. No. 352) at 9) Finally, Adamu contends that the charges against him should be dismissed for lack of jurisdiction. (Adamu Br. (Dkt. No. 354) at 5-8)

  For the reasons stated below, Defendants' motions will be denied.

---

[1] The page numbers referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

## BACKGROUND

I.   **FACTUAL ALLEGATIONS**

The Government charges that, between April and July 2018, Landji and Adamu's co-defendant, David Cardona-Cardona, engaged in a conspiracy to transport more than 1,200 kilograms of cocaine from South America to Holland.[2] (Cardona-Cardona Cmplt. (Dkt. No. 1) at ¶¶ 23-32)  Cardona-Cardona and his co-conspirators planned that if this initial shipment to Holland was successful, the same vessel would be used to transport large quantities of cocaine to West Africa.  (Govt. Opp. (Dkt. No. 364) at 5)  From there, the cocaine would be flown to buyers in Croatia.  According to the Government, Landji and Adamu – who are both pilots – agreed to transport Cardona-Cardona's cocaine from West Africa to Croatia and other parts of southern Europe for sale there.  (Id. at 5-7; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 17)[3]

Landji is a United States citizen who owned and operated an aviation charter business called Okland Aviation, a limited liability company based in Georgia.  Okland Aviation owned a U.S.-registered Gulfstream IIB airplane.  Okland Aviation employed Adamu as a pilot. (Cardona-Cardona Cmplt. (Dkt. No. 1) ¶¶ 17-18; Govt. Opp. (Dkt. No. 364) at 6)

In May 2018, Landji met with Cardona-Cardona and DEA informants in Lome, Togo – in West Africa – to discuss using Landji's airplane to transport cocaine from West Africa to southern Europe.  (Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 17)  In recorded conversations, Cardona-Cardona and Landji discussed with the DEA informants prior cocaine shipments,

---

[2] In Count Seven of the (S1) Indictment, this cocaine shipment is the basis for a Maritime Drug Law Enforcement Act charge against Cardona-Cardona.  ((S1) Indictment (Dkt. No. 39))  Landji and Adamu are not charged in Count Seven.

[3] The Cardona-Cardona Complaint references a co-conspirator labeled "CC-1." The Government disclosed that "CC-1" references Landji.  (See March 6, 2020 Govt. Ltr. (Dkt. No. 254) at 1)

Landji's access to airplanes, and future plans to transport large quantities of cocaine to Croatia. These discussions included references to the fact that Landji owned the Gulfstream IIB airplane (the "G2"), that the plane was registered in the United States, and that Landji and Adamu would fly the G2 to Croatia with an initial shipment as a test run for future shipments of hundreds of kilograms of cocaine. Landji also described his experience with "black flights," in which "flight plans are either misfiled or not filed at all, and communications and safety equipment are deactivated" in order to evade law enforcement. (Govt. Opp. (Dkt. No. 364) at 6-7)

During the May 2018 discussions in Togo, Cardona-Cardona told a DEA informant that "we" changed the registration of Landji's U.S. registered plane, "because once you put a kilo inside a plane that has an American registration [it] is as if you were putting it in the center of New York. . . . [a]t a legal level. At a criminal level." (Id. at 7) Cardona-Cardona and Landji engaged in a similar conversation about the legal ramifications of using a U.S. registered plane to transport cocaine. (Id.) Landji confirmed that he understood that the plane that would be used to transport cocaine to Croatia "should not have an American registration." He also confirmed that his plane could carry as much as one ton of cocaine. (Id. at 7-8)

After the May 2018 discussions in Togo, Cardona-Cardona had additional meetings with DEA informants to further discuss his plan to transport cocaine to southern Europe by aircraft. Cardona-Cardona planned to trade the cocaine for sophisticated weaponry, which he would then sell to extremist groups in Africa. (Id. at 8; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 19)

On September 15, 2018, Cardona-Cardona met with the DEA informants and an undercover Croatian law enforcement officer in Zagreb, Croatia. The informants and undercover officers brought Cardona-Cardona to a warehouse where they showed him a box of AK-47

machineguns, a surface-to-air missile, and night-vision goggles. Cardona-Cardona told the informants and undercover officers that this equipment was highly useful and sought after in Africa, and that they would be sold to Ansar al-Dine, a terrorist organization. He also said that he planned to use the weapons to protect the shipments of cocaine that would be transported to Africa. (Govt. Opp. (Dkt. No. 364) at 8; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 20)

