UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-against-

JEAN-CLAUDE OKONGO LANDJI and
JIBRIL ADAMU,

                              Defendants.

**MEMORANDUM
OPINION**

(S1) 18 Cr. 601 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

   Defendants Jean-Claude Okongo Landji and Jibril Adamu are charged in (S1)

Indictment 18 Cr. 601 (PGG) with conspiring to distribute and possess with intent to distribute

five kilograms and more of cocaine on board a U.S.-registered and U.S.-owned aircraft, or by a

U.S. citizen on board any aircraft.  ((S1) Indictment (Dkt. No. 39))

   Defendants contend that (1) agents of the Drug Enforcement Administration

("DEA") seized documents from the Defendants at the time of their extradition from Zagreb,

Croatia; (2) the documents seized from the Defendants contain and reflect attorney-client

communications; (3) DEA personnel and U.S. Attorney's Office personnel improperly accessed

these privileged documents; and (4) as a result, Defendants are entitled to dismissal of the

charges against them in the (S1) Indictment or "a lesser sanction," such as the "disqualification

of the tainted agents and prosecutors or preclusion of evidence developed after the invasion of

the privilege."  (Def. Post-Hrg. Br. (Dkt. No. 554) at 7-13, 36)

   In an October 12, 2021 Order, this Court denied Defendants' motion for dismissal

of the (S1) Indictment or for a lesser sanction.  (Dkt. No. 584)  The purpose of this Memorandum

Opinion is to explain the Court's reasoning.

<u>**BACKGROUND**</u>

I.      <u>**FACTUAL ALLEGATIONS**</u>

Defendant Landji is a United States citizen who owned and operated an aviation charter business.  Landji's company owned a U.S.-registered Gulfstream IIB airplane (the "G2 aircraft") and employed Adamu as a pilot.  (Cardona-Cardona Cmplt. (Dkt. No. 1) ¶¶ 17-18; Apr. 29, 2021 Order (Dkt. No. 460) at 2)[1]

The Government charges that, between April and July 2018, Landji and Adamu's co-defendant – David Cardona-Cardona – engaged in a separate conspiracy to transport more than 1,200 kilograms of cocaine from South America to Holland by marine vessel.  (Cardona-Cardona Cmplt. (Dkt. No. 1) at ¶¶ 23-32)  Cardona-Cardona and his co-conspirators in that conspiracy planned that if this initial shipment to Holland was successful, the same vessel would be used to transport large quantities of cocaine to West Africa.  (Apr. 29, 2021 Order (Dkt. No. 460) at 2)  From there, the cocaine would be flown to buyers in Croatia.  According to the Government, Landji and Adamu – who are both pilots – agreed to transport Cardona-Cardona's cocaine from West Africa to Croatia and other parts of southern Europe, using Landji's G2 aircraft.  (<u>Id.</u>; Cardona-Cardona Cmplt. (Dkt. No. 1) ¶¶ 17, 21)

Landji and Adamu agreed to perform a trial run to Zagreb airport, which would involve a one kilogram "sample" of cocaine.  (Apr. 29, 2021 Order (Dkt. No. 460) at 5)  Once the buyers approved the one kilogram sample, 500 kilograms of cocaine would be flown from West Africa to Croatia.  (Cardona-Cardona Cmplt. (Dkt. No. 1) ¶¶ 20-22)

---

[1] The page numbers referenced in this Memorandum Opinion & Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

In October 2018, Landji and Adamu made final preparations for the flight to Zagreb with the cocaine "sample." Landji filed passport information for the Defendants and flight plans for the G2 aircraft. The flight plans indicated that the G2 aircraft would fly from Africa to Zagreb. Cardona-Cardona confirmed with Adamu that he and Landji were prepared for the flight to Croatia, and merely waiting for delivery of the cocaine sample. (Apr. 29, 2021 Order (Dkt. No. 460) at 5)

On October 30, 2018 – after Landji and Adamu had received the one kilogram "sample" – they flew Landji's plane to Zagreb. Upon landing in Zagreb, Croatian authorities arrested Landji and Adamu, and seized one kilogram of cocaine, as well as Defendants' possessions and cellphones, from the G2 aircraft. (Id.)

## II.   DEFENDANTS' EXTRADITION FROM CROATIA, AND THE SEIZURE, PROCESSING, AND PRODUCTION OF DEFENDANTS' DOCUMENTS[2]

### A.   Defendants' Indictment and Extradition

On November 8, 2018, a grand jury in this District issued an indictment charging Defendants with, inter alia, conspiring to distribute and possess with intent to distribute five kilograms and more of cocaine while on board an aircraft owned by a U.S. citizen or registered in the United States, or by a U.S. citizen on board any aircraft, in violation of 21 U.S.C. §§ 959(c), 959(d), and 963. ((S1) Indictment (Dkt. No. 39))

After their October 30, 2018 arrest in Zagreb, Landji and Adamu were each assigned a court-appointed attorney. Landji was represented by Krešimir Šušnjar, a Croatian attorney who speaks English. (Landji Decl. (Dkt. No. 508-1) ¶¶ 3-4)

---

[2]  The facts set forth below are drawn from hearings conducted on September 9, September 14, and October 8, 2021. (See Dkt. No. 595 (Sept. 9, 2021 Hearing Transcript); Dkt. No. 599 (Sept. 14, 2021 Hearing Transcript); Dkt. No. 610 (Oct. 8, 2021 Hearing Transcript))

On October 17, 2019 – approximately a year after their arrest in Zagreb – Croatian authorities authorized the Defendants' extradition.  (Kastigar Hearing Transcript ("Tr.") 46)

U.S. DEA agents Joseph Catalano and Matthew Fihlman arrived in Zagreb to assist the U.S. Marshal Service with the extradition of the Defendants.  Catalano and Fihlman were responsible for "help[ing] transport the defendants back to the United States from Croatia, as well as bring[ing] [to the United States] any possible nondrug evidence for the case."  (Tr. 13) Agents Catalano and Fihlman took custody of certain materials collected by the Croatian National Police during their investigation, including (1) "binders of Croatian prosecution material and investigative material"; (2) discs containing surveillance footage, photographs, the results of wiretaps, and audio recordings; and (3) sealed, brown paper bags containing physical evidence seized from the G2 aircraft at the time of the Defendants' arrest.  (Tr. 56-57, 230-31)

On the day of the extradition, the Croatian National Police brought the Defendants and their luggage to a police station at the airport in Zagreb.  (Tr. 14-15, 47) Defendants "came with an unusual amount of property for a prisoner transportation."  (Tr. 295)

B.    **The Seizure of Defendants' Documents**

While in the presence of the Defendants, Agents Catalano and Fihlman searched their luggage.  Each Defendant "acknowledged to [the agents] that that was their suitcase and it was their items."  (Tr. 18, 20, 30, 48)  Because the Defendants "were not going to be allowed to take anything with them on the flight," Agents Catalano and Fihlman quickly sorted through the items in the suitcases, separating out "any money, any valuables, religious items and clothes." (Tr. 15, 28-29, 48-50)  These items were left with Landji's Croatian counsel.  (Tr. at 15, 77, 96)

The Defendants' suitcases contained thousands of pages of documents, which the agents seized as possible non-drug evidence ("Defendants' Documents").  (Tr. 29, 51, 304) "[A]lmost every document that was in the [Defendants'] suitcases," including "receipts, [documents that contained] handwriting, [and] business cards," was looked over "briefly."  (Tr. 15)  Agent Catalano and Agent Fihlman did not read the documents, but instead "glanced" at them as they quickly "shuffl[ed] through" the contents of the suitcases, "making sure there was no drug or weapons, and then separating any money and jewelry."  (Tr. 18-19, 32-33, 51-53, 80-81)  The agents seized items such as "leather binders[] and flight logs," because they "seemed like something that would have come from the airplane."  (Tr. 116; see also Tr. 51)

Defendants claim that some of the documents the agents seized contain privileged communications.  Landji says that his "legal documents" were stored in a blue cloth bag in his suitcase.  The blue bag contained a memorandum prepared by Landji's Croatian counsel, in which the lawyer set forth his "legal opinion on different aspects of [Landji's] case and a strategy to defend [him] against the charges."  (Landji Decl. (Dkt. No. 508-1) ¶¶ 7-9)  The blue bag also contained documents from Landji's counsel on which Landji "took notes" to remind himself "of issues and potential defenses . . . to discuss with [his] attorney."  (Id. ¶¶ 5-6, 9; Sept. 7, 2021 Def. Br. (Dkt. No. 525) at 1)

Adamu claims that his documents also contained privileged material, including "a notebook containing over one hundred pages of Mr. Adamu's notes, taken both in anticipation of and during meetings with his lawyer."  (Sept. 7, 2021 Def. Br. (Dkt. No. 525) at 2)

Agent Fihlman testified that Adamu told him that some of the documents in Adamu's suitcase were "important court papers" that he wanted to keep.[3]  (Tr. 54-55, 78-80, 97-99; see DX 5 at 1)  Agent Fihlman understood Adamu to be referencing "something like a description of a hearing, a proceeding, something that could possibly be a public record."  (Tr. 54-55)  Neither Defendant said that the "court papers" "came specifically from their attorney" (Tr. 56), and "it didn't strike [Agent Fihlman] that [the 'court papers'] would have been privileged."  (Tr. 117)

Agent Fihlman told Adamu that he would not be permitted to carry the documents on the plane, but that he would "be seeing an American defense attorney as soon as [he] land[s] in New York," and that he could "explain the situation to [his] defense attorney, to then have the conversation with the AUSA about getting the documents back."  (Tr. 82, 84)  As Agent Fihlman sorted through the Defendants' Documents and personal belongings, he noticed "official Croatian public proceeding documents," and documents bearing a seal from the Croatian Ministry of Justice.  (Tr. 54, 85)  Agent Fihlman did not tell any other agent that Adamu said that he had "important court papers" that he wanted returned.  (Tr. 83)

The agents placed some of the loose documents inside unsealed DEA evidence bags.  These evidence bags were marked with the name of the Defendant from whom the documents had been seized.  Some of the notebooks and folders seized from the Defendants were too large to fit inside an evidence bag.  Similarly, Landji's blue bag was too large to fit inside an evidence bag.  Agent Catalano took photographs of the evidence bags containing the documents – along with the other belongings seized from the Defendants – in order to show which

---

[3]  Deputy U.S. Marshal Marco Tramontana testified that, during the extradition process, one of the Defendants – he did not specify whether Adamu or Landji – said "my legal work is in the luggage," and that those "documents [were] in each one of [his] suitcases."  (Tr. 294, 297)

documents belonged to which Defendant.  (Tr. 17-18, 30-32, 34-37, 52; GX 1 (photograph of

Landji documents), GX 2 (photograph of Adamu documents))

>           After separating Defendants' Documents from their personal effects, Agents

Catalano and Fihlman put Defendants' Documents inside a suitcase.  Inside that same suitcase

the agents placed materials provided by the Croatian National Police and the Croatian

prosecutor, including "sealed paper bags of evidence and a receipt of what those items were, . . .

very big prosecutor files," and "several stacks of compact discs that contained recordings."  The

suitcase was then loaded onto the plane in which Defendants were to be transported to the United

States.  (Tr. 20-21, 35-36, 56-57)

>           The plane landed in White Plains, New York, where it was met by DEA

Supervisory Special Agent Kyle Brannon and Jeff Lloyd, a DEA intelligence research analyst.

(Tr. 22, 57-58, 169-170, 212)  Agent Catalano, Agent Brannon, and Analyst Lloyd transported

the suitcase to a hotel in Manhattan, where they remained overnight.  The next morning, the

agents and Lloyd transported the suitcase to DEA's offices in Chantilly, Virginia.  (Tr. 22-23,

171, 214)  Once at the Chantilly office, Defendants' Documents were placed in a temporary

storage locker.  They were later moved to a safe in Agent Brannon's office.  (Tr. 23, 215-16; GX

6)  Agent Catalano told other agents that he had seized documents that the Defendants had had

with them in Croatia while awaiting extradition.  (Tr. 139)

>           After transporting Defendants' Documents to Chantilly, neither Agent Catalano

nor Agent Fihlman ever looked at them again.  Agents Catalano and Fihlman likewise took no

investigative steps based on anything they had seen in Defendants' Documents, and they did not

tell prosecutors about anything they had seen in those documents.  (Tr. 24, 58-60, 89-90, 335,

347)

C.     **The Scanning of Defendants' Documents**

After Defendants' Documents were brought to DEA's Chantilly office, DEA

personnel scanned the documents so that they could be transmitted to the U.S. Attorney's Office,

where "someone else would make [the] decision" as to "what was important and what was not

important" among the documents.  (Tr. 166; see id. at 184 (Analyst Lloyd testifying that he

scanned a portion of Defendants' Documents after "receiv[ing] an email from one of the

prosecutors asking for the discovery in the case"); GX 7 at 4 (Nov. 4, 2019 email from DEA

Special Agent Waters responding to Assistant United States Attorney ("AUSA") Elizabeth Hanft

and copying Analyst Lloyd, explaining that "[g]etting the Croatian discovery out is a top

priority" and that "it is pretty voluminous"))  The DEA personnel understood that to the extent

the documents were "responsive to the request for discovery," they would then be "provided to

defense attorneys."  (Tr. 185)