During this same Zagreb meeting, Cardona-Cardona told the informants that the airplane he would use to transport the cocaine and weapons would have an altered tail number. The U.S. registered tail number would be changed to an African tail number in order to evade U.S. jurisdiction. (Cardona-Cardona Cmplt. (Dkt. No. 1) ¶ 20(f))

Cardona-Cardona also stated that a shipment of 500 kilograms of cocaine had recently arrived in Guinea Bissau, and that he would use this cocaine for the weapons transaction. (Id. ¶ 20(g))

On September 16, 2018, Cardona-Cardona met again with the DEA informants in Zagreb. One of the informants told Cardona-Cardona that he had access to a portion of Zagreb International Airport that was used by private aviation. The informant arranged for Cardona-Cardona and an undercover Croatian law enforcement officer posing as a corrupt security guard to tour the private aviation area. Cardona-Cardona said that he was pleased with the arrangements, and that Landji's plane was ready to be used for transporting the cocaine, and would be operated by "trained pilots." (Id. ¶ 21)

Cardona-Cardona told a DEA informant that – using cocaine – he wished to purchase two surface-to-air missiles, a box of rifles, one or two boxes of ammunition, a fifty-caliber rifle, and night vision goggles. Cardona-Cardona said that he planned for the airplane to bring at least two to three kilograms of cocaine to Zagreb, and that the shipment could be as

large as twenty kilograms. It was agreed that the exchange of cocaine for the weapons and other equipment would take place in the private aviation area of the Zagreb airport. (Id.)

On October 9, 2018, Cardona-Cardona sent an encrypted message to a DEA informant stating that the cost of the flight to Zagreb would be €90,000, and that the plane would arrive in Zagreb eight days after the payment was made. (Id. ¶ 22)

On October 18, 2018, Cardona-Cardona traveled to Croatia, where he had several additional meetings with the DEA informants in order to finalize plans for the arrival of the G2 with the cocaine and to repeat his demands for flight expenses. (Govt. Opp. (Dkt. No. 364) at 8) Cardona-Cardona told the DEA informants that he would provide a sample of cocaine for their approval. Once they approved the initial sample, Cardona-Cardona said that 500 kilograms of cocaine then in Africa would be flown to Croatia. (Id.)

Landji and Adamu then made final preparations for the flight to Croatia with the cocaine "sample." Landji filed passport information for the Defendants and flight plans for the G2. The flights plans indicated that the G2 would fly from Africa to Zagreb, Croatia. Landji and Adamu agreed that the cocaine "sample" would be one kilogram. Cardona-Cardona discussed with Adamu the location of the cocaine "sample," and its delivery to Adamu and Landji in Africa prior to the flight to Croatia. Adamu confirmed with Cardona-Cardona that he and Landji were prepared for the flight to Croatia, and were merely waiting for delivery of the cocaine sample. (Id. at 9)

On October 30, 2018 – after Landji and Adamu had received the one-kilogram "sample" – they flew Landji's plane to Zagreb. Landji and Adamu were arrested by Croatian authorities once they landed in Zagreb, and one kilogram of cocaine was seized from the G2. (Id.)

5

Shortly after his arrest, Adamu met with representatives of the DEA and Croatian law enforcement. He received Miranda warnings, and agreed in writing to waive his rights. Adamu admitted knowing that Cardona-Cardona was a drug dealer who used airplanes to smuggle narcotics. He admitted to having assisted Cardona-Cardona in the past in finding airplanes to transport narcotics, and described one incident in which Cardona-Cardona had paid him $3,000 to transport cocaine from Guinea Bissau to Panama. (Id. at 9-10; Tremonte Decl., Ex. A (Dkt. No. 355-1))

As to Landji, Adamu said that he had recently joined Landji's aviation company as a pilot. Adamu told the agents that Landji (1) knew Cardona-Cardona; (2) had told Adamu that Cardona-Cardona was planning on travelling from West Africa to Europe; and (3) that Landji intended to meet with Cardona-Cardona in Zagreb. Adamu said that Cardona-Cardona and Landji were meeting in Zagreb to discuss Cardona-Cardona's narcotics trafficking. (Id.; Tremonte Decl., Ex. A (Dkt. No. 355-1))