A week after the documents had been placed in a temporary storage locker in the

Chantilly DEA office, DEA Special Agent Waters "ma[de] an assessment of" the contents of the

evidence bags utilized in Croatia, along with the loose notebooks and binders, which had been

placed inside two larger evidence bags.[4]  Agent Waters labeled one of the large evidence bags

"Adamu," and the other "Landji."  (Tr. 121-24 (Agent Waters testifying that the bag depicted in

GX 4 was labeled "Adamu" and the bag depicted in GX 5 was labeled "Landji"), 152, 167, 142;

GX 3-5 (photographs of evidence bags))  The materials placed in these larger evidence bags

were not organized in any particular way.  (Tr. 125, 174)  Moreover, there was not a clear

---

[4]  The record is not clear as to when the unsealed evidence bags and materials depicted in GX 1
and GX 2 were placed in larger evidence bags.  Agent Waters testified that when he "first [came]
into contact" with Defendants' documents, "there were two larger bags," which he identified as
GX 4 and GX 5, and "two smaller bags, which [GX] 3 is one of them, inside the larger bags."
When Waters first retrieved the bags, GX 3 was contained inside GX 5.  (Tr. 121-22)

delineation between Landji and Adamu documents within the evidence bags – some Landji documents were placed in the bag labeled "Adamu," and some of Adamu's documents were placed in the bag labeled "Landji."  (See Biale Decl. (Dkt. No. 508-2) ¶ 14; Sept. 7, 2021 Def. Br. (Dkt. No. 525) at 2 n.1)

Agent Waters and Analyst Lloyd scanned Defendants' Documents so that they could be transmitted to the prosecutors in New York.  Waters scanned the documents in the bag marked "Adamu," while Lloyd scanned the documents in the bag marked "Landji."  (Tr. 124, 172-73)  Waters intermittently scanned Adamu's documents over one or two days, while Lloyd spent "a single afternoon" scanning Landji's documents.  (Tr. 128, 163, 176, 191-92)

In scanning Defendants' Documents, Agent Waters and Analyst Lloyd did not remove documents from the evidence bags in any particular order, and did not replace them in the evidence bags in any particular order.  (Tr. 130, 176)  Agent Waters testified that he "randomly [took] things out of the bag" and if it fit in his scanner, he scanned it.  Items such as a spiral-bound notebook that would not fit in the scanner "were not scanned."  (Tr. 126, 163-64)  Analyst Lloyd made photocopies of items that would not fit in his scanner, scanned the photocopied pages, and then shredded the photocopies.  (Tr. 175, 179, 190-91)

Analyst Lloyd testified that, in scanning Landji's documents, he scanned "everything that had writing on it."  (Tr. 186-87, 189)  In scanning Adamu's documents, Agent Waters conducted a "quick . . . review" to determine whether an item might have evidentiary value.  "[D]ocuments that appeared to be official" were scanned, while generic items, such as "a travel brochure or a menu," were not scanned, because Waters assumed that the latter had no evidentiary value.  (Tr. 126-27; 145-46, 163)  Aside from items such as travel brochures and

menus, and items that were too large to fit in his scanner, Agent Waters "did [his] due diligence to scan" everything else.  (Tr. 164)

During this time – early November 2019 – DEA personnel transmitted to the U.S. Attorney's Office ("USAO") materials provided by the Croatian authorities, including binders of documents, paper bags of evidence seized from Landji's G2 aircraft at the time of Defendants' arrest, and discs containing, among other things, surveillance footage and wiretap recordings.  In a November 8, 2019 email to Analyst Lloyd, AUSA Matthew Hellman discussed his plan for reviewing the paper bags of evidence provided by the Croatian authorities.  (GX 7 at 2)  In response, Analyst Lloyd told Hellman that

> [w]e forgot to mention there was other paperwork we were given for both Adamu and [L]andji that was not in those [paper] bags.  It appears to be mostly paperwork they collected while they were sitting in jail waiting extradition.  [Agent Waters] is putting that in our non drug evidence so we are photocopying it.  I have the [L]andji stuff copied and scanned, he is working on the [A]damu stuff.  I think we can either email that or upload it to usafx since it'll just be scanned documents.  I'll follow up with him to see if he's done with his part and I'll get that to you next week.

(GX 7 at 1-2)[5]

Later that day, Analyst Lloyd informed Hellman that "[t]he [L]andji stuff was maybe about 100 pages or so – some of it was business plans related to [Ok]land aviation."[6] Lloyd offered to provide a CD containing scans of this material.  In an email sent a short time later Lloyd wrote, "actually let me see if the files are small enough to email."  Hellman replied, "Received six emails."  Lloyd answered:  "That should be it for him.  I'll check on the adamu stuff when I get back."  (GX 7 at 1)  At the <u>Kastigar</u> hearing, Analyst Lloyd testified that he "saved the PDF files [of the scanned copies of Landji's documents] in [the DEA's] electronic

---

[5]  USAFX is a cloud-based service that the USAO uses to transfer electronic files.  (Tr. 233)
[6]  Although Analyst Lloyd informed Hellman that Landji's documents comprised "100 pages or so" (GX 7 at 1), Defendants represent that Landji's documents total 1,404 pages.  (Tr. 303-04)

case management folder, and then . . . provided copies of those to AUSA Hellman" in November 2019.[7] (Tr. 177; see also Tr. 233 (Hellman testifying that Analyst Lloyd sent "approximately six" PDFs of scanned documents to him via email))  Hellman testified that he did not open or review the PDFs of the scanned documents Analyst Lloyd transmitted to him because he thought – incorrectly – that these scanned documents were duplicates of materials Croatian authorities had supplied in paper bags, which Hellman was then reviewing.  (Tr. 236)

Agent Waters and Analyst Lloyd testified that – as they scanned Defendants' documents – they did not read them.  (Tr. 127-28, 175)  Indeed, Agent Waters testified that he has no "knowledge of [their] content."  (Tr. 128)  Agent Waters noticed "some documents that appeared to be official," but he did not determine whether those documents were "court, legal, or police documents," and he "did not spend the time to figure out exactly what they were."  (Tr. 126-27, 145-46)  Agent Waters does not recall seeing handwritten notes, memoranda, or a blue bag, and does not recall scanning documents contained inside a blue bag.  (Tr. 127-29, 158-59)  Similarly, Analyst Lloyd testified that he had no more "than a passing glimpse of things as [he] was handling the documents."  (Tr. 175)  Lloyd does recall seeing a blue bag, handwritten notes, notebooks, a flight manual, and references to "[Ok]land Aviation."  (Tr. 175, 194-95)  When the scanning was completed, the evidence bags were returned to the safe in Agent Brannon's office.  (Tr. 130, 176)

In the months after scanning Defendants' Documents, Agent Waters and Analyst Lloyd "participated in proffers or interviews of people involved in the case."  (Tr. 131, 179)

---

[7]  In a September 8, 2021 letter, Landji's counsel states that "the native files of the six emails that Lloyd sent AUSA Hellman on November 8, 2019, attaching PDFs of 'paperwork [the defendants] collected while they were sitting in jail awaiting extradition'" "do not include the privileged documents identified in Mr. Landji's renewed motion, such as the legal memo from his Croatian attorney."  (Sept. 8, 2021 Def. Ltr. (Dkt. No. 529))

Neither took any investigative steps based on what they had seen in Defendants' Documents,

however, and neither had substantive discussions with prosecutors about the contents of

Defendants' Documents.  (Tr. 131, 340-41 360; see also Tr. 179-80 (Analyst Lloyd reported to

AUSA Hellman that he had merely "glimpsed" Defendants' Documents while scanning them);

Tr. 193-94 (Analyst Lloyd reported to prosecutors that he recalled seeing "aviation[-]related"

documents, including some with "references to [Ok]land Aviation," a flight log, and "court

documents"))

### D.      The U.S. Attorney's Office Produces Portions of Defendants' Documents

On November 21, 2019, Agent Waters informed Hellman and AUSA Elizabeth

Hanft that he had left a hard drive containing "additional copies [of the] misc documents for [the

Defendants]" with Michael DeLuca, a USAO paralegal.  (DX 20 at 1-2; Tr. 130-31, 154-55)

Hellman asked DeLuca what the hard drive contained.  DeLuca reported that the contents looked

"mostly like documents," with data from a few electronic devices saved in a separate folder.

(DX 20)  Although Hellman did not know it at the time, the PDFs that Lloyd had emailed to

Hellman earlier that month – which contained scans of Landji's documents – were on the hard

drive, along with the scans that Waters had made of Adamu's documents.  (See Tr. 233, 439)

Meanwhile, Thomas Dunn – Adamu's lawyer – was requesting access to the

materials seized from Adamu at the time of his extradition from Croatia.  In an October 30, 2019

email to AUSA David Denton – who was then assigned to this case – Dunn requested the return

of "documents and property" seized from Adamu when he was extradited.[8]  Dunn explained that

agents had told Adamu that his "property and documents [had been seized because they] were

_____

[8]  Dunn also notes that he "didn't hear back from [Denton]" about Dunn's earlier request for the
return of Adamu's "documents and property."  (DX 15 at 5)

evidence." (DX 15 at 5)  In a November 8, 2019 email to Denton – with a copy to James DeVita, who was then representing Landji – Dunn states that he "got no response" to his October 30, 2019 email, and he again requests the material seized from Adamu at the time of his extradition.  (Id. at 4-5)  Dunn also asks when he and DeVita can "expect the discovery." (Id. at 5)  Hellman responds that he will "provide the global discovery," and that he is reviewing "[a]dditional materials received from Croatia," and that the USAO will "get [Dunn and DeVita] the discovery ASAP." (Id. at 2)

In a November 18, 2019 email to Hellman – with a copy to Denton, Hanft, AUSA Amanda Houle, and DeVita – Dunn makes clear that he is not seeking the Croatian discovery Hellman had referenced.  Dunn emphasizes that he wants "the actual papers [taken from Adamu during his extradition,] including the tape of a phone call which Adamu received from his lawyer in Croatia," and "any notes made by Adamu." (Id.)

In an email exchange with Hellman later that day, with a copy to Denton and Houle, AUSA Hanft states that she believes that Dunn "has been trying to say he believes something beyond discovery items were taken from his client in transit," and that she is concerned that what was taken from Adamu might be "something [prosecutors] shouldn't be looking at for some reason or another."[9]  (Id. at 1; Tr. 259-61)  Hanft wrote that it "[s]eems like [Dunn is] saying a lawyer communication may have been involved" in the documents seized from Adamu during his extradition.  (DX 16 at 1; Tr. 262-63)  She asks Hellman if DeVita is "saying something similar," and suggests "hav[ing] a conversation with them to flesh out exactly what they are asking for/claiming."[10]  (DX 16 at 1)

---

[9]  Neither side called Hanft to testify at the Kastigar hearing.
[10]  The record does not reflect what, if any, communications were taking place between Hellman and DeVita in November 2019 regarding documents seized from Landji at the time of his

At the <u>Kastigar</u> hearing, Hellman acknowledged that he was aware – by November 2019 – "of the possibility that the agents might have seized privileged documents from the defendants."  (Tr. 250)

Hellman did not arrange for a taint team to determine whether privileged documents had been seized from the Defendants in Zagreb, however.  Nor did he take any other steps to determine what materials the DEA agents had seized from the Defendants at the time of their extradition.  (Tr. 265-66)  Instead, he "had conversations with Mr. Dunn and Mr. DeVita" concerning the materials that they were seeking.  (Tr. 264)  Based on Hellman's conversations with Dunn and DeVita, and his mistaken belief that the materials defense counsel were seeking were part of the materials supplied by the Croatian authorities, Hellman concluded that the materials Dunn and DeVita were seeking – documents seized from the Defendants at the Zagreb airport – were not privileged.  (Tr. 264-66, 268)

Hellman testified that he believed that Dunn and DeVita had "agree[d]" that the documents were not privileged, citing emails to defense counsel in which he had "memorialized" their conversation.[11]  (Tr. 266, 268; <u>see</u> DX 18 (Jan. 6, 2020 email from Hellman to Dunn, copying Houle, Denton, and Hanft, stating that, "based on our prior conversations it is my understanding that these documents, although discussed with a lawyer in Croatia, are not privileged"))  Hellman further testified that this understanding was based on "[c]onversations [Hellman had] had up to that point with Mr. Dunn about the exact nature of the documents he

extradition, although had Dunn noted in his October 30, 2019 email that "[Landji] also had his property taken" at the time of extradition.  (DX 15 at 5)
[11]  It is not clear what Dunn or DeVita said that gave Hellman the impression that the documents defense counsel was seeking were not privileged.  Dunn states that he has "no recollection" of ever telling Hellman that Adamu's documents "were not privileged," and that he "strongly doubt[s that he ever] said that."  (Adamu Reply Ltr. (Dkt. No. 572) at 1)

wanted copies of," which Dunn described as "related to the Croatian court proceedings that his

client had discussed with an attorney, but they were either prosecution or court documents, . . .

not documents prepared by an attorney."  (Tr. 276-77)

        Dunn's efforts to recover the documents seized from Adamu did not end in

November 2019.  In December 2019, Hellman arranged for a production of materials supplied by

Croatian law enforcement authorities.  He instructed Dunn to supply a one-terabyte hard drive

"onto which [the Government would] load everything."  (DX 17 at 2; Tr. 270)  In a January 6,

2020 email to Hellman, copying Houle, Denton, and Hanft, Dunn wrote:

> I am having difficulty with the discovery.  The PDFs are fine but I cannot open other things.  In particular I cannot open the Adamu discovery.
>
> Also I understand there is at least one recorded telephone call.  Could you direct [me] where I would find it.
>
> If necessary I can bring my laptop over to you with the hard drive and try to figure out how to open files.
>
> Finally within days of Adamu appearing here I have asked a number of times for the papers including the recording which the DEA took from him in Croatia.  Can I please have those documents and recording.  He was provided these documents by his Croatian lawyer, which related to this case.