## II.   CHARGES AND EXTRADITION FROM CROATIA

In November 2018, Cardona-Cardona, Landji, and Adamu were charged with conspiring to distribute and possess with intent to distribute five kilograms and more of cocaine on board a U.S.-registered and U.S.-owned aircraft, in violation of 21 U.S.C. §§ 959(c), 959(d), 963 and 18 U.S.C. § 3238. Cardona-Cardona, Landji, and Adamu were also charged with distributing and possessing with intent to distribute five kilograms and more of cocaine on board a U.S.-registered and U.S.-owned aircraft, in violation of 21 U.S.C. §§ 812, 959(c), 959(d), 960(a)(3), 960(b)(1)(B) and 18 U.S.C. §§ 3238 and 2. ((S1) Indictment (Dkt. No. 39) ¶¶ 1-6)

The United States sought Landji and Adamu's extradition from Croatia. The extradition process consumed nearly a year. (Govt. Opp. (Dkt. No. 364) at 11) Once the

extradition process was completed, DEA agents took custody of the Defendants and personal effects and documents that had been seized by Croatian authorities. The Government produced the documents to the Defendants during discovery. (Fihlman Decl. (Dkt. No. 398-1) ¶¶ 4-5)

Trial is scheduled for June 8, 2021. (Dkt. No. 428) As discussed above, in their pretrial motions, Defendants seek a severance from their co-defendants in the (S1) Indictment, and Landji seeks a severance from Adamu, alleging that Adamu's post-arrest statements create a Bruton issue. (Adamu Br. (Dkt. No. 354) at 4-5; Landji Br. (Dkt. No. 352) at 3-9) Defendants also seek the return of documents that the Government obtained from Croatian authorities, claiming that these documents contain information protected by the attorney-client and work product privileges. (Adamu Br. (Dkt. No. 354) at 3-4; Landji Br. (Dkt. No. 352) at 9) Finally, Adamu contends that the charges against him must be dismissed for lack of jurisdiction. (Adamu Br. (Dkt. No. 354) at 5-8)

## DISCUSSION

### I. SEVERANCE

Landji and Adamu seek a severance from the other Defendants charged in the (S1) Indictment: Steven Antonius, David Cardona-Cardona, Shervington Lovell and Argemiro Zapata-Castro. (Landji Br. (Dkt. No. 352) at 6-9; Adamu Br. (Dkt. No. 354) at 4-5) Landji and Adamu's motions will be denied as moot, because Antonius, Cardona-Cardona, Lovell, and Zapata-Castro have all pled guilty. (Antonius Plea Tr. (Dkt. No. 388); Cardona-Cardona Minute Entry Apr. 26, 2021; Lovell Minute Entry Nov. 23, 2020; Zapata-Castro Plea Tr. (Dkt. No. 294))

Landji further contends that he should be granted a severance as to Adamu, because of Bruton issues. (Landji Br. (Dkt. No. 352) at 3-5)

7

### A. Applicable Law

Federal Rule of Criminal Procedure 8(b) provides that two or more defendants may be joined in a single indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Joinder of defendants in multiple-count indictments is proper where the charged conduct is "'unified by some substantial identity of facts or participants' or 'arise[s] out of a common plan or scheme.'" United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989) (quoting United States v. Porter, 821 F.2d 968, 972 (4th Cir. 1987)) (citing United States v. Green, 561 F.2d 423, 426 (2d Cir. 1977)); accord United States v. Rittweger, 524 F.3d 171, 177 (2d Cir. 2008).

Joinder is also appropriate where "common factual elements" of different charges are readily apparent. United States v. Turoff, 853 F.2d 1037, 1044 (2d Cir. 1988). "For example, counts might be 'connected' if one of the offenses 'depend[s] upon [ ]or necessarily l[eads] to the commission of the other,' or if proof of one act 'constitute[s] [ ]or depend[s] upon proof of the other." United States v. Shellef, 507 F.3d 82, 98 (2d Cir. 2007) (quoting United States v. Halper, 590 F.2d 422, 429 (2d Cir. 1978)) (alterations in Shellef). Similarly, where one offense stems from the other, "that link provides a sound basis for joinder under Rule 8(b)." Turoff, 853 F.2d at 1044.