(DX 17 at 1; Tr. 270-71)[12]

        In a January 6, 2020 email to Hellman, Houle, and Denton, Hanft wrote that

Dunn's email was "troubling," and that "it sounds like [Dunn had] only just scratched the

surface" of the voluminous discovery.  She added that she would "see if DeLuca can reach out to

him to assist him in opening things."  (DX 17 at 1; Tr. 271)  Hanft also asked Hellman whether

---

[12]  Hellman testified that, at this time, he was "having conversations [with DeVita] that were similar to those [he] was having with Mr. Dunn."  DeVita was seeking "copies" of Landji's "documents and materials that had been seized in connection with the extradition."  DeVita did not raise concerns about privileged material until after Dunn's January 6, 2020 email exchange with Hellman, however.  (Tr. 278-79)

he "spoke to [Dunn] about whatever papers and recordings these are," and advised him to "make sure any of those conversations are documented, since it seems like what is conveyed in phone calls may not be getting across."  (DX 17 at 1; Tr. 271)

Although Dunn had repeatedly stated that he was seeking documents that had been "provided [to Adamu] by his Croatian lawyer" (DX 17 at 1; Tr. 270-71), Hellman did not arrange for a taint team to determine whether privileged material had been seized from the Defendants in Zagreb.  Instead, in a January 6, 2020 email to Dunn, with a copy to Houle, Denton, and Hanft, Hellman provided DeLuca's contact information for technical and "logistical issues [Dunn was having] with the discovery."  (DX 18 at 1; Tr. 272-73 (Hellman testifying that he "tr[ied] to help facilitate [Dunn's] access to the discovery" that Hellman had provided, namely the materials provided by the Croatian authorities))

With respect to the materials seized from Adamu at the time of his extradition, Hellman wrote:

> [Y]ou and I have spoken about [the documents seized from Adamu during his extradition] a number of times, and I do believe we have given you everything in discovery that DEA has given us.  Maybe you have not been able to access it yet, but the discovery we provided included substantial documentation from Croatia – after you've solved the logistical issues you should be able to confirm with Adamu whether the documents and/or recordings are in fact not present.

(DX 18 at 1)  Hellman testified that he believed that Dunn already had the material taken from Adamu at the time of his extradition, because Dunn "had everything [Hellman] had that had been obtained and in relation to the defendants in the Croatian extradition."  (Tr. 273)

With respect to the material provided to Adamu by his Croatian lawyer that Dunn had been seeking, Hellman asked Dunn to

> be more specific about what these documents are (based on our prior conversations it is my understanding that these documents, although discussed with a lawyer in Croatia, are not privileged – if any are, please make that clear immediately so we do not inadvertently

16

review or request anything that is privileged) and the nature of the recording, that would be useful.  For example, with respect to the recording, it is not clear the meaning of the phrase that a recording "was taken from him" – does that mean, for example, that the DEA made a recording of him, or some other permutation.  I will make further inquiries with the agents and the country contacts to try and track down whatever these documents and/or recordings are, but any greater detail you can provide will help me confirm whether we've already turned these materials over to you, or if these are materials we need to identify.

(DX 18 at 1)  Hellman also invited Dunn to "come look at the physical evidence – which includes documents taken from your client's possessions on the plane, including portfolios, notes, identification cards, travel itineraries, flight logs, and the like," noting that he had previously invited Dunn to inspect this evidence.  (Id.)

Later that day, Hellman sent an email to Agents Brannon, Waters, and Kohut, Analyst Lloyd, and other DEA personnel concerning Dunn's request for documents seized from Adamu at the time of his extradition:

> [Dunn] is requesting: "the papers including the recording which the DEA took from him in Croatia. . . He was provided these documents by his Croatian lawyer which related to this case."
>
> I have asked the attorney for some clarification as to what these documents and the alleged recording are.  Needless to say, we turned over everything we got from the Croatians already.  I suspect any documents his lawyer provided could have been the notice of rights forms and other charging documents he received during his prosecution.  I do not know what the recording allegedly is.
>
> While we wait for clarification, if anybody has a sense of what this is – i.e., is there any record or recollection of anyone taking papers from Adamu in Croatia, whether those are documents, recordings, or otherwise?  Was a recording made of Adamu by DEA?  Was a recording taken from him?
>
> Alternatively, . . . did anyone from USMS reach out about documents/papers/recordings/evidence that was in Adamu's possession when they traveled to get him from Croatia?  I'll follow up with them separately, but wanted to cast a wide net.

(DX 19)  On January 7, 2020, Agent Brannon added to the email chain other agents "from the investigation who may [be able to] shed light," including Agent Matthew Fihlman.  (DX 5 at 2)

In a January 8, 2020 email, Agent Fihlman discussed his role in seizing

Defendants' Documents at their extradition:

> [W]hen [Defendants] arrived at the airport police station prior to their transfer to the [United States], they both had significant amounts of paperwork and personal belongings with them which were contained in two large suitcases and a backpack and briefcase. . . . On the morning of the extradition, A[damu] did mention to me that one of his folders contained important court papers from the investigation in Croatia. However, due to the time constraints to make an on-time departure, we weren't able to examine each document as thoroughly as I would have liked. Also, if I recall correctly, many of the documents were in Croatian which I don't understand. So just to be safe, I made the decision to treat everything as evidence to sort through at a later date.

(DX 5 at 1) Fihlman further explained that Defendants' Documents were "turned over to

[Agent] Waters for processing at the [Bilateral Investigations Unit, 'BIU']." (Id. at 2)

Hellman then contacted Agent Waters about Agent Fihlman's email concerning

the seizure of Defendants' Documents at the Zagreb airport. (Tr. 232, 266-67) After speaking

with Agents Fihlman and Waters, Hellman realized – for the first time – that the documents

seized from the Defendants at the time of their extradition were "an additional category of

documentation" not included in the materials provided by the Croatian authorities, and that

Defendants' Documents had not yet been produced to defense counsel.[13] (Tr. 232-33, 236, 266-

69) Hellman also concluded, as a result of "the conversations [he] had been having with [Dunn]

. . . that there was a potential privilege issue."[14] (Tr. 237) Although Hellman had understood,

"based on the earlier conversations with Mr. Dunn, that they weren't actually privileged

---

[13] Although Analyst Lloyd had informed Hellman in a November 8, 2019 email that "there was other paperwork [the DEA agents] were given for both Adamu and [L]andji that was not in those [paper] bags [provided by the Croatian authorities]," and that this additional "paperwork [was material that the Defendants had] collected while they were sitting in jail waiting extradition" (GX 7 at 1), Hellman testified that he "didn't make the connection at the time" between what Analyst Lloyd had scanned and emailed to him and the request from Dunn. (Tr. 281-82)

[14] Hellman testified that DeVita did not make a claim of privilege as to Landji's materials until January 21, 2020. (Tr. 402-04)

materials," Hellman acknowledged that he "had also been under the impression that [he] had everything already and [had] produced it to defense counsel."  (Tr. 403)  "So in light of the fact that there were new materials [that he] didn't know about before," and that he had "been having privilege-related discussions" with Dunn, Hellman "determined that he would not look at [Defendants' Documents] and [would instead] produce them directly to counsel."  (Tr. 403)

        Hellman did not arrange for a taint team to determine whether privileged documents had in fact been seized from the Defendants in Zagreb, however.  Instead, he verbally "advis[ed] agents and members of the [USAO] not to review these documents while we learn what, if anything, privilege[d] they might contain."  (Tr. 237)  Hellman asked Agent Waters "to make it clear [to other DEA personnel] that the documents should not be reviewed."  (Tr. 405-06)

        Hellman further directed "Agent Waters to provide . . . the scans that he had in his possession of [Defendants' Documents] and upload them to a file-sharing service" so that the Government "could produce them to the defense attorneys."  (Tr. 267; see also Tr. 233-34) Agent Waters then transmitted the electronically stored copies of Defendants' Documents to the USAO through a file exchange service.  (Tr. 130-31, 154, 203)  Although Hellman did not realize it at the time, the material that Agent Waters uploaded to the file share platform was the same as the contents of the hard drive that Agent Waters had delivered to the USAO in November 2019, which contained the PDFs that Analyst Lloyd had emailed to Hellman on November 8, 2019.  (Tr. 130-31, 233; see also Tr. 154 (Waters testimony) ("Q.  In what form did you provide copies of the documents to the U.S. Attorney's Office?  A. A hard drive and then electronic file transfer."), Tr. 401)

Hellman testified that he told Paralegal DeLuca "to download the materials that were sent and to prepare them for discovery, but that we weren't reviewing them." (Tr. 410) Hellman also testified that "typically paralegals don't review the contents of documents being produced in discovery unless they're specifically asked to," and that the Bates-stamping process is done automatically and does not require the opening of individual files. (Tr. 410, 418) After receiving the file transfer on January 8, 2020, DeLuca accessed the documents and electronically Bates-stamped them. (Tr. 234) That same day – January 8, 2020 – DeLuca wrote to Hellman that he "[w]as trying to figure out why that stuff looked familiar. It was included in some materials that Doug [Waters] gave us on 11/24." (DX 20 at 1; Tr. 283-86)

Hellman and Hanft also accessed the materials from Agent Waters on the file sharing platform. On January 14, 2020, DeLuca emailed Hellman and Hanft a link and asked them to "confirm[] that the below is what we want to produce." (DX 21 at 1-2) Hanft responded on January 15, 2020, suggesting that the "consular notification form and fax cover sheet" be deleted, and that certain photographs attached to her email be added. (Id. at 1) Hellman responded, stating that he had "added these photos to each folder, and deleted the consular notification stuff [Hanft] had mentioned." Hellman further stated that he had "[r]eviewed the rest and agree these are right." (Id.; Tr. 287-89) At the Kastigar hearing, Hellman testified that although he had reviewed the file names, he did not open the individual files on the file sharing platform. (Tr. 237)

On January 21, 2020, DeLuca produced to Defendants the electronic scans of Defendants' Documents stored on the file sharing platform. (Tr. 234) At that time, Hellman believed that this material constituted all of the documents in the DEA's possession that agents had seized from Defendants at the time of their extradition. As discussed below, however,

Hellman learned in July 2021 that more documents had been seized from Defendants than were produced to them on January 21, 2020.  (Tr. 237-38, 418-19)

III.    **DEFENDANTS' PRETRIAL MOTIONS**

Landji and Adamu filed pre-trial motions on October 5 and 7, 2020, respectively. (Dkt. Nos. 352, 354)  Defendants sought a severance from others named in the (S1) Indictment, and Landji sought a severance from Adamu.  Adamu moved to dismiss the charges against him for lack of jurisdiction.  And both Defendants moved for the return of documents seized from them at the time of their extradition, arguing that these documents contained privileged communications.

Adamu asserted that "[DEA] agents took possession of [his] legal papers, which included documents concerning attorney-client communications with Mr. Adamu and his lawyer," and that "[i]ncluded in the legal papers was his lawyer's work-product."  Landji asserted that DEA "agents took possession of certain documents belonging to Mr. Landji, including documents reflecting attorney-client communications between Mr. Landji and his Croatian counsel, as well as Croatian counsel's work product."  (Adamu Br. (Dkt. No. 354) at 3; Landji Br. (Dkt. No. 352) at 9)  Although Defendants' assertions were not supported by an affidavit or declaration from Adamu or Landji, they requested a hearing "to determine whether or not the [G]overnment's review of these materials violated [their] Fifth and Sixth Amendment Rights."  (Landji Br. (Dkt. No. 352) at 9; see Adamu Br. (Dkt. No. 354) at 3)

The Government urged that Defendants' application regarding their allegedly privileged documents be denied.  (Govt. Opp. (Dkt. No. 364) at 18)  In its briefing, the Government asserted that it had "provided all of the materials in its possession that are responsive to the Defendants' request" by producing scans of these materials to Landji and

Adamu on January 21, 2020. (<u>Id.</u> at 18-20) The Government further contended that "because counsel for the Defendants previously represented that these materials might contain privileged communications, the Government did not review those documents before producing them and still has not reviewed them." The Government further represented that DEA personnel had not reviewed these materials. (<u>Id.</u> at 20) To the extent that Defendants sought the return of their original documents (<u>see</u> Adamu Br. (Dkt. No. 354) at 3; Landji Br. (Dkt. No. 352) at 9), the Government argued that Defendants had not shown a right to such relief because – despite their access to electronic versions of these documents – they had not demonstrated that any of these documents were protected by the attorney-client privilege. (Govt. Opp. (Dkt. No. 364) at 20)

In his reply, Landji complained that the Government's "conclusory assertion[s]" regarding (1) its production of all materials seized from Defendants; and (2) the fact that neither the Government nor DEA personnel had reviewed Defendants' Documents, were not supported by affidavit or declaration. (Landji Reply Br. (Dkt. No. 380) at 5-6)[15]

At a November 20, 2020 conference, the Court ordered the Government to submit "appropriate declarations or affidavits addressing both review of [Defendants'] seized materials by anyone at the U.S. Attorney's office as well as a declaration or affidavit from an appropriate individual at the DEA with respect to any possible review by someone at DEA with respect to the materials that Mr. Landji has put in issue." (Nov. 20, 2020 Conf. Tr. (Dkt. No. 391) at 5; <u>see also</u> Nov. 20, 2020 Order (Dkt. No. 390))

In a December 2, 2020 declaration, AUSA Hellman states that "the only DEA personnel who have handled the Documents or reviewed them in any respect are Special Agents

---

[15]   As discussed above, however, Landji and Adamu's assertions that attorney-client material had been seized from them at the time of their extradition were likewise not supported by affidavit or declaration.