Landji and Adamu are alleged to have conspired to distribute and possess with intent to distribute five kilograms and more of cocaine on board a U.S.-registered and U.S.-owned aircraft. ((S1) Indictment (Dkt. No. 39) ¶¶ 1-4) The charges against the Defendants arise from jointly-undertaken conduct and arise from a common scheme or plan. Accordingly, joinder is clearly appropriate. See United States v. Cooper, No. 17-CR-296 (PKC), 2020 WL 2307646,

at *5 (E.D.N.Y. May 8, 2020) ("'[A] non-frivolous conspiracy charge' is generally sufficient to support joinder." (quoting United States v. Nerlinger, 862 F.2d 967, 973 (2d Cir. 1988))); accord United States v. Davis, No. 17 CR. 610 (LGS), 2018 WL 4373998, at *4 (S.D.N.Y. Sept. 13, 2018).

Federal Rule of Criminal Procedure 14 provides, however, that even where – as here – joinder is proper under Rule 8(b), a court may nonetheless grant a severance "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government . . . ." Fed. R. Crim. P. 14.

In order to prevail on a severance motion under Rule 14, a "defendant must show not simply some prejudice but substantial prejudice." United States v. Sampson, 385 F.3d 183, 190 (2d Cir. 2004) (quoting United States v. Werner, 620 F.2d 922, 928 (2d Cir. 1980)) (emphasis in Sampson). A defendant has the "extremely difficult burden" of showing that he would be so prejudiced by joinder that he would be denied a fair trial. United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir. 1989) (internal quotation marks and citation omitted). It is thus not sufficient for a defendant to show that he "may have a better chance of acquittal in [a] separate trial[ ]." Zafiro v. United States, 506 U.S. 534, 540 (1993). Instead, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of [a defendant], or prevent the jury from making a reliable judgment about guilt or innocence." Id. at 539. Even in those rare instances where a defendant establishes a "high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." Id. (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)).

9

The Second Circuit has instructed that "the principles that guide the district court's consideration of a motion for severance usually counsel denial." United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993).

A severance may be necessary, however, where statements made by a co-defendant threaten to violate a defendant's Sixth Amendment rights under the Confrontation Clause. Where the Government seeks to offer a statement from a co-defendant who will not testify at trial, and that statement specifically inculpates a co-defendant, courts "cannot accept limiting instructions as an adequate substitute for [the co-defendant's] constitutional right of cross-examination." Bruton v. United States, 391 U.S. 123, 135-37 (1968). In such circumstances, courts generally have three options: (1) careful redaction of the out-of-court statement such that all references to the co-defendant are eliminated; (2) severance; or (3) exclusion of the statement at the joint trial. United States v. Jass, 569 F.3d 47, 56 n.5 (2d Cir. 2009)

The Second Circuit has approved two types of redaction to address Bruton concerns: (1) a redaction that eliminates all reference to a co-defendant's existence; and (2) a redaction that replaces a co-defendant's name with a neutral pronoun such that the statement, standing alone, cannot be understood to refer to the co-defendant. Id., 569 F.3d at 56 (Bruton concerns may be addressed through use of a limiting instruction and redaction that "eliminate[s] not only the defendant's name, but any reference to his or her existence" (quoting Richardson v. Marsh, 481 U.S. 200, 211 (1987))); see also id. ("'[A] redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise

10

connect co-defendants to the crimes, may be admitted without violating a co-defendant's Bruton rights.'" (quoting United States v. Tutino, 883 F.2d 1125, 1135 (2d Cir. 1989))).

The Second Circuit has made clear that the first method of redaction – which "eliminate[s] completely from a confession any mention of a non-declarant defendant's existence" – is the preferred approach. Id. at 56 n.5. The second method of redaction, which employs neutral pronouns, should be employed "only" as a last resort, "when complete redaction would distort the confession . . . or chang[e] the tenor of the utterance as a whole." Id. (internal citation and quotation marks omitted). Moreover, the Supreme Court has cautioned that clumsy redactions that "simply replace a name with an obvious blank space or word such as 'deleted' or . . . other similarly obvious indications of alteration" do not suffice to eliminate Bruton concerns. Indeed, such redactions "so closely resemble Bruton's unredacted statements . . . that . . . the law . . . require[s] the same result." Gray v. Maryland, 523 U.S. 185, 192 (1998).