Joseph Catalano, Matthew Fihlman, and Douglas Waters, and Analyst Jeffrey Lloyd."[16]
(Hellman Decl. (Dkt. No. 398) ¶ 4)  Hellman further states that "many of the Documents appear
to be in Croatian," and that none of the DEA personnel can read Croatian.  Hellman also
represents that DEA personnel "did not review the contents of the Documents, apart from [a]
limited viewing."  (Id.)

Hellman states that he and Agent Waters "assembled copies of the Documents,
and . . . produced copies of the Documents to the Defendants" on January 21, 2020.  (Id. ¶ 5)
Hellman further represents that he has "not reviewed the contents of the Documents," that no
"other AUSAs with past and/or present involvement in the investigation and prosecution of this
case" have reviewed the Documents, and that no other "personnel of the United States
Attorney's Office" has reviewed the Documents.  (Id. ¶¶ 6-7)

In response to the Court's November 20, 2020 Order, the Government also
submitted declarations from Agents Fihlman and Waters (See Dkt. Nos. 398-1, 398-2), which
Hellman drafted.  (Tr. 90-91, 140-41)

In his declaration, Agent Fihlman states that he and Agent Catalano assisted in the
extradition of the Defendants on October 17, 2019.  When the Defendants were transferred to
American custody, "the Croatian authorities also provided [the DEA agents with] paperwork and
personal effects from each of the Defendants.  The Defendants asked [Fihlman] to separate their
paperwork from their effects," and "Adamu asked that specific court paperwork be transferred
with him during the extradition."  (Fihlman Decl. (Dkt. No. 398-1) ¶¶ 3-5)

[Fihlman] identified documents in the Defendants' respective personal property that
appeared on their face to be related to their Croatian proceedings and responsive to their

---

[16] "Documents" is defined in the Hellman declaration as "certain documents which had been in
the Defendants' possession prior to their extradition from Croatia to the United States."
(Hellman Decl. (Dkt. No. 398) ¶ 3)

> requests (e.g., documents that appeared to bear Croatian writing and judicial markings or
> appeared to contain handwritten notes in Croatian). . . . The combined documents
> appeared to contain papers aside from the Croatian language documents, such as business
> cards, travel brochures, maps, or other flight-related paperwork.  [Fihlman] gathered and
> packaged the paperwork in two packets, with one packet containing the paperwork from
> defendant Adamu and the other packet containing the paperwork from defendant Landji
> (collectively, the "Documents").

(Id. ¶ 5)  Agent Fihlman states that he did not review the contents of the documents and that he

"cannot read the Croatian language."  (Id. ¶¶ 5, 7)

In Agent Waters' declaration, he states that – at the time of the Defendants'

extradition – agents took custody of, "among other things, two packets, each containing

approximately several hundred pages of documents, which [Agent Waters] understood the

Defendants had asked to be transferred with them during their extradition."  (Waters Decl. (Dkt.

No. 398-2) ¶ 3)  Agent Waters states that the Documents "appeared on their face to be related to

the Defendants' Croatian proceedings (e.g., documents that appeared to bear Croatian writing

and judicial markings or appeared to contain handwritten notes in Croatian). . . . Some of the

Documents appeared to be business cards, travel brochures, or other paperwork."  (Id. ¶ 4)

Agent Waters further states that he did not review the contents of the documents and that he

cannot read Croatian.  (Id. ¶¶ 4-5)

Based on the declarations submitted by Hellman and the DEA agents – and in

particular, Hellman's assurance that the Defendants had been given copies of the documents that

they asserted contained attorney-client material, and had not identified any such privileged

material – this Court denied Defendants' request for the return of the original documents seized

from them at the time of their extradition:

> [A]lthough Defendants have copies of the documents at issue[,] they have not
> demonstrated that the documents . . . contain communications between Landji and
> Adamu and their attorneys that were intended to be kept confidential and were used for
> obtaining or providing legal advice.  (Landji Br. (Dkt. No. 352) at 9; Adamu Br. (Dkt.

24

No. 354) at 3-4)  Defendants merely state that "[i]t seems beyond dispute that the 'packets' taken from the defendants included their written communications to and from Croatian counsel."  (Landji Reply Br. (Dkt. No. 380) at 5)  This assertion does not provide a basis for this Court to find that the documents at issue are protected by the attorney-client or work product privilege.  See Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg, 171 F. Supp. 3d 136, 142 (S.D.N.Y. 2016) (denying a request to quash a subpoena where counsel's assertion of attorney-client and work-product privileges "failed to engage the basic work necessary to satisfy their burden of showing that any particular documents or communications are protected from disclosure under either privilege").  Accordingly, Defendants' request for the return of these materials will be denied.

(Apr. 29, 2021 Order (Dkt. No. 460) at 15-16)[17]

This Court likewise denied Defendants' request for a hearing "to determine whether or not the [G]overnment's review of these materials violated [Defendant's] Fifth and Sixth Amendment Rights," citing the "Government['s] . . . declarations representing that no Government personnel have reviewed the contents of these allegedly privileged documents."

(Id. at 15, 15 n.4)

---

[17]  In an August 9, 2021 declaration, Landji's counsel states that the Government's January 21, 2020 production "contained, among other things, a copy of the U.S. indictment with various notations on the document that . . . Mr. Landji had written, emails between Mr. Landji's Croatian attorney, . . . and Mr. Landji's wife, and other documents that Mr. Landji had obtained through [his Croatian counsel] that were relevant to his defense, including a copy of a flight plan."  (Biale Decl. (Dkt. No. 508-2) ¶ 4)  Landji contends, in an October 5, 2021 ex parte submission, that these materials are privileged.  This assertion contradicts Landji's representation that none of the PDFs Analyst Lloyd emailed to Hellman – which were included on the file share that was produced to Defendants on January 21, 2020 – contained privileged material.  (See Sept. 8, 2021 Landji Ltr. (Dkt No. 529) at 1)  To the extent that the Government's January 21, 2020 production contained privileged material, Landji's counsel was obligated to bring that material to the Court's attention when Landji filed his October 5, 2020 motion for return of the documents.  As discussed above, however, Defendants' motion for return of the documents seized from them at the time of their extradition contained no specific information concerning the alleged privileged documents.

## IV.   **DEFENDANTS' RENEWED MOTION FOR A *KASTIGAR* HEARING**

### A.   **Defense Counsel's Review of Hard Copy Documents**

On July 5, 2021, Noam Biale – Landji's counsel – requested an opportunity to inspect the original documents seized from the Defendants at the time of their extradition.  (Biale Decl. (Dkt. No. 508-2) ¶ 6)  Later in July 2021, Agent Waters brought this material to the USAO so that defense counsel could inspect the hard copy documents.  (See Tr. 238, 424)

On July 28, 2021, Biale reviewed these materials, which were contained in three DEA evidence bags.  (Biale Decl. (Dkt. No. 508-2) ¶ 7; Tr. 237-28)  Adamu's counsel reviewed these same materials at the USAO on August 12, 2021.  (Govt. Post-Hrg. Br. (Dkt. No. 562) at 28)

The contents of one of the evidence bags Biale reviewed – which bears serial number EM000159217 and is currently marked as DX 12[18] – "matched approximately to the [Government's January 21, 2020] production and contained only a stack of papers."  (Biale Decl. (Dkt. No. 508-2) ¶ 8)  That evidence bag "contained, among other things, a copy of the U.S. indictment with various notations on the document that . . . Mr. Landji had written, emails between Mr. Landji's Croatian attorney, . . . and Mr. Landji's wife, and other documents that Mr. Landji had obtained through [his Croatian attorney] that were relevant to his defense, including a copy of a flight plan."  (Biale Decl. (Dkt. No. 508-2) ¶ 4)

Biale also examined the contents of an evidence bag bearing serial number EL000064068.  This bag – which is now marked as DX 10[19] –

> contained both personal effects, such as business cards, a Bible, and various items related to aviation, as well as numerous legal documents.  These legal documents were mostly, though not exclusively, contained in three blue folders and one white folder.  The blue

---

[18]  This bag is depicted in a photograph marked GX 3.
[19]  This bag is depicted in a photograph marked GX 5.

folders contained various Croatian court documents, such as the judicial decisions on the defendants' continued detention, a decision authorizing the investigation of the aircraft, and the extradition decision. . . . In addition, numerous of these legal documents contained handwritten notes by Mr. Landji, which appeared to be notes to himself or to his attorney regarding factual assertions in the documents with which he disagreed or potential defenses to the government's proof.  The majority of these notes were in English, with some additional notes in French.

(Id. ¶ 9)  A white folder inside DX 10 "contained a legal memo, written on [the] letterhead of [Landji's Croatian counsel], which set forth his evaluation of the evidence, the legality of the search of the airplane, and, in general, the defense strategy."  (Id. ¶ 11)

Some of the notes contained in DX 10 "appear[] to discuss the elements of the charges and outline certain legal defenses."  Landji asserts that these notes are in Adamu's handwriting.  (Id. ¶¶ 13-14)  It is undisputed that none of the documents contained in DX 10 were included in the Government's January 21, 2020 production.  (See Tr. 243-44)

As for Adamu, his lawyers "inspected the originals of the documents previously disclosed to him" and "found extensive material that had not been previously disclosed, including privileged material – most significantly, a notebook containing over one hundred pages of Mr. Adamu's notes, taken both in anticipation of and during meetings with his lawyer."[20] (Sept. 7, 2021 Def. Br. (Dkt. No. 525) at 2)

In July 29, 2021 and August 1, 2021 emails – sent after Biale had reviewed the hard copy materials – Biale asked the Government "to explain the discrepancies between the evidence [Biale] observed and the [Government's January 21, 2020 production], as well as

---

[20]  Adamu's claim is consistent with Agent Waters' testimony that he did not scan items, such as notebooks, that did not fit in his scanner.  (See Tr. 126, 163)  Adamu's counsel does not specify the serial number of the bag that they reviewed.  The DEA evidence bag marked with "Adamu" bearing serial number EL000064060 was admitted into evidence as DX 11, and is depicted in a photograph marked GX 4.

inconsistencies between the physical evidence and the government's prior representations to the Court" in opposing Defendants' pre-trial motions.  (Biale Decl. (Dkt.No. 508-2) ¶ 15)

As a result of Biale's emails, Hellman "learned that [he] had not received [from DEA personnel] the entirety of the documents seized from the defendants."  (Tr. 237)  In early August 2021 – after learning from Biale that the Government's discovery production had not been complete – Hellman directed a USAO paralegal who was not part of the prosecution team to "open the [DEA evidence] bags [containing the hard copy documents that Agent Waters brought to the USAO for Biale to review (DX 10, DX 11, and DX 12)], prepare fresh scans . . . of the contents of those bags, and provide them to [defense] counsel."  (Tr. 237-40, 425)  Hellman did not review either the electronic copies of Defendants' Documents or the originals.  (Tr. 239)

### B.    Defendants Again Request a *Kastigar* Hearing

On August 8, 2021, Defendants renewed their request for a Kastigar hearing, arguing that defense counsel's "review of the original physical evidence at the [USAO] . . . revealed new facts" that contradicted the Government's earlier representations about Defendants' Documents.  (Landji Br. (Dkt. No. 508) at 1, 6)

As an initial matter, Defendants asserted that while the Government had represented in earlier briefing that it had "provided all of the materials in its possession that are responsive to the Defendants' request" (Govt. Opp. (Dkt. No. 364) at 18-19), defense counsel's review of the hard copy materials seized from their clients in Zagreb had revealed that the Government had not produced all of the documents that were seized from the Defendants in Zagreb.  (Landji Br. (Dkt. No. 508) at 4, 6; Sept. 7, 2021 Def. Br. (Dkt. No. 525) at 2))  Most notably, the Government had not produced a legal memorandum that Landji's Croatian counsel –

28

Krešimir Šušnjar – had prepared that "outlined Mr. Landji's defense strategy."  In this memorandum, Šušnjar "detailed the proof, as he saw it, against Mr. Landji, the areas where, in his opinion, there was an absence of proof, and his legal conclusions as to both the lawfulness of the search of the aircraft and the government's ability to maintain the charges."  (Landji Br. (Dkt. No. 508) at 2)  Adamu's counsel represented that, in his review of the hard copy materials at the USAO, he had discovered "extensive material that had not been previously disclosed, including privileged material – most significantly, a notebook containing over one hundred pages of Mr. Adamu's notes, taken both in anticipation of and during meetings with his lawyer."  (Sept. 7, 2021 Def. Br. (Dkt. No. 525) at 2)

Defendants further argued that – contrary to the Government's earlier representations (see Hellman Decl. (Dkt. No. 398) ¶ 4 ("[A]t least many of the Documents appear to be in Croatian."); Fihlman Decl. (Dkt. No. 398-1) ¶ 5 ("I identified documents . . . that appeared on their face to be . . . responsive to their requests (e.g., documents that appeared to bear Croatian writing and judicial markings or appeared to contain handwritten notes in Croatian)."); Waters Decl. (Dkt. No. 398-2) ¶ 4 ("I observed that many of the Documents appeared on their face to be related to the Defendants' Croatian proceedings (e.g., documents that appeared to bear Croatian writing and judicial markings or appeared to contain handwritten notes in Croatian).")) – much of the material seized from their clients, including allegedly privileged material, is in English and not in Croatian.  (Landji Decl. (Dkt. No. 508-1) ¶¶ 5-6; Biale Decl. (Dkt. No. 508-3) ¶¶ 7-9)  Because Landji does not speak Croatian, his Croatian lawyer had arranged for the Croatian legal documents to be translated into French and English. In preparing to speak with his Croatian lawyer about these materials, Landji made notes on these documents reflecting "issues and potential defenses [he] wanted to discuss with [his] attorney."