Where neutral pronouns are used, the propriety of the redactions should be considered in light of two inquiries: "(1) did the redacted statement give any 'indication to the jury that the original statement contained actual names,' and (2) did 'the statement standing alone . . . otherwise connect co-defendants to the crimes.'" Jass, 569 F.3d at 58 (quoting Tutino, 883 F.2d at 1135). A court considering the admissibility of a redacted statement that employs neutral pronouns must "view the redacted confession in isolation from the other evidence" in order to insure that "the confession, when so viewed, does not incriminate the defendant." United States v. Williams, 936 F.2d 698, 700-01 (2d Cir.1991). "The critical inquiry is always whether introduction of a confession at a joint trial presents an 'overwhelming probability' that the jury will not be able to follow an instruction limiting consideration of the confession to the declarant defendant." Jass, 569 F.3d at 56 n.5 (quoting Richardson, 481 U.S. at 208); see also id.

11

at 60–61. Where a redacted statement utilizing neutral pronouns passes this test, "it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to defendant." Williams, 936 F.2d at 700-01; see also Jass, 569 F.3d at 61 ("The critical inquiry is, thus, not whether a jury might infer from other facts (whether evidence admitted at trial or circumstances such as the number of defendants on trial) that a declarant's neutral allusion to a confederate might have referenced the defendant.").

B. **Application**

Landji contends that he is entitled to a severance from Adamu because Adamu made statements in a post-arrest interview that "directly implicat[e] Mr. Landji in the crime alleged in the indictment," such that the admission of Adamu's statements at a joint trial would violate Landji's Sixth Amendment rights under the Confrontation Clause. (Landji Br. (Dkt. No. 352) at 3)

In connection with his severance motion, Landji has submitted a DEA "Report of Investigation" that describes an interview of Adamu conducted by DEA agents on October 31, 2018, after Adamu was arrested in Zagreb. At the outset of this interview, Adamu received Miranda warnings and waived his rights. (Tremonte Decl., Ex. A (Dkt. No. 355-1) at 2-3)

Most of the DEA report recounts Adamu's statements about his communications with Cardona-Cardona. (Id. at 3-4) The DEA report also states, however, that Adamu told agents that Landji had flown with Adamu on the aircraft to Zagreb. (Id. at 3) Adamu also told agents that Landji knew Cardona-Cardona, that Landji told Adamu that Cardona-Cardona would be traveling from West Africa to Europe, and that Landji would be meeting with Cardona-Cardona in Zagreb. Adamu further stated that he "assumed" that Landji would be discussing drug trafficking with Cardona-Cardona, because Cardona-Cardona is a drug dealer:

12

> ADAMU said LANDJI knows CARDONA and it was LANDJI who informed ADAMU that CARDONA was planning to travel from [W]est Africa to Europe. . . . Per ADAMU, he knew LANDJI would be meeting CARDONA and other business associates when they arrived in Zagreb. ADAMU indicated he assumed that CARDONA, LANDJI and the other associates [were] coming to Zagreb to discuss drug business because that is what CARDONA does. ADAMU claimed that he was not going to attend those meetings.

(Id. at 4)

The Government intends to "offer evidence of Adamu's post-arrest statements through the testimony of one or more witnesses." (Govt. Opp. (Dkt. No. 364) at 16) However, the Government maintains that any Bruton issue can be addressed by redacting Landji's name. (Id. at 16-18) The Government has not made a specific proposal as to how Adamu's post-arrest statements should be redacted, however.

The Court concludes that Adamu's post-arrest statements can be redacted to ensure that Landji's Sixth Amendment rights are not violated. While Landji contends that any redaction of his name would be ineffective – because "there is only one person to whom Adamu could be referring with his incriminating statements" (Landji Reply Br. (Dkt. No. 380) at 3) – Adamu's statements refer to multiple people, including Cardona-Cardona and "other business associates." (Tremonte Decl., Ex. A (Dkt. No. 355-1) at 3-4) Accordingly, it is not clear that the use of neutral pronouns, as to certain statements, presents any risk of inculpating Landji in violation of the Sixth Amendment. See, e.g., United States v. Ashburn, 76 F. Supp. 3d 401, 427 (E.D.N.Y. 2014); United States v. Lyle, 919 F.3d 716, 735 (2d Cir. 2019) (finding no Bruton error when "statements referred to multiple people – not only one unnamed person to correspond to the one co-defendant" – and thus "did not present the necessary process-of-elimination problem that left the jury's choice of implied identity narrow" (emphasis, internal quotation marks and citation omitted)). Use of neutral pronouns may not be appropriate as to other

statements, and certain statements – such as Adamu's assumptions about why Cardona and Landji were meeting in Zagreb – are independently inadmissible.