(Landji Decl. (Dkt. No. 508-1) ¶¶ 5-6)  Defense counsel asserts that "most, if not all," of the Croatian legal documents "had certified translations in either English or French attached on top." Moreover, Landji's notes were primarily in English, with some notes in French.  (Biale Decl. (Dkt. No. 508-3) ¶¶ 7-9)[21]

Because Defendants had not submitted to the Court the material that they claimed was privileged, this Court directed Defendants to submit – on an ex parte basis – all materials that DEA agents seized from Defendants in Zagreb that Defendants claim constitutes privileged attorney-client material.  (Oct. 5, 2021 Order (Dkt. No. 576))  Defendants made this submission on October 5, 2021.

### 1.   The Alleged Privileged Material

Landji claims that 167 pages of the documents seized from him in Zagreb contain privileged material.  According to Landji, most of these documents – 144 pages – were produced to him on January 20, 2021.[22]  (See Oct. 5, 2021 Ex Parte Submission Lodged Under Seal (Dkt. No. 632))  The materials Landji claims are privileged fall into four categories.

First, Landji claims that twelve pages of court documents that contain his handwritten markings and marginalia such as underlines, question marks, and exclamation points are privileged.  The Second Circuit has stated, however, that "[a] rule that recognizes a privilege for any writing made with an eye toward legal representation would be too broad."  United States v. DeFonte, 441 F.3d 92, 96 (2d Cir. 2006).  More is required for a claim of privilege, such as

---

[21]  Landji also sought to compel testimony from DEA Agent Catalano, who had not submitted a declaration concerning his handling of Defendants' Documents.  (Landji Br. (Dkt. No. 508) at 12)

[22]  As noted above, Landji does not explain his contradictory assertion (see Sept. 8, 2021 Landji Ltr. (Dkt No. 529) at 1) that none of the PDFs Analyst Lloyd emailed to Hellman – which were included on the file share that the Government produced to the Defendants on January 21, 2020 – contained privileged material.

"an outline of what a client wishes to discuss with counsel – and which is subsequently discussed with one's counsel." Id.  Accordingly, this material is not privileged.[23]

Second, Landji claims that twelve additional pages of handwritten notes, some of which consist of mere bullet points, are privileged.  One page appears to be written in French, one page lists entities unrelated to this case – the European Court of Human Rights and Amnesty International, and one page appears to reference statutes.  There is no evidence that Landji discussed these notes with Šušnjar, however, or that he used these notes as an outline for his discussions with his attorney.

Third, Landji claims that 142 pages of email printouts from Šušnjar – 139 of which were produced to him on January 21, 2020 – are privileged.  It is not clear, however, that any of these emails reflect communications between Landji and Šušnjar.  Seven pages contain emails between Šušnjar and Landji's wife.  Another six pages are emails from an account named "backland aviation" forwarding information to Šušnjar.  And the remaining 129 pages were forwarded to Šušnjar from Landji's Okland Aviation email account.  Because Landji was in custody at the time the emails were sent, these emails appear to have been forwarded not by Landji himself, but instead by someone else with access to the account.  Emails from third parties to Landji's counsel are not protected by the attorney-client privilege.  "The attorney-client privilege protects communications (1) between a client and his . . . attorney (2) that are intended

---

[23]  Landji argues that "[c]ourts in this district have interpreted [United States v. DeFonte, 441 F.3d 92, 96 (2d Cir. 2006)] not to require actual communication of such an outline so long as it was prepared for use in an attorney-client meeting."  (Def. Reply Br. (Dkt. No. 571) at 7 n.3)  In support of this argument, Landji cites United States v. Allen, 14 Cr. 272 (JSR), 2016 WL 315928, at *2 (S.D.N.Y. Jan. 8, 2016).  In Allen, an attorney provided materials to his client and instructed the client to read through the materials and highlight anything he wanted to discuss with counsel.  The Allen court concluded that the markings prepared by the client at the lawyer's direction were privileged.  There is no evidence that Landji's markings on documents were made at Šušnjar's direction, however.

to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." <u>United States v. Mejia</u>, 655 F.3d 126, 132 (2d Cir. 2011).  Landji does not offer any argument as to how these emails could be privileged.  (<u>See</u> Def. Reply Br. (Dkt. No. 571) at 6-7 (addressing whether Landji's notes are privileged, but not addressing whether the email communications are privileged))

        The fourth category of material is a one-page memorandum prepared by Šušnjar on counsel's letterhead.  This memorandum contains Šušnjar's legal opinions about certain aspects of Landji's case, as well as a proposed strategy for defending Landji.  Without question, this memorandum constitutes extremely sensitive attorney work product.  It reflects Šušnjar's "mental impressions, conclusions, opinions, and legal theories," and is thus afforded the "highest level of protection" under the law.  <u>S.E.C. v. Collins & Aikman Corp.</u>, 256 F.R.D. 403, 410 (S.D.N.Y. 2009).

        In sum, one page of the documents seized from Landji plausibly contains privileged material.

        Adamu contends that 211 pages of privileged material were seized from him in Zagreb.  This allegedly privileged material falls into three categories.  Adamu first claims that thirty-one pages of court documents – which contain his underlining, highlighting, and short notes in the margins – are privileged.  As discussed above, underlining and highlighting documents does not make them privileged, and notes are not privileged absent proof that they were discussed with a lawyer or intended to serve as an outline of what would be discussed with a lawyer.  There is no such proof here.

Adamu next claims that 175 pages of his handwritten notes are privileged.[24]
There is no evidence that these notes were discussed with a lawyer or that they were prepared as
an outline of matters to discuss with a lawyer.[25]  Moreover, Adamu's handwriting is in script and
and is often nearly illegible.  It would not be possible to decipher his handwriting from a quick
glance.

Adamu also cites five pages of emails sent by an interpreter to the Nigerian
embassy on behalf of Adamu's Croatian counsel.  None of these emails are between Adamu and
his attorney, and thus they are not privileged.

In sum, of the materials Defendants have submitted to the Court, only a single
page – the memorandum prepared by Landji's attorney Šušnjar – is clearly privileged.

V.      **THE EVIDENCE AT THE SEPTEMBER 2021 *KASTIGAR*
         HEARING, AND POST-HEARING BRIEFING**

Given the new allegations set forth in the Defendants' renewed motion, this Court
conducted a two-day evidentiary hearing on September 9 and September 14, 2021 concerning
Defendants' Kastigar violation claim.

A.      **September 2021 *Kastigar* Hearing**

Eight witnesses testified at the September 2021 evidentiary hearing.  The
Government called Agents Catalano, Fihlman, Waters, and Brannon, Analyst Lloyd, and AUSA
Hellman.  Defendants called U.S. Marshal Marco Tramontana and Landji's paralegal Ryan
Pollock.

---

[24]  164 of these pages are from a notebook.
[25]  Although Adamu asserts in a brief (see Sept. 7, 2021 Def. Br. (Dkt. No. 525) at 2) that "a
notebook containing over one hundred pages of [his] notes, taken both in anticipation of
and during meetings with his lawyer," were seized by agents in Zagreb, this assertion is not
supported by an affidavit or declaration and is thus disregarded.

1.      **The Government's Evidence**

Agents Catalano and Fihlman testified that they assisted with the extradition of the Defendants in Zagreb, and took custody of materials collected by the Croatian National Police.  (Tr. 15, 56)  In the presence of the Defendants, the agents also searched through the luggage that Defendants had brought with them to the police station at the Zagreb airport.  (Tr. 18, 20, 30, 48)  The agents quickly "shuffl[ed] through" the material in Defendants' luggage, leaving money and valuables with Croatian counsel, and seizing documents.  During that process, Catalano and Fihlman "glanced" at the thousands of pages of documents that they seized, but did not read them.  (Tr. 18-19, 32-33, 51-53, 80-81)

Agent Fihlman testified that Adamu told him that some of the documents in Adamu's suitcase were "important court papers" that he wanted to keep.  Agent Fihlman understood Adamu to be referencing court filings; he did not understand Adamu to be referring to confidential material prepared by Adamu's attorney.  (Tr. 54-55, 78-80, 97-99, 117; see DX 5 at 1)

Agents Catalano and Fihlman put Defendants' Documents inside a suitcase, which they transported on the flight from Zagreb to New York, and on a train from New York to the DEA office in Chantilly.  After transporting Defendants' Documents to Chantilly, neither Agent Catalano nor Agent Fihlman ever looked at them again.  (Tr. 22-24, 58-60, 89-90)  The Court finds both Agents Catalano and Fihlman credible.

At the Chantilly office, Agent Waters and Analyst Lloyd scanned Defendants' Documents so that they could be transmitted to the prosecutors in New York.  Agent Waters scanned the documents in the bag marked "Adamu," while Analyst Lloyd scanned the documents in the bag marked "Landji."  (Tr. 124, 172-73)  Agent Waters testified that he

scanned items that fit through his scanner and that he thought might have evidentiary value. Accordingly, Waters did not scan a spiral-bound notebook, and he did not scan material such as travel brochures and menus.  (Tr. 126-27, 145-46, 163-64)  Analyst Lloyd testified that he scanned "everything that had writing on it"; materials that would not fit in a scanner were photocopied and then scanned.  (Tr. 175, 186-87, 189-91)

        Agent Waters and Analyst Lloyd testified that they did not read the documents as they scanned them.  (Tr. 127-28, 175)  The Court finds Agent Waters' and Analyst Lloyd's testimony credible, including their assertion that they did not read the substance of Defendants' Documents.[26]

        AUSA Hellman testified that – beginning in November 2019 – he spoke with Thomas Dunn, Adamu's counsel, about legal papers seized from Adamu at the time of his extradition.  Hellman mistakenly believed that the documents Dunn sought were part of the materials supplied by the Croatian National Police, which had been produced to Defendants. Although Hellman received scans of Landji's documents from Analyst Lloyd in November 2019, he did not review those scans, for the same reason.  (Tr. 236, 258, 264-66, 268, 273)  There is no evidence that Hellman intentionally sought to mislead Dunn.

        In January 2020, Dunn and DeVita continued to request production of legal papers seized from their clients at extradition.  Hellman began to have concerns at this point that privileged material may have been seized from the Defendants at the time of their extradition. Despite these concerns, he did not arrange for a taint team to review the materials seized from

---

[26]  Although Analyst Lloyd recalls that some of the documents appeared to be court or legal documents, contained handwritten notes, and referred to Okland Aviation, this testimony is not inconsistent with Lloyd's assertion that he had only "passing glimpse[s]" of the documents  as he scanned them.  (Tr. 175, 194-95; GX 7)

the Defendants in Zagreb.  Instead, Hellman directed Agent Waters to upload scans of these

documents to the USAO file sharing platform, not realizing that Agent Waters has already

provided the scans months earlier.  (Tr. 236-37, 266-69, 287-79)

                In January 2020, Hellman realized that the scans from Lloyd and Waters were not

duplicative of the materials provided by the Croatian National Police, which had earlier been

produced to the Defendants.  Hellman then worked with USAO paralegal DeLuca to produce the

scans to Defendants.  That production was made on January 21, 2020.[27]  (Tr. 232-33, 286)

                In July 2021, Biale reviewed Defendants' documents in hard copy form at the

USAO.  Biale informed Hellman that certain hard copy documents he had reviewed had not

previously been supplied to the Defendants. (Tr. 237-38)  In early August 2021, Hellman

directed a taint paralegal at the USAO to "open the [DEA evidence] bags [containing the hard

copy documents Biale had reviewed], prepare fresh scans . . . of the contents of those bags, and

provide them to [defense] counsel."  (Tr. 238-40)

        2.      **Defense Witnesses**

                Paralegal Ryan Pollock – who is part of Landji's defense team – testified that he

reviewed each page from the Government's August 2021 production of Defendants' Documents,

noting "whether a page of text appeared to be in the Croatian language or not."  (Tr. 302)

Contrary to the Government's December 2020 declarations, which suggested that most of

Defendants' Documents were in Croatian, Pollock testified that only 298 of the 2,584 "pages in

the production . . . contain text in Croatian that wasn't associated with a certified translation."

(Tr. 304; DX 23)

---

[27]  Although DeLuca prepared these materials for production, there is no evidence that he read
these documents.