What portions of Adamu's post-arrest statements the Government will seek to introduce, and the precise redaction that will be required, must await trial. Severance is not required, however, because the Court will redact Adamu's post-arrest statements in order to protect Landji's Sixth Amendment rights.

Accordingly, Landji's motion for a severance as to Adamu will be denied.

## II. RETURN OF DOCUMENTS

Defendants were arrested in Croatia in October 2018 and were held in a Croatian jail while awaiting extradition to the United States. While in Croatia, each Defendant was represented by counsel. After extradition was granted, DEA agents took custody of the Defendants, and of personal effects and documents related to their case. (Fihlman Decl. (Dkt. No. 398-1) ¶¶ 3-4) The DEA agents identified "several hundred pages of documents" as potentially related to Defendants' Croatian court proceedings, and – at Defendants' request – the agents separated these documents from other paperwork. (Id. ¶ 5; Waters Decl. (Dkt. No. 398-2) ¶¶ 3-4) The agents did not review these documents, which are in Croatian, a language that the agents do not understand and cannot read. (Id. at ¶¶5, 7; Waters Decl. (Dkt. No. 398-2) ¶¶ 4-5)

On January 21, 2020, as part of Rule 16 discovery, the Government produced to Landji and Adamu copies of the alleged privileged material. (Hellman Decl. (Dkt. No. 398) ¶ 5) The Government has submitted declarations representing that no Government personnel have reviewed the contents of these allegedly privileged documents.[4] (Id. ¶¶ 6-7) Although the

---

[4] In light of the declarations from the Government and DEA personnel, the Defendants' request for a hearing "to determine whether or not the [G]overnment's review of these materials violated

Defendants have received copies of these documents, they seek the return of the originals. (Adamu Br. (Dkt. No. 354) at 3; Landji Br. (Dkt. No. 352) at 9) The Government has denied this request, stating that Defendants have not made an adequate showing that these documents are in fact protected by the attorney-client and/or work product privileges. (Govt. Opp. (Dkt. No. 364) at 19-21)

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011). The purpose of the privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). "In order to balance this protection of confidentiality with the competing value of public disclosure, however, courts apply the privilege only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable." Mejia, 655 F.3d at 132 (quotation marks, alterations, and citation omitted). Defendants bear the burden of establishing the privilege. Id.

Here – although Defendants have copies of the documents at issue – they have not demonstrated that the documents at issue contain communications between Landji and Adamu and their attorneys that were intended to be kept confidential and were used for obtaining or providing legal advice. (Landji Br. (Dkt. No. 352) at 9; Adamu Br .(Dkt. No. 354) at 3-4) Defendants merely state that "[i]t seems beyond dispute that the 'packets' taken from the

---

[Defendant's] Fifth and Sixth Amendment Rights" is denied. (Landji Br. (Dkt. No. 352) at 9; see Adamu Br. (Dkt. No. 354) at 3)

15

defendants included their written communications to and from Croatian counsel." (Landji Reply Br. (Dkt. No. 380) at 5) This assertion does not provide a basis for this Court to find that the documents at issue are protected by the attorney-client or work product privilege. See Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg, 171 F. Supp. 3d 136, 142 (S.D.N.Y. 2016) (denying a request to quash a subpoena where counsel's assertion of attorney-client and work-product privileges "failed to engage the basic work necessary to satisfy their burden of showing that any particular documents or communications are protected from disclosure under either privilege"). Accordingly, Defendants' request for the return of these materials will be denied.

## III.  JURISDICTION

Adamu has moved to dismiss the charges against him for lack of jurisdiction. (Adamu Br. (Dkt. No. 354) at 5-8) He argues that these charges violate his Fifth Amendment due process rights because he is not a U.S. citizen and is not charged with any conduct that took place in the United States. (Id. at 6) Adamu further contends that the alleged involvement of a U.S.-registered and U.S.-owned aircraft is insufficient, because "[t]here is no proof that the aircraft intended to enter into the United States." (Id.)