Deputy U.S. Marshal Marco Tramontana testified that he participated in the Defendants' extradition from Zagreb to the United States.  Tramontana testified that Defendants "came with an unusual amount of property for a prisoner transportation," carrying "several large bags, which generally [defendants in custody] wouldn't have."  (Tr. 294-95)  Tramontana recalled that "one defendant" – he did not specify which – told Tramontana that his "legal work is in the luggage," and that he had "documents in each one of these suitcases."  (Tr. 296-97)  Tramontana did not know if those documents were "privileged communications between [the Defendant] and his attorney."  (Tr. 299)  Tramontana testified that he did not review any materials seized from the Defendants.  (Tr. 299)

### B.    <u>Post-Hearing Briefing</u>

After the September 2021 <u>Kastigar</u> hearing, both sides submitted additional briefing.  (<u>See</u> Dkt. Nos. 554, 562, 571, 572)

Defendants argued that, under <u>Kastigar</u>, they had put forth evidence sufficient to shift the burden to the Government to disprove taint.  In support of this argument, Defendants asserted that

> (1) the government was on constructive and actual notice that the property seized from the defendants during their extradition likely contained privileged materials; (2) members of the prosecution team accessed and viewed privileged material; (3) the government undertook no measures to protect the defendants' Sixth Amendment rights; (4) the government changed its theory of the case and has provided no explanation for that change independent of the contents of the privileged material; (5) the declarations of the AUSA and DEA agents submitted to the Court were inaccurate and misleading; and (6) the AUSA's explanation of the government's conduct in his sworn testimony was not credible.

(Def. Post-Hrg. Br. (Dkt. No. 554) at 5)

Defendants also sought a second evidentiary hearing at which "the government [would be put] to the 'heavy burden' of proving that its trial evidence is 'derived from a wholly independent source.'"[28]  (Id. at 33)

Finally, pursuant to this Court's supervisory powers, Defendants sought an order imposing sanctions on the Government for its alleged violation of the Defendants' Sixth Amendment rights.  Defendants argued that sanctions were warranted "based on the government's pattern of reckless disregard for the defendants' rights."  (Id. at 37)  Defendants' suggested sanctions included dismissal of the indictment, disqualification of tainted agents and prosecutors, and preclusion of any evidence developed after Defendants' extradition, including the testimony of witnesses, such as Cardona-Cardona, who had proffered after Defendants' extradition.  (Id. at 36)

The Government argued that Defendants had not shown a Sixth Amendment violation, as the uncontroverted testimony established that no DEA or USAO employee had read Defendants' Documents.  (Govt. Post-Hrg. Br. (Dkt. No. 562) at 39-41)  The Government further argued that Defendants had not shown that they suffered any prejudice as a result of the Government's handling of Defendants' Documents.  (Id. at 46-50)

---

[28]  Prior to the September 2021 Kastigar hearing, Defendants had argued that they were entitled to disclosure of the grand jury minutes, so that they could determine whether the Government's theory of the case had shifted.  (Aug. 9, 2021 Def. Ltr. (Dkt. No. 508) at 13)  On August 25, 2021, this Court denied that request without prejudice, because Defendants had not made the required showing for access to grand jury materials.  (Dkt. No. 522)

In their post-hearing briefing, Defendants renewed their request for disclosure of the grand jury minutes.  (Def. Post-Hrg. Br. (Dkt. No. 554) at 33 n.6)  Defendants ultimately obtained the Government's grand jury presentation, because Agent Waters was the Government's witness before the grand jury, and the Government produced Waters' grand jury testimony to Defendants as part of Section 3500 disclosures in connection with the October 8, 2021 Kastigar hearing discussed below.  (See DX 25; Tr. 370-71)  Accordingly, Defendants' request for the grand jury minutes is moot.

As to Defendants' burden-shift argument, the Government contended that the burden should not shift to the Government based on mere access and that, in any event, the Government had already satisfied its burden to disprove taint.  (Id. at 50-55)

As to the Court's supervisory powers, the Government argued that Second Circuit case law precludes the relief Defendants sought.  (Id. at 55)

On October 6, 2021, this Court ruled that a second evidentiary hearing would be conducted concerning the taint issue.  In so ruling, this Court noted that there is "a dearth of law in the Second Circuit" as to when the burden shifts for purposes of a Kastigar claim premised on access to privileged materials.  "[I]t [thus] seemed prudent to [the Court], given the absence of governing authority in this circuit, to take evidence on the issue of whether the government's investigation and prosecution of the defendants was tainted by . . . access to privileged material." (Tr. 314-15)

## VI.   OCTOBER 8, 2021 *KASTIGAR* HEARING

On October 8, 2021, the Court conducted a second Kastigar hearing, at which the Government called the same six witnesses:  Agents Brannon, Catalano, Fihlman, and Waters, Analyst Lloyd, and AUSA Hellman.

As to the handling of Defendants' Documents, Hellman testified that DEA personnel had provided "scans of [Defendants' Documents]" to the USAO "on three distinct occasions":  "First when Analyst Lloyd sent [Hellman] PDFs via email; second, when . . . Agent Waters delivered copies of PDFs on a hard drive; and third, when . . . Agent Waters delivered PDFs via [a file-sharing platform] to the U.S. Attorney's Office."  (Tr. 435)  After the September 2021 Kastigar hearing, a USAO taint paralegal had compared "what had [been] provided in discovery to the defendants with the items [that the USAO] had received."  The paralegal

"determined that all [of the] material [in each of the three instances Hellman described] had been produced in discovery to the defendants." (Tr. 435-36, 439)

As to whether evidence collected after the Defendants' extradition was tainted, Agents Brannon and Waters testified that the post-extradition evidence included (1) the cockpit voice recorder from the G2 aircraft, which was collected at Defendants' request; (2) statements from an interview with Curtis Seal, who was on board the G2 aircraft during the flight from Mali to Zagreb; and (3) information from proffer sessions with Cardona-Cardona. (Tr. 317, 361-62, 369, 437-38)

Agent Waters testified that neither his decision to interview Seal nor the substance of the interview was informed by anything Agent Waters saw in Defendants' Documents. (Tr. 362-63, 385) During the interview, Seal mentioned that one "unusual" aspect of the flight from Mali to Zagreb was that the transponders were not functioning properly, such that the flight would have appeared on the radar screen but the aircraft would not have been identifiable. Seal did not attribute the malfunctioning transponders to any action taken by the Defendants. (Tr. 363-65)

As to the decision to seek Cardona-Cardona's cooperation, Agent Brannon testified that Cardona-Cardona was a "very important" target for the DEA Bilateral Investigations Unit that Brannon headed: "this [case] was one of the big ones . . . because it involved large-scale cocaine trafficking in narcoterrorism that was occurring on four different continents." The DEA had designated Cardona-Cardona as a "consolidated priority organization target, . . . in essence, a kingpin," because "he [had] operated for many decades and was instrumental in . . . the destabilization of a couple of African governments." (Tr. 329-30) Agent Brannon further testified that – while he was not familiar with the contents of Defendants'

Documents – he was confident that they played no role in the decision to bring Cardona-Cardona in for proffer sessions. Brannon's unit had pursued Cardona-Cardona for two-and-a-half years; Brannon had been "intimately involved" in the investigation; and he "had a really good handle on what was going on with the case." He "would have noticed something . . . different" if new information had been used in questioning Cardona-Cardona at the proffer sessions. (Tr. 317, 324-28)

Hellman similarly testified that the decision to bring Cardona-Cardona in for proffer sessions was not based on the contents of Defendants' Documents. Instead, the Government believed "that Cardona could provide information that, if credible and corroborated, would allow the [G]overnment to pursue a significant number of additional target subjects," both "in the immediate investigation" and "in many other investigations worldwide." (Tr. 391) Hellman would have "[a]bsolutely" taken the same steps in pursuing Cardona-Cardona's cooperation, regardless of Defendants' Documents. (Tr. 391-92)

Certain testimony at the October 8, 2021 Kastigar hearing focused on whether the Government had changed its approach to the evidence because of its access to Defendants' Documents. Defendants argued that the Government had alleged prior to obtaining Defendants' Documents that the flight into Zagreb had been a "black flight," but that after obtaining Defendants' Documents, the Government dropped that assertion. (Def. Post-Hrg. Br. (Dkt. No. 554) at 18-19) Defendants similarly argued that the Government had characterized Seal as a "flight instructor" before the grand jury, but had subsequently identified him as another pilot on the flight. (Id. at 19)

Cardona-Cardona attended at least six proffer sessions between December 2019 and March 2020. (See Tr. 324) While certain DEA personnel who had handled Defendants'

41

Documents participated in some of those proffers, none of these individuals participated in the March 2, 2020 proffer, at which Cardona-Cardona discussed whether or not the flight from Mali to Zagreb had been a "black flight."[29]  (Tr. 320, 324, 336, 342, 365, 369, 393)

During the March 2, 2020 proffer session, Cardona-Cardona said that black flights into Central Europe were not common, and that the conspirators had not discussed whether the flight into Zagreb would be a black flight.  (Tr. 392)  Although the Government had asserted before the grand jury that the flight into Zagreb had been a black flight[30] – based on Cardona-Cardona's account – the Government decided not to argue at trial that the flight had been a black flight.  (Tr. 394)  Similarly, Agent Waters told the grand jury that Seal was on the flight as "a flight instructor" (DX 25 at 25 (Waters testifying that "an American older gentleman" named "Curtis Seal" who "was a flight instructor" was on the aircraft); Tr. 378), while the Government subsequently maintained that Seal was onboard the flight as "a pilot," and that "typically many aircraft[] have more than one pilot on them."  (Tr. 379)

The DEA witnesses at the October 8, 2021 Kastigar hearing testified that they did not speak with prosecutors or with other DEA personnel about the contents of Defendants' Documents.[31]  (Tr. 335-36, 339-41, 347, 352-53, 360-61)  None of these witnesses took any

---

[29]  Agent Waters testified that a "black flight" is one in which a plane's transponders have been turned off.  In such circumstances, the plane "could still be detected on radar," but the plane would "not [be] recognizable to other people in the aviation industry as to what aircraft that is." When a plane's "transponders are on, . . . . [the] dot [on the radar screen] will be associated with the airplane's registration."  (Tr. 373)

[30]  During Agent Waters' November 8, 2018 testimony before the grand jury, he had been asked whether the flight into Zagreb had "land[ed] in the normal way that a regular aircraft lands." Agent Waters testified that "apparently [the aircraft's] transponders were off" such that the flight did not "pop[] up on the radar screen" until "really the last minute [that it] was coming into airspace. . . ."  (DX 25 at 24-25; Tr. 372-73)

[31]  Agent Catalano testified that he was not involved in the investigation after the Defendants were extradited, as he was reassigned.  (Tr. 335, 337)  And Agent Fihlman testified that, after the

investigative steps based on the contents of Defendants' Documents (Tr. 335, 340, 347, 358, 360)  And AUSA Hellman testified that he did not "adjust the government's theory of this case based on anything [he] saw in the defendants' documents."  (Tr. 390)

## DISCUSSION

I.      **ALLEGED SIXTH AMENDMENT VIOLATION**

    A.      **Applicable Law**

        The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."  U.S. Const. amend. VI.  "[G]overnment interference in the relationship between attorney and defendant may violate the latter's right to effective assistance of counsel."  United States v. Ginsberg, 758 F.2d 823, 833 (2d Cir. 1985) (citing Massiah v. United States, 377 U.S. 201 (1964)).  Thus, "[w]hen conduct of a Government agent touches upon the relationship between a criminal defendant and his attorney, such conduct exposes the Government to the risk of a fatal intrusion and must be accordingly carefully scrutinized."  United States v. Gartner, 518 F.2d 633, 637 (2d Cir. 1975).

---

extradition, he was not involved in collecting evidence, and did not participate in any proffer sessions with Cardona-Cardona.  (Tr. 348)

Analyst Lloyd testified that that he did not take any investigative steps based on anything he saw in Defendants' Documents.  (Tr. 340)  He "did not have any conversations with prosecutors about anything [he] saw in . . . [D]efendants' [D]ocuments," outside of the November 2019 email communication with Hellman that Analyst Lloyd described in his testimony. (Tr. 177; GX 7)  Nor did he discuss any details of the documents with prosecutors while preparing for his testimony at the Kastigar hearings.  (Tr. 340-41)  He has not "discussed the substance or contents of the documents with anyone else," including other DEA personnel.  (Tr. 341)

Although Agent Waters was involved in "proffers, interviews, and . . .  facilitating the receipt of a cockpit voice recorder . . . removed from the aircraft" at issue, (Tr. 361), his decision to participate in the proffers and interviews and to collect the cockpit voice recorder was not motivated by anything he saw in the Defendants' Documents, and he did not discuss the substance of Defendants' Documents in the proffers or interviews.  (Tr. 362, 365)

To establish a Sixth Amendment violation based on Government interference with the attorney-client relationship, a defendant must demonstrate "'that privileged information [was] passed to the government or that the government . . . intentionally invaded the attorney client relationship, and resulting prejudice.'"  Ginsberg, 758 F.2d at 833 (quoting United States v. Dien, 609 F.2d 1038, 1043 (2d Cir. 1979)); see also United States v. Schwimmer, 924 F.2d 443, 447 (2d Cir. 1991).  Absent a Government intrusion into the attorney-client relationship that is "manifestly and avowedly corrupt," "a defendant must ordinarily demonstrate prejudice stemming from the Government's conduct."  United States v. Hoey, No. 15 CR. 229 (PAE), 2016 WL 270871, at *6 (S.D.N.Y. Jan. 21, 2016); see also United States v. Sattar, No. 02 Cr. 395 (JGK), 2002 WL 1836755, at *6 (S.D.N.Y. Aug. 12, 2002) ("Where the intrusion upon an attorney-client communication is unintentional or justified there can be no violation of the Sixth Amendment without a showing that the intercepted communication was somehow used against the defendant to the defendant's prejudice."); Schwimmer, 924 F.2d at 447 ("[U]nless 'the conduct of the Government has . . . been . . . manifestly and avowedly corrupt,' . . . a defendant must show prejudice to his case resulting from the intentional invasion of the attorney-client privilege." (quoting Gartner, 518 F.2d at 637)).