Although Adamu's conduct occurred outside the United States, it is within the reach of 21 U.S.C. § 959. (See (S1) Indictment (Dkt. No. 39) ¶¶ 1-6) Section 959(c) makes it "unlawful for . . . any person on board an aircraft owned by a United States citizen or registered in the United States[] to . . . distribute . . . or . . . possess a controlled substance or listed chemical with intent to distribute." The statute expressly provides for extraterritorial application. 21 U.S.C. § 959(d) ("This section is intended to reach acts of . . . distribution committed outside the territorial jurisdiction of the United States."). And the Second Circuit has confirmed that

16

Congress intended that the statute be applied to conduct that takes place entirely outside of the United States. United States v. Epskamp, 832 F.3d 154, 166 (2d Cir. 2016).

As to Adamu's due process argument, a "sufficient nexus" must exist to ensure that the extraterritorial application of a federal criminal law, such as Section 959, comports with constitutional due process. See United States v. Yousef, 327 F.3d 56, 111 (2d Cir. 2003). The purpose of this nexus requirement "is to prevent [the] extraterritorial application of U.S. criminal laws from being 'arbitrary or fundamentally unfair.'" United States v. Van Der End, 943 F.3d 98, 106 (2d Cir. 2019) (quoting Epskamp, 832 F.3d at 168). "For non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests." United States v. Al Kassar, 660 F.3d 108, 118 (2d Cir. 2011). "Where Congress expressly intends for a statute to apply extraterritorially, as [this Court] conclude[s] it did here, the 'burden is a heavy one' for a defendant seeking to show that extraterritorial application of the statute violates due process." Epskamp, 832 F.3d at 168. Here, Adamu has not carried that "heavy" burden.

The Second Circuit's decision in Epskamp – which Adamu does not address in his briefing – is dispositive. There, the defendant was a Dutch citizen who boarded a U.S.-registered charter plane in the Dominican Republic to travel to Belgium. The plane contained approximately 1,000 kilograms of cocaine. Id. at 159-60. "The government's evidence showed that the conspirators deliberately sought out a United States-flagged aircraft in order to avoid . . . scrutiny . . . ." Id. at 169. The Second Circuit reasoned that "[t]he United States plainly has an interest in prosecuting narcotics conspiracies that . . . secure United States-registered aircraft with the deliberate intent to exploit the perceived authority and lawfulness of such aircraft," and that the defendant's "behavior was self-evidently criminal" and thus "subject . . . to prosecution

17

somewhere." Id. (quoting Al Kassar, 660 F.3d at 119 ("Fair warning does not require that the defendants understand that they could be subject to criminal prosecution in the United States so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." (emphasis in original))) Given these circumstances, Epskamp's prosecution in the United States did not violate due process. Id.

The facts here are similar. Like Epskamp, Adamu is not a U.S. citizen. He flew between two countries that are outside of the United States, and none of his conduct was aimed at the United States. But Adamu, Landji, and Cardona-Cardona were aware that the G2 was a U.S.-registered plane with a U.S.-based owner. Landji's aviation company had hired Adamu as a pilot, and as a pilot, Adamu would understand the significance of the plane's "N" tail number, which indicates U.S. registration.[5] Having chosen to use a U.S.-registered airplane with a U.S.-based owner to transport cocaine, Adamu and his co-defendants cannot contend that this prosecution violates due process. Accordingly, Adamu's motion to dismiss the charges against him for lack of jurisdiction will be denied.

---

[5] Although the Government is not required to prove that the Defendants understood that their use of a U.S.-registered and U.S.-owned plane would subject them to prosecution in the United States, see Al Kassar, 660 F.3d at 119, there is evidence that the Defendants knew that the plane's relationship with the United States made them subject to prosecution in the United States. Indeed, Cardona-Cardona and Landji discussed altering the plane's tail identification to disguise its connection with the United States.

18

## **CONCLUSION**

For the reasons stated above, Defendants' pretrial motions are denied.

Dated: New York, New York
April 28, 2021

SO ORDERED.

Paul G. Gardephe
United States District Judge