Where the Government has intentionally intruded on the attorney-client privilege, such conduct "warrants careful scrutiny."  Schwimmer, 924 F.2d at 447.  Even in cases of intentional intrusion, however, the "[Second] Circuit never has gone so far as to adopt a per se rule" requiring the dismissal of an indictment.  Id.  "'The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights.'"  United States v. Sharma, No. 18 CR. 340 (LGS), 2019 WL 3802223, at *3 (S.D.N.Y. Aug. 13, 2019) (quoting United States v. De La Pava, 268 F.3d 157, 165 (2d Cir.

2001)).  Short of dismissal, "courts have applied a different and a less rigid rule which attempts to measure the harm or prejudice, if any, to the defendant rather than punish the prosecutor by freeing the defendant."  Gartner, 518 F.2d at 637.

**B.    Analysis**

Defendants argue that the Government's conduct shows "a reckless disregard" for Defendants' Sixth Amendment rights.  According to Defendants, the Government "took no precautions" to shield DEA agents from Defendants' privileged materials.  Members of the prosecution team were exposed to privileged material, and "nothing [was done] once the AUSAs realized there could be a breach of the privilege."  (Def. Post-Hrg. Br. (Dkt. No. 554) at 34, 37)

Defendants further argue that the Government should have known that the Defendants – who had been in Croatian custody for approximately a year – would have privileged material in their luggage.  According to Defendants, inmates "in custody who are engaged in legal proceedings almost invariably possess legal documents in their cells, including privileged communications with their attorneys."  (Id. at 5)  Defendants further argue that the agents involved in the extradition were alerted to a potential privilege issue when Adamu told Agent Fihlman that he had "important court papers" that he wanted to keep.  (Id. at 7)

The Court credits Agent Fihlman's testimony, however, that he understood Adamu's reference to "court papers" to mean "something like a description of a hearing, a proceeding, something that could possibly be a public record," rather than materials prepared by Adamu's attorney.  Neither Defendant said "that documents came specifically from their attorney."  (Tr. 54-56, 78-80, 99)  Agent Fihlman's account is credible given that he observed – while sorting through the documents in the Defendants' luggage – "official Croatian public

45

proceeding documents" and documents bearing the seal of the Croatian Ministry of Justice. (Tr. 54, 85)

Moreover, this Court finds credible Agents Fihlman and Catalano's testimony that they did not read Defendants' Documents. The primary purpose for these agents' presence in Zagreb was to assist in the extradition of the Defendants. There was no time for a studied review of the thousands of pages of material found in Defendants' luggage. The agents were quickly "triaging" and "shuffling through" the materials in the Defendants' luggage, "making sure there was no drug or weapons," and separating out materials to be left with Croatian counsel. There is no evidence that Agents Catalano and Fihlman did more than "glance[]" at the documents while collecting them from the Defendants' luggage. (Tr. 18-19, 32-33, 49, 51-53, 80-81)

Defendants argue that Agent Waters and Analyst Lloyd read their documents while scanning them, in preparation for transmission to the USAO. Defendants contend that Agent Waters' and Analyst Lloyd's recollection of certain information contained in Defendants' Documents belies their testimony that they only conducted a "quick . . . review" and only "glimpsed" Defendants' Documents. (Def. Post-Hrg. Br. (Dkt. No. 554) at 9-10; Tr. 126-27; 145-46, 163, 179-80) This Court finds Agent Waters and Analyst Lloyd's testimony fully credible on this point, however. That the agents recall certain features of the documents they seized – for example, that some were "court, legal, or police documents," while others were flight manuals and notebooks (see Tr. 145-46, 193-96) – does not undermine their testimony that they did not read the documents.

Defendants have not demonstrated that Fihlman, Catalano, Waters and Lloyd's cursory review of Defendants' Documents intruded upon their attorney-client privilege in violation of their Sixth Amendment rights.

As to USAO personnel, Defendants argue that prosecutors violated their Sixth Amendment rights both by viewing privileged documents and by failing to employ a taint team to review and produce Defendants' Documents to defense counsel.  (Def. Post-Hrg. Br. (Dkt. No. 554) at 5, 10-13)

As discussed above, after the Defendants' extradition on October 17, 2019, in November 2019, Adamu's counsel asked the Government to provide him with "the actual papers . . . which Adamu received from his lawyer in Croatia.  This would include any notes made by Adamu."  (DX 15 at 2; Tr. 259-61)  Subsequent emails between AUSAs Hellman and Hanft make clear that the prosecution team was aware that "a lawyer communication may have been involved" in the documents seized from the Defendants at the time of their extradition.  (DX 15, DX 16; Tr. 259-63)  Hellman conceded as much during his testimony.  (Tr. 250)  Given these circumstances, the Government should have, but did not, take appropriate steps – in November 2019 and continuing up until August 2021 – to insulate the prosecution team and the investigating agents from materials it had reason to suspect were privileged.[32]

Having said that, there is no evidence that AUSA Hellman himself read Defendants' Documents.  Hellman testified that he did not open any of the PDFs of the scanned

---

[32]  It was not until August 2021 that the Government utilized a taint paralegal to scan and re-produce to defense counsel Defendants' Documents.  (Tr. 239)  Instead of using a taint team during the period between November 2019 and August 2021 to review Defendants' Documents and to make a determination as to whether any documents were privileged, the Government used an agent and analyst who were part of the investigative team (see Tr. 133, 179) to scan these documents in preparation for producing them in discovery.  Although in January 2020, AUSA Hellman instructed Agent Waters not to review Defendants' Documents, that warning came months after the documents had been scanned, and did not involve all of the DEA and USAO personnel working on the case.  (Tr. 237)  AUSA Hellman's failure to recognize the need to implement a taint team earlier, and to take appropriate steps to ensure that members of the investigative team were not exposed to privileged material, suggest a lack of appropriate training at the USAO concerning the handling of potentially privileged material.

documents that Analyst Lloyd emailed to him on November 8, 2019.  (Tr. 236)  And in January

2020, after Hellman concluded that Defendants' Documents might contain privileged

information, he warned Agent Waters not to review the materials.  (Tr. 237)  While Hellman

accessed the file sharing platform loaded with the Defendants' Documents in order to add

photographs and to remove a consular notice before the contents were produced to Defendants

(DX 21; Tr. 287-89), there is no evidence that Hellman viewed or read privileged material.

            USAO Paralegal DeLuca – who was part of the prosecution team – accessed

electronic versions of Defendants' Documents in November 2019 and January 2020.[33]  (DX 20

at 2)  DeLuca's November 2019 review of the documents seized at the time of the Defendants'

extradition was sufficient for him to state that the documents Agent Waters uploaded to the file

exchange server in January 2020 "looked familiar."  (Id.)  While it is undisputed that DeLuca

accessed Defendants' Documents in order to produce them to defense counsel (see Govt. Post-

Hrg. Br. (Dkt. No. 562) at 40-41), there is no evidence that DeLuca read these documents, that

he disclosed their contents to Hellman, or that he did more than glance at the documents while

processing them for purposes of producing them to defense counsel.

## 1. Whether Defendants Were Prejudiced by the Government's Access to Defendants' Documents

            While Defendants argue that "the government's conduct from before the

extradition through at least January 2020 intruded on [Defendants'] attorney-client relationship

. . . [without] justification," Defendants do not contend that the Government engaged in

intentional wrongdoing or that it acted with a "manifestly and avowedly corrupt [purpose]."

(Def. Post-Hrg. Br. (Dkt. No. 554) at 33 (citing Gartner, 518 F.2d at 637))  Defendants instead

---

[33]  Neither side called DeLuca to testify at the Kastigar hearings.

argue that the Government acted with "reckless disregard" for their rights.  (Id.)  Accordingly, in order to state a Sixth Amendment violation, Defendants must show that they were prejudiced by the Government's conduct.  See Schwimmer, 924 F.2d at 447 ("[U]nless 'the conduct of the Government has . . . been . . . manifestly and avowedly corrupt,' . . . a defendant must show prejudice to his case resulting from the intentional invasion of the attorney-client privilege." (quoting Gartner, 518 F.2d at 637)); Sattar, 2002 WL 1836755, at *6 ("Where the intrusion upon an attorney-client communication is unintentional or justified there can be no violation of the Sixth Amendment without a showing that the intercepted communication was somehow used against the defendant to the defendant's prejudice.").

Here, in an effort to show prejudice, Defendants contend that the Government's theory of the case changed in two respects after its improper review of Defendants' Documents. According to Defendants, the Government dropped its assertions that (1) Landji helped co-pilot the flight into Zagreb; and (2) that the flight into Zagreb was a "black flight."  (Def. Post-Hrg. Br. (Dkt. No. 554) at 18-19)

As to the first point, the Government argues that it has not changed its position as to who flew the G2 aircraft.  In his affidavit submitted in support of the Government's extradition application, Agent Waters described "a plan to ship cocaine to Croatia via an aircraft (the Aircraft) flown by LANDJI and ADAMU."  (DX 9, ¶ 9) (emphasis in original).  Defendants have not offered evidence demonstrating that the Government has changed its position as to the conspirators' plan regarding who would fly the G2 into Zagreb from Mali.  Defendants point to Hellman's testimony that "Curtis Seal was . . . on the plane" with the Defendants, and that Seal "handled substantial, if not primary, responsibility for flying the plane."  Defendants acknowledge, however, that Hellman testified that they also "had a hand [in flying the plane] at

various points."  (Def. Post-Hrg. Br. (Dtk. No. 554) at 19 (citing Tr. 292-93))  Hellman's

testimony that the Defendants "had a hand" in flying the plane is consistent with Waters'

affidavit describing a plan to transport cocaine in a plane "flown by" Defendants.

As to the second point – whether the flight into Zagreb was a "black flight" – the

Government has shown by a preponderance of the evidence that its decision to drop any

argument that the flight into Zagreb was a black flight was premised on sources wholly

independent from Defendants' Documents.

The factual background is as follows:  In Agent Waters' November 8, 2018

testimony before the grand jury, he testified that the G2 aircraft did not "land [in Zagreb] in the

normal way that a regular aircraft lands," because the plane's "transponders [were] off."[34]  (DX

25 at 24; Tr. 372-73)

On March 2, 2020, the Government conducted a proffer session with Cardona-

Cardona.  No Government personnel who had been exposed to Defendants' Documents

participated in this proffer session, and none of the questions at that proffer session were based

on information contained in Defendants' Documents.  (Tr. 450-51)  During this proffer session,

Cardona-Cardona reported that black flights into Central Europe were not typically done.

Cardona-Cardona went on to say that he had not discussed with the Defendants or any other co-

conspirators whether the flight into Zagreb would or should be a black flight.  (Tr. 392, 394)

Agent Waters then interviewed Seal, who volunteered that an "unusual" aspect of

the flight was that the plane's transponders were not functioning.  As a result, the plane would

---

[34]  As Agent Waters explained at the <u>Kastigar</u> hearing, when a flight's transponders are not
functioning – a circumstance sometimes referred to as a "black flight" – a plane can "still be
detected on radar" but it "is not recognizable to other people in the aviation industry as to what
aircraft that is."  By contrast, when the "transponders are on, . . . . [the] dot [on the radar screen]
will be associated with the airplane's registration."  (Tr. 373)

have appeared on the radar screen but would not have been identifiable.  Seal stated that the transponders had not deliberately been made non-functional.  (Tr. 363-65)

Based on Cardona-Cardona and Seal's statements, the Government decided not to argue at trial that the flight into Zagreb was a black flight.  (See Tr. 394)

Defendants argue the Government's showing is insufficient because (1) Defendants have other examples for how the Government changed its theory of the case[35] (see Tr. 463); and (2) "the government must 'undergo a line-by-line, piece by piece analysis of the evidence to determine an independent source.'"  (Def. Reply Br. (Dkt. No. 571) at 8-9 (quoting United States v. Martinez, 81 F. Supp. 3d 1046, 1056 (D. Colo. 2015))  According to Defendants, in order to show "that Cardona-Cardona's testimony has not been shaped, altered, or affected . . . in any way by the [D]efendants' [D]ocuments," "the law requires . . . a run-through of [Cardona-Cardona's] testimony and . . . the [G]overnment has to establish the independent source of each portion of that testimony."  (Tr. 465, 469-70)

The out-of-circuit cases that Defendants rely on for this proposition are not on point, however, because they involve the use of compelled testimony to obtain an indictment.  (See Def. Reply Br. (Dkt. No. 571) at 8 (citing Martinez, 81 F. Supp. 3d at 1056 (D. Colo. 2015); United States v. Hampton, 775 F.2d 1479, 1486 (11th Cir. 1985)))

Moreover, this Circuit has not endorsed the taint theory proffered by Defendants here – that "the [G]overnment's thought process or questioning of witnesses may have been

---

[35] Following the October 8, 2021 Kastigar hearing, Defendants submitted ex parte a list of other areas in which the Government's theory of the case had allegedly shifted in response to viewing Defendants' Documents.  (See Oct. 8, 2021 Ex Part Submission Lodged Under Seal (Dkt. No. 633); Tr. 475-76)  Defendants' ex parte submission lists twelve topics that largely focus on facts about the G2 aircraft and the absence of certain types of evidence from the Government's case. This list does not change the Court's view that a shift in the Government's strategy attributable to Defendants' Documents has not been shown.

influenced by [its access to Defendants' Documents]." See United States v. Rivieccio, 919 F.2d 812, 815 (2d Cir. 1990) (holding that use of immunized testimony to shape the questioning of witnesses and "ascertain [the defendant's] demeanor" was "merely tangential and was therefore not a prohibited use"); accord United States v. Mariani, 851 F.2d 595, 600 (2d Cir. 1988) (declining to "foreclose the prosecution of an immunized witness where his immunized testimony might have tangentially influenced the prosecutor's thought processes in preparing the indictment and preparing for trial"; noting that the Government did not make "direct use" of the testimony); Schwimmer, 924 F.2d at 446 (rejecting argument that "even the indirect use of privileged information by the prosecution is prohibited"). In sum, even if – contrary to the evidence – Government personnel had read Defendants' Documents, and even if the Government's thought processes and questioning of Cardona-Cardona had been influenced by its review of Defendants' Documents, such non-evidentiary, tangential use of Defendants' privileged material would not constitute a Kastigar violation. See Schwimmer, 924 F.2d at 445-46 (holding that although the Government had "intentionally obtained . . . information protected by the attorney-client privilege" – in the form of workpapers of the defendant's accountant – "any influence on the government's case by information obtained at [subsequent] interviews or from the workpapers was 'wholly conjectural and insubstantial,'" and thus "not . . . an improper use").

Defendants also argue that they were prejudiced because their "trial strategy" was exposed to the Government. (Def. Post-Hrg. Br. (Dkt. No. 554) at 33-34 (emphasis omitted)) As discussed above, one page of the 2,584 pages agents removed from the Defendants' luggage constitutes highly sensitive, attorney work product material. This document reflects a Croatian lawyer's proposed trial strategy for Landji. While the Government had access to this page as a

result of seizing Defendants' Documents, there is no evidence that any agent or prosecutor read this page.  Indeed, all of the evidence is to the contrary.  Defendants have cited no case suggesting that this Court should presume prejudice under these circumstances.[36]

Because there is no evidence that the Government (1) acted with a "manifestly and avowedly corrupt [purpose]"; or (2) intentionally intruded on the Defendants' attorney-client privilege and thereby caused prejudice to the Defendants, this Court's October 12, 2021 Order (Dkt. No. 584) denied their motion for sanctions based on a violation of their Sixth Amendment rights.

## II. MOTION TO DISMISS INDICTMENT PURSUANT TO *KASTIGAR*

### A. Applicable Law

Defendants argue that "[t]he evidence adduced at the [Kastigar] hearing[s] more than suffices to shift the burden" to the Government to disprove taint under Kastigar – that is, to

---

[36] Defendants cite Gartner and United States v. Danielson, 325 F.3d 1054, 1074 (9th Cir. 2003), as amended (May 19, 2003) in support of their argument that prejudice should be presumed under the circumstances here (Def. Post-Hrg. Br. (Dkt. No. 554) at 33-34), but neither case supports their argument.

In Gartner, the court held that there was "no actual intrusion upon the confidential attorney-client relationship" arising from the Government's taping of a meeting between the defendant, his attorney, and a co-defendant cooperating with the Government.  Gartner, 518 F.2d 633 at 637.  The court also noted that there was "no evidence that Gartner suffered any prejudice as a result [of the Government's taping of the meeting] since no trial strategy was discussed. . . ."  Id. at 638.

In Danielson, the Ninth Circuit concluded that the Government "deliberately sent its informant . . . to obtain information from [the defendant]," and that the informant shared the information he elicited about the defendant's trial strategy with the Government, which analyzed that information in a subsequent memorandum.  Danielson, 325 F.3d at 1074.  Even in these egregious circumstances the Ninth Circuit did not presume prejudice.  The court instead remanded for an evidentiary hearing to determine whether the Government had derived "its pre-trial and trial strategy" from independent sources.  Id.

prove that the Government's evidence comes from legitimate and independent sources.  (Def. Post-Hrg. Br. (Dkt. No. 554) at 29)

Kastigar provides defendants with broad use and derivative use protection for compelled testimony.  Indeed, Kastigar "prohibits the prosecutorial authorities from using the compelled testimony in any respect."  Kastigar v. United States, 406 U.S. 441, 453 (1972). "This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures."  Id. at 460. Kastigar also sets a high standard for prosecution where the Government has had access to compelled testimony:  "[w]hen a witness has been compelled to testify relating to matters for which he is later prosecuted, the government bears 'the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources.'"  United States v. Allen, 864 F.3d 63, 91 (2d Cir. 2017) (quoting Kastigar, 406 U.S. at 461-62).

Once the burden shifts to the Government, it must show – by a preponderance of the evidence – "that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony."  Kastigar, 406 U.S. at 460.  This is a "heavy, albeit not insurmountable, burden. . . ."  Allen, 864 F.3d at 92.  "[A] bare, generalized denial of taint from a witness who has materially altered his or her testimony after being substantially exposed to a defendant's compelled testimony is insufficient as a matter of law to sustain the prosecution's burden of proof[, however]."  Id. at 97.

The same protection against use and derivative use applies where the Government has obtained information protected by the attorney-client privilege.  Schwimmer, 924 F.2d at 446 ("The government must demonstrate that the evidence it uses to prosecute an individual was

derived from legitimate, independent sources," and not "improperly" derived from "privileged information."). The Second Circuit has not addressed in the context of attorney-client privilege, however, the threshold showing a defendant must make concerning the nature of the intrusion into the attorney-client privilege such that the burden shifts to the Government to show that its evidence comes from an untainted source.

Given the uncertainty about what standard the Second Circuit would deem appropriate in the context of an alleged Government intrusion into material protected by the attorney-client privilege, this Court conducted an evidentiary hearing concerning whether the Government's evidence was free from any taint arising from access to privileged information. (See Tr. 314-15 (noting that "there's a dearth of law in the Second Circuit" as to when the burden shifts in a Kastigar analysis concerning access to privileged materials, and that "it seemed prudent to [the Court], given the absence of governing authority in this circuit, to take evidence on the issue of whether the [G]overnment's investigation and prosecution of the defendants was tainted by [the Government's] access to privileged material"))

B.    **Analysis**

Defendants concede that the bulk of the Government's evidence in this case was collected before the Defendants' extradition from Croatia. (Def. Post-Hrg. Br. (Dkt. No. 554) at 36) Agent Brannon testified that the only evidence recovered after Defendants' extradition was (1) the cockpit voice recorder from the G2 aircraft that was flown into Zagreb; (2) statements made by Curtis Seal during his DEA interview; and (3) statements made by Cardona-Cardona during his proffer sessions with the Government. (Tr. 317)

With respect to evidence collected by the Government post-extradition, "if it appears that that pursuit could have been motivated by both tainted and independent factors, the

court must determine whether the government would have taken the same steps entirely apart from the motivating effect" of the privileged materials.  United States v. Nanni, 59 F.3d 1425, 1432 (2d Cir. 1995) (quotation marks and citation omitted).

Here, the Government demonstrated at the October 8, 2021 hearing that the decision to obtain the cockpit voice recorder, and the decision to pursue interviews of Seal and Cardona-Cardona, were not motivated by anything contained in Defendants' Documents.

As to the cockpit voice recorder, the Government obtained this item at the Defendants' request.  (Tr. 368-69, 437-38)

As for Seal – as one of the three occupants of the plane flown into Zagreb – he was an obvious candidate for interview.  (See Tr. 362-63, 385)

As for Cardona-Cardona – given his extensive experience in international drug trafficking, narco-terrorism, and arms trafficking, and his status as a "consolidated priority organization target" of the DEA – the Government's witnesses credibly testified that he was an obvious candidate for a proffer session.  Cardona-Cardona was ideally situated to provide valuable information both in this case and in connection with unrelated investigations worldwide.  (Tr. 329-30, 391-92)  There is no evidence that contradicts the credible testimony from the Government's witnesses that the proffer sessions with Cardona-Cardona were not influenced by any Government access to Defendants' Documents.[37]

In sum, the October 8, 2021 Kastigar "hearing evidence demonstrated that no preview of defense strategy was derived from [Defendants' Documents] and that no other

---

[37]  United States v. Pelletier, 898 F.2d 297, 303 (2d Cir. 1990) – cited by Defendants (see Tr. 462, 473) – is not to the contrary.  In Pelletier, "the government . . . made direct use of . . . immunized evidence."  Accordingly, it was of no moment that "the government [had] independent sources for some of the evidence used at trial."  Pelletier, 898 F.2d at 303.  No such use of privileged information took place here.

violative use of privileged information had occurred." <u>Schwimmer</u>, 924 F.2d at 447.  It was for

this reason that this Court issued the October 12, 2021 Order denying Defendants' motion to

dismiss the indictment under <u>Kastigar</u>.

## III.  <u>MOTION FOR SANCTIONS UNDER THE COURT'S SUPERVISORY POWERS</u>

        Defendants argue that the Government "demonstrated a pattern of recklessness"

that should be "'remedied under the Court's supervisory powers.'"  (Def. Post-Hrg. Br. (Dkt. No.

554) at 34 (quoting <u>United States v. Renzi</u>, 722 F. Supp. 2d 1100, 1132 (D. Ariz. 2020)))  In

addition to the alleged improper review of privileged material, Defendants complain that the

Government "repeatedly misrepresented to defense counsel and the Court that all documents in

the [G]overnment's possession had been disclosed, and submitted misleading declarations to the

Court in response to the defendants' motions."  (<u>Id.</u>)

        "The supervisory power 'permits federal courts to supervise the administration of

criminal justice among the parties before the bar.'"  <u>United States v. HSBC Bank USA, N.A.</u>,

863 F.3d 125, 135 (2d Cir. 2017) (quoting <u>United States v. Payner</u>, 447 U.S. 727, 735 n.7

(1980)).  "'The purposes underlying use of the supervisory powers are threefold:  to implement a

remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a

conviction rests on appropriate considerations validly before the jury; and finally, as a remedy

designed to deter illegal conduct.'"  <u>Id.</u> (quoting <u>United States v. Hasting</u>, 461 U.S. 499, 505

(1983)).  "[G]enerally the exercise of supervisory power arises in the context of requests by

defendants to vacate convictions . . . , dismiss indictments . . ., or invalidate sentences."  <u>United

States v. Johnson</u>, 221 F.3d 83, 96 (2d Cir. 2000) (citations omitted).  "Courts have also

traditionally exercised their supervisory powers to establish rules of evidence and procedure to

govern the administration of justice in the federal courts."  <u>HSBC Bank</u>, 863 F.3d at 135.

The supervisory powers "doctrine is an extraordinary one which should be sparingly exercised." Id. at 136 (citation and quotation marks omitted). A district court's "supervisory authority is not a form of free-floating justice, untethered to legal principle," and cannot be used "as a substitute" for "jurisprudence [that] adequately safeguards against" constitutional violations. United States v. Ming He, 94 F.3d 782, 792 (2d Cir. 1996) ("[C]ourts cannot 'fashion their own "sub-constitutional" limitations on the conduct of law enforcement agents.'" (citation omitted)); accord United States v. Lambus, 897 F.3d 368, 401 (2d Cir. 2018) (holding that courts cannot invoke "supervisory powers" to address suppression motions because the Second Circuit has provided a framework that governs the resolution of alleged Fourth Amendment violations). Indeed, "[i]n situations where . . . [a] substantive constitutional provision supplies a standard for the [remedy sought], courts must follow that standard, not invent their own." United States v. Maxwell, No. 20-CR-330 (AJN), 2021 WL 2776658, at *6 (S.D.N.Y. June 25, 2021).

While a court has, "[u]nder the supervisory powers doctrine, . . . the authority to dismiss [an] indictment[,] 'absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment [due to government misconduct] is plainly inappropriate, even though the violation may have been deliberate.'" United States v. Turner, 23 F. Supp. 3d 290, 319 (S.D.N.Y. 2014) (quoting United States v. Morrison, 449 U.S. 361, 365 (1981)). Given this "exacting standard," indictments are "rarely dismiss[ed] based on government misconduct." Id.

Citing Ninth Circuit case law, Defendants ask this Court to use its supervisory authority to dismiss the indictment, disqualify the "tainted agents and prosecutors," or preclude evidence developed after Defendants' extradition. (Def. Post-Hrg. Br. (Dkt. No. 554) at 36) The Second Circuit has established a framework for addressing Sixth Amendment violations,

however, including those premised on improper access to privileged material.  See Gartner, 518 F.2d at 637.  Accordingly, resort to the supervisory powers doctrine would be improper.  See Ming He, 94 F.3d at 792; Johnson, 221 F.3d at 96.

And while the Court acknowledges that the Government made repeated misrepresentations to both defense counsel and the Court concerning, inter alia, the nature of Defendants' Documents, Defendants have not demonstrated that they suffered prejudice as a result of those misrepresentations.  Accordingly, Defendants' request for dismissal of the Indictment or lesser sanctions under the Court's supervisory powers was denied.

## **CONCLUSION**

For the reasons stated above, this Court issued its October 12, 2021 Order denying Defendants' motion to dismiss the Indictment and for lesser sanctions.

Dated:  New York, New York
        November 18, 2021

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

59