UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| -against- | **MEMORANDUM OPINION & ORDER** |
| JEAN-CLAUDE OKONGO LANDJI and JIBRIL ADAMU, | (S1) 18 Cr. 601 (PGG) |
| Defendants. | |

PAUL G. GARDEPHE, U.S.D.J.:

Defendants Jean-Claude Okongo Landji and Jibril Adamu are charged with

conspiring to distribute and possess with intent to distribute five kilograms and more of cocaine

on board a U.S.-registered or U.S.-owned aircraft, or by a U.S. citizen on board any aircraft, in

violation of 21 U.S.C. §§ 959(c), 959(d), and 963. ((S1) Indictment (Dkt. No. 39))  Landji and

Adamu proceeded to trial on October 6, 2021.  (Oct. 6, 2021 Minute Entry)  On October 25,

2021, the jury returned a verdict finding both Defendants guilty.  (Verdict (Dkt. No. 605); Trial

Tr. ("Tr.") 1183-86)[1]

Landji and Adamu have moved for a judgment of acquittal under Federal Rule of

Criminal Procedure 29, or alternatively for a new trial under Rule 33.  (Dkt. Nos. 638-39)  Landji

and Adamu argue that (1) the evidence is insufficient; (2) this Court erred in permitting the

Government to introduce extractions from their cell phones; and (3) the venire and petit jury did

not reflect a fair cross-section of the community.  (Landji Br. (Dkt. No. 638) at 33-40, 42-44, 46-

---

[1] Citations to page numbers of docketed material correspond to the pagination generated by this
District's Electronic Case Files ("ECF") system.  Citations to the trial transcript correspond to
the pagination generated by the court reporter.  Unless otherwise noted, references to "Tr." are to
the trial transcript.  (See Dkt. Nos. 606, 608, 612, 614, 616, 618, 620, 622, 624, 626, 628, 630)
All references to "Voir Dire Tr." are to the separately paginated transcript of the voir dire.

49; Adamu Br. (Dkt. No. 639) at 3-14)  Landji also argues that (1) the jury was prejudiced by references to the presence of cocaine that was not admitted at trial; and (2) the conditions of confinement during trial deprived him of a meaningful opportunity to participate in his defense. (Landji Br. (Dkt. No. 638) at 40-42, 44-45)

For the reasons stated below, Landji's and Adamu's motions will be denied.

## BACKGROUND

### I.      EVIDENCE AT TRIAL

#### A.      The Government's Evidence

The Government called six witnesses at trial, including co-defendant and Government cooperator David Cardona-Cardona.  The Government's proof also included video and audio recordings of the Defendants, text messages authored by the Defendants, stipulations as to certain facts, and other documentary evidence.

##### 1.      Cardona-Cardona's 2009 and 2010 Contacts with Landji and Adamu

In 2009 and 2010, Cardona-Cardona – an international drug trafficker and arms dealer – schemed with Landji and Adamu to transport cocaine from South America to West Africa.[2]

Landji met Cardona-Cardona in 2009 through a mutual acquaintance "Loco Lucho," with whom Cardona-Cardona had trafficked cocaine.  (Tr. 286-87, 331)  At their first meeting, Cardona-Cardona, Landji, Lucho, and others discussed a plan to transport two tons of cocaine using a Gulfstream III – a plane typically used for charter or business flights.  (Tr. 287-

---

[2]  Evidence concerning conduct that took place prior to October 2017 was received subject to a limiting instruction.  The jury was instructed that conduct "prior to the October 2017 to October 2018 time period alleged in the indictment" could only be considered "for the purpose of deciding whether the defendant had the state of mind, knowledge, and intent necessary to commit the crime charged in the indictment."  (Tr. 1155)

88) Cardona-Cardona gave Landji money to lease the Gulfstream III through Landji's aviation charter company, Okland Aviation. (Tr. 289, 405; GX 502W) The conspirators agreed that Landji – a pilot and a U.S. citizen – would fly the Gulfstream III from the United States to Conakry, Guinea in West Africa, and then on to Venezuela, where he would to pick up the cocaine, and then return to Conakry with the drugs. (Tr. 90, 289-90, 329; GX 1000) A military officer who controlled the airport in Conakry was paid a $50,000 bribe to ensure that the drugs would be secure upon arrival. (Tr. 330-31) In addition, because Landji had not been authorized to fly into Venezuela airspace, he planned to land at a Caribbean island close to Venezuela and await clearance from Venezuelan officials. These Venezuelan officials – who had likewise been bribed – would inform Landji when he could fly to Venezuela to pick up the cocaine. (Tr. 290, 327-34, 570-71)

The scheme did not proceed as planned. After Landji landed at the Caribbean island, he did not receive the necessary authorization to enter Venezuela. (Tr. 332-34) To placate officials at the airport – who were suspicious as to his reasons for being there – Landji falsely reported that the plane had technical issues. (See Tr. 332-34, 571) Landji eventually returned to West Africa without picking up the cocaine in Venezuela. (Tr. 333, 572)

A few months later, Cardona-Cardona, Landji, and Lucho attempted to transport 2.5 tons of cocaine from Venezuela to West Africa using the Gulfstream III. (Tr. 334, 336) Landji was responsible for arranging for the plane to be picked up in the United States, resolving issues with the pilots' expired licenses, and preparing the flight plan. (Tr. 334-35, 344-45) Cardona-Cardona and Landji agreed that the plane would be officially registered to fly from Mali to Conakry. Instead of landing in Conakry, the plane would fly on to Venezuela to pick up the cocaine, and would then return to Conakry. (Tr. 335-39, 343-46; GX 238) This flight would be

a "black flight" – that is, an undeclared flight in which no flight plan is filed and the plane's transponders and GPS location systems are disabled so that the plane cannot be detected. (Tr. 275-76, 335-36, 458) Cardona-Cardona bribed officials in Conakry to ensure that the drugs would be secure upon arrival. (Tr. 336-38) Although the plane arrived in Mali, the remainder of the operation had to be cancelled because the plane's batteries were overheating. (Tr. 343-44, 347) Despite these failed operations, Cardona-Cardona and Landji "agreed not to lose touch." (Tr. 348)

In or around 2010, Adamu – who is also a pilot – was introduced to Cardona-Cardona by "Jimmie," a mutual friend. Jimmie was one of Cardona-Cardona's cocaine customers. (Tr. 271-72, 355) Cardona-Cardona and Adamu discussed purchasing a King Air 350 or a Cessna Conquest II that would be used to transport cocaine from South America to Conakry in West Africa. (Tr. 271-75, 354, 708) Cardona-Cardona and Adamu estimated that, depending on which plane they purchased, they could transport between 800 kilos and one ton of cocaine at a time. (Tr. 275) Adamu agreed to fly the plane on black flights. (Tr. 275-76) Cardona-Cardona and Adamu also discussed bribing officials at airports and using makeshift landing strips to avoid detection by authorities. (Tr. 276-77) Ultimately, Cardona-Cardona and Adamu did not purchase either plane. (Tr. 277)

That same year, Cardona-Cardona and Adamu – and Cardona-Cardona's friend Juan Carlos – began planning a separate narcotics trafficking operation. (Tr. 277-78) As part of that operation, Adamu was to be paid to fly a Boeing 727 – "a large-capacity cargo plane" – from Senegal to Panama. (Tr. 278-79, 709) The plan was for Adamu to transport a large quantity of cocaine from Panama to West Africa. (See Tr. 278-79, 354) After Adamu arrived in Panama, the Colombian drug traffickers who held the cocaine decided to use a different pilot,

and Adamu returned to West Africa.  (Tr. 278-79)  The Boeing 727 airplane Adamu had flown to

Panama was loaded with five tons of cocaine and flown to West Africa.  The plane crashed in

Mali, however, as a result of a sandstorm.  (Tr. 279-80)  After Adamu returned to Africa, Adamu

and Cardona-Cardona discussed Adamu's compensation for his participation in the operation,

and Cardona-Cardona informed Adamu that the plane had crashed in Mali with the cocaine, an

event that was reported internationally.  (Id.)

### 2. Cardona-Cardona's 2016-17 Contacts with Landji and Adamu

In 2016, Landji purchased a Gulfstream II airplane.  Although Landji purchased

the plane in Portugal, it was registered in the United States.  (Tr. 261-62, 348, 350; GX 214,

1000)  While Landji was in Europe, he contacted Cardona-Cardona to discuss using the plane to

traffic cocaine.  (Tr. 261-62, 348)  A few months later, Landji and Cardona-Cardona met in

Lomé, Togo and discussed using the plane to transport two tons of cocaine from South America

to West Africa.  (Tr. 348-49)  Cardona-Cardona told Landji that he needed a "trusted pilot" to

transport the drugs, and suggested Adamu.  (Tr. 349-50, 353-54)  Landji and Cardona-Cardona

discussed the training Adamu would have to receive in order to pilot the Gulfstream II, as well as

the maintenance required for the plane.  (Tr. 350)  Landji and Cardona-Cardona also discussed

changing the plane's U.S. registration.  Cardona-Cardona expressed concern that using a U.S.-

registered plane to transport illegal drugs would subject them to criminal liability under U.S. law.

(Tr. 350-51)  Cardona-Cardona gave Landji $350,000 to cover the cost of changing the plane's

registration and performing required maintenance on the plane.  (Tr. 351-52)  Cardona-Cardona

and Landji also purchased new phones so that they could communicate about the operation

without detection.  (Tr. 352-53)

A few months later – in late 2016 or early 2017 – Cardona-Cardona met with Adamu and Jimmie in Lomé to discuss the operation. (Tr. 353-55) Cardona-Cardona told Adamu that Landji "had proved himself to be courageous" in their prior drug trafficking operations. (Tr. 355-56) Cardona-Cardona and Adamu agreed that Adamu's role in the new operation would be to fly a plane carrying cocaine from South America to West Africa. (Tr. 356-57) Adamu requested that he be paid $250,000 per flight. (Tr. 357-58)

The next day, Cardona-Cardona met separately with Landji in Lomé. (Tr. 358-59) Landji told Cardona-Cardona that he wanted to be paid $1,000 per kilogram of cocaine, and that he wanted to "be in charge of everything," including the plane's crew and expenses. (Tr. 359)

Cardona-Cardona then introduced Landji to Adamu, and the three men discussed the logistics of the operation – including how much cocaine would be transported (two tons per shipment) and under what circumstances black flights would be utilized. (Tr. 359-63) Cardona-Cardona, Landji, and Adamu agreed that the plane would transport cocaine from South America to the Western Sahara, either Sierra Leone or Conakry. (Tr. 360-61; see also Tr. 249-50)

### 3.    Landji and Adamu Prepare for the 2018 Operation

Over the next few months, Landji and Adamu began preparing for the transport of cocaine from South America to West Africa. Adamu was responsible for overseeing the maintenance of the Gulfstream II, then in Mali. (Tr. 260, 373-74) In September 2017, Landji travelled to the Western Sahara to inspect various landing strips to determine whether they would be suitable for the operation. (See Tr. 363, 368, 841-42, 847-52; GX 502Q1, 502X1) Landji used his phone to take photos and videos of the landing strips and considered whether they were large enough to accommodate the Gulfstream II, and whether the desert dust at these locations

6

would interfere with the functioning of the plane.  (See Tr. 364-66, 368-73, 841-42, 847-52; GX 502Q, 502X, 502Y)  Landji reported to Cardona-Cardona that he felt "confident" about the landing strips he visited, because these sites were kept secure by a local military officer with close ties to Cardona-Cardona's friends, Richard and Gordo.  (Tr. 251-52, 361-63, 369-73)

Landji and Adamu were in frequent contact at this time, including through phone calls and text messages over the Whatsapp platform.  (See, e.g., GX 501S, 501T, 501U1, 501U2, 501U3)  Landji and Adamu discussed the progress of the operation, and Landji helped coordinate Adamu's training to become certified to fly the Gulfstream II.  In March 2018, for example, Adamu sent Landji a Whatsapp message stating:  "They are ready for us and the aircraft" when "we finish training."  Adamu also stated that, "[o]nce you conclude[,] I sure he is ready to deal."  (GX 501U1; see also Tr. 350, 385-86, 409-10, 807, 827; GX 501Z1-T)  Landji and Adamu also discussed the status of the operation with Youssouf Fofana, one of Cardona-Cardona's cocaine customers who acted as an intermediary between Landji and Adamu on the one hand, and Cardona-Cardona on the other.  (Tr. 252-54, 374; see also Tr. 261-62)

In May 2018, Cardona-Cardona contacted Landji over Whatsapp to discuss a "big opportunity" to increase the scale of their planned operation.  (Tr. 384-92; GX 501Z1-T, 501Z2-T, 501Z3-T, 501Z4-T)  At that time, Cardona-Cardona was in communication with an individual he knew as "Rambo."  Rambo posed as a large-scale drug trafficker who was interested in purchasing planes that could be used to transport drugs.  In reality, Rambo was a Drug Enforcement Administration ("DEA") informant.  (Tr. 250, 389-90, 397-99)  Using coded language, Cardona-Cardona instructed Landji to meet him in Lomé, where Cardona-Cardona would "explain everything."  (Tr. 388-89; GX 501Z1-T, 501Z2-T)  Landji told Cardona-

Cardona, "I'm ready for everything" (GX 501Z3-T), and Cardona-Cardona told Landji that he would "have a business like never" (GX 501Z4-T).

### 4.   May 2018 Meetings in Lomé

A few days after Cardona-Cardona and Landji exchanged these text messages, Landji travelled to Lomé to meet with Cardona-Cardona. (Tr. 392)  Landji, Cardona-Cardona, and Fofana met outside of a hotel where Rambo was staying, and Cardona-Cardona briefly explained that they were going to meet Rambo to discuss Rambo's investment in their operation. (Tr. 392-95; GX 208)  Landji, Cardona-Cardona, and Fofana then went to the lobby area of the hotel, where Rambo joined them. (Tr. 395-96)  Over the next two days, the four men discussed the logistics of the scaled-up operation. (Tr. 396-97)

During these meetings – which Rambo secretly recorded – the men discussed purchasing cargo and charter planes that would be used to transport large quantities of cocaine under the "cover of a legal enterprise" – Landji's company, Okland Aviation. (Tr. 396-98; GX 301A, 303H; see also Tr. 491-92; GX 304D ("[T]he idea is to make a fusion of the real business with the illegal business."))  Rambo proposed that they transport drugs through the company's planes "twice a month" and conduct legal business "the rest of the time." (GX 304D)  Alternatively, he proposed mixing legitimate cargo – such as mangoes, bananas, or fish – with "our cargo" – i.e., narcotics – in order to avoid detection. (Tr. 492; GX 301D, 304D)  Landji responded "Yeah" and "[t]his will be a good time" to Rambo's proposals, indicating his agreement to the scheme. (Tr. 443-46, 492-93; GX 304D, 302E; see also GX 303M)  Landji told the others that he had two pilots at Okland Aviation "who are there solely for what we do" – that is, drug trafficking. (Tr. 471-75; GX 303Q-T, 303S-T)  Landji identified Adamu as one of the pilots who did the "dirty work." (Tr. 473-75; GX 303Q-T, 303S-T)

8

The four men discussed how they would avoid law enforcement detection, including by using black flights, secret landing strips, and bribes to airport officials. As to black flights, Landji explained which devices onboard an aircraft would have to be disabled in order to fly undetected to Africa with drugs. (Tr. 470-71; GX 303P; see also Tr. 463-66; GX 303L, 303M) Landji said that the King Air 350 airplane would be suitable for black flights, and that he had been seeking to purchase that plane in South Africa. (Tr. 464-65; GX 303L; see also GX 501CC, 501EE)

Landji also described the secret landing strips in remote desert locations that would be used to unload the narcotics shipments. Landji stated that the pilots could "leave the lights off" on the plane, unload the plane in "five . . . or ten minutes," and then "boom, boom, boom" take off with an empty plane. (Tr. 475-77; GX 303T) Landji also agreed that airport officials in Africa would be bribed to ensure that the narcotics remained safe when they were loaded and unloaded. (Tr. 401-04, 454-56; GX 303C) The four men discussed working with Landji's "friends" – a reference to a military officer and his associates who controlled the airport in Conakry, and whom Cardona-Cardona and Landji had bribed during a prior drug trafficking operation. (Tr. 330-31, 399-404; GX 301A) The drugs would be transported from West Africa to Europe. Odessa, Albania, and Montenegro were discussed as possible destinations, because Rambo represented that he had relationships with officials there. (Tr. 401; GX 301A, 302C, 302F, 303F, 303M)

Cardona-Cardona, Landji, Fofana, and Rambo also discussed the types of planes they would use for the drug shipments and the quantities of drugs those planes could carry. They discussed Landji's Gulfstream II, and the fact that it could transport as much as 2.5 tons of cocaine, depending on the distance the plane would be traveling. Landji told the others that they

would "keep the seat[s]" in the plane, but load it up with "paper" – referring to cocaine. (Tr. 410-12; GX 301C; see also GX 303D, 303S) They also discussed purchasing additional planes that could carry "bigger cargo." (Tr. 404-05; GX 301A; see also GX 303L) These larger planes included (1) the "Sukhoi Superjet," a "multipurpose" aircraft that could carry both passengers and cargo; (2) the "Ilyushin 76D," a cargo plane suitable for landing in the desert; and (3) the "Antonov 12," a cargo plane that has the ability to land in many types of terrain. (Tr. 479-85, 490-91; GX 304A, 304D; see also GX 210, 212, 213) The men also discussed the fact that the King Air 350 – which they agreed to use for black flights – would be able to transport as much as one ton of cocaine:

| | |
|---|---|
| Rambo: | Once [the King Air 350] is loaded . . . once the planes is with the tanks, everything. |
| Cardona-Cardona: | Uh-hum. |
| Rambo: | It creates weight. It creates weight. So how much weight more from the dope. |
| Landji: | One ton. |
| Rambo: | How much can we put in? |
| Cardona-Cardona: | One ton. |
| Rambo: | So one ton plus the gas. |
| Cardona-Cardona: | So one ton plus, plus the . . . fuel. One ton. |
| Rambo: | Is strong plane. |

(Tr. 486-90; GX 304C)

During the May 2018 Lomé meetings, Cardona-Cardona remarked that none of the planes they would use could be registered in the United States, because using a U.S.-registered plane would subject them to criminal liability under U.S. law:

| Cardona-Cardona: | If you put one kilo on a plane that has the American registration, it's the same thing as putting it in . . . in the middle of . . . of . . . of Madi . . . Madison Square Garden in New York. The same thing. For the justice system. |
| --- | --- |
| Landji: | Yes, yes. |

(Tr. 460-62; GX 303J)

Landji agreed that they would have to change the Gulfstream II's registration in order to use it for drug shipments:

| Cardona-Cardona: | But we're going to change the registration. |
| --- | --- |
| Fofana: | No, there's no way around that. |
| Landji: | No way around it. |

(Tr. 462-63; GX 303N-T; see also Tr. 469-70; GX 303O-T)

Landji also agreed that they would use the Gulfstream II to transport a small sample of drugs from Mali -- where the Gulfstream II was maintained -- to Montenegro, in order to show their European investors that they had the capacity to ship larger quantities of drugs:

| Cardona-Cardona: | It is very, very, very important . . . and is very good, uh . . . in a few time, as soon possible. I think in two, three weeks send the plane there for, for . . . flight proof. |
| --- | --- |
| Landji: | Uh-hum. |
| Cardona-Cardona: | To show them that we has . . . that kind of capacity. |
| Landji: | Yeah. |
| Rambo: | Is to show them the line is open. |
| Cardona-Cardona: | [overlapping voices] The line is open. |
| Landji: | [overlapping voices] Yeah, the line is open. |

(Tr. 452-53, 459-60; GX 303B, 303F; see also Tr. 457; GX 303E (Landji: "I will do it. I will take it. We go and do the testing."))

During this portion of the discussion, Landji asked whether the plane would be flying "empty." Rambo stated that the plane would carry a "small thing," "[n]othing expensive" – a reference to a small sample of cocaine – to show the investors that "we're ready for business." Landji responded "Yeah, cool, no problem." (Tr. 453-54; GX 303B) Landji later confirmed that he would transport a "kilo" of cocaine in the test shipment. (Tr. 463; GX 303L) Landji further agreed that, after completing the test shipment, they would begin transporting up to two tons of cocaine at least twice a month, or as frequently as every week. (See Tr. 451-52, 466-67, 492-93; GX 303B, 303M, 304D) Landji also confirmed that – after the narcotics shipments arrived in Europe – he would take responsibility for transporting the money paid for the cocaine – which could amount to as much as 40 million euros for a ton of cocaine – back to Africa. (Tr. 449-51; GX 303B)

The four men also agreed to purchase a new "Skype" or "PGP" phone for Landji that was specially encrypted; that Landji would use an encrypted messaging app called "Telegram"; and that they would use coded language when speaking with each other about cocaine – all in an effort to ensure that their scheme would not be discovered by law enforcement. (Tr. 485-86; 502-04; GX 304B, 305D-T; see also GX 501Z1-T)

### 5.   Landji and Adamu Finalize the Plan for the Test Shipment

While the May 2018 meetings in Lomé were underway, Adamu was waiting to receive an update regarding the operation. On May 27, 2018 – the first day of the meetings – Adamu sent Landji a message asking what the "next plan" was. (GX 503R3) Landji responded, "standby []we are in a meeting pls," to which Adamu responded "Ok.  Standing by when you done." (Id.) Adamu also sent Fofana a message, asking Fofana to call him back: "[I] have not heard from you and a[l]so jc [Jean-Claude] is not contact.  so dont know his program." (GX

503N4)  Fofana was tasked with informing Adamu what his role would be in the operation.  (Tr. 504-05)

On May 29, 2018 – after the Lomé meetings had concluded – Fofana contacted Adamu and said that he had a "programme" for Adamu, but that they had to meet.  Adamu responded, "Oook ! Where and when?"  (GX 503N4 (text message), 503N4 (voice note); Tr. 505, 507, 868; see also Tr. 517-18)  That day, Landji messaged Adamu asking him "to come out to" "Cotonou," to which Adamu responded, "ok.cool."  (GX 503U)  Landji and Adamu exchanged dozens of calls over the next week.  (See GX 503T)

In subsequent months, Landji continued to coordinate the trafficking operation with Fofana and Cardona-Cardona.  In a June 6, 2018 text message to Landji, Fofana stated that "[t]here is hope . . . [f]or Monte Negro" (GX 501Y4-T) – referring to the test shipment of cocaine they planned to transport from Mali.  In a June 10, 2018 text message to Cardona-Cardona – whose screen name on Whatsapp was "Antony Bah" (Tr. 383-84) – Landji stated that he would be speaking with their "friend," and that Landji would "organize things."  (GX 501Z5-T; see Tr. 509-10)

In July 2018, Landji and Fofana exchanged a series of text messages regarding the whereabouts of Gordo – the drug trafficker with ties to a military officer who controlled a landing strip in the Western Sahara that Landji intended to use.  Landji and Fofana discussed whether they would ask Gordo to invest $50,000 in their operation.  (GX 501Y7-T; see Tr. 252, 360-61, 370-71)  Landji and Fofana also discussed paying a $500,000 to $1 million bribe to a military officer who was stationed at the Conakry airport.  (GX 501Y8-T; see also Tr. 402-04)

Several months after the May 2018 Lomé meetings, Landji met with Cardona-Cardona and Fofana in Sierra Leone.  (Tr. 511)  Landji updated Cardona-Cardona on the

progress of his preparations, and asked for more money to cover the maintenance of the

Gulfstream II and to expedite the process to change its registration. (Tr. 511-13)  Cardona-

Cardona gave Landji $300,000 to cover these expenses. (Tr. 512)  Landji also inquired as to the

status of their plan to purchase additional planes, and Cardona-Cardona explained that Rambo

was "wait[ing] for us to do a gesture of good faith" – that is, a test shipment of cocaine – "before

the planes could be bought." (Tr. 513)

      In October 2018, Landji and Adamu began their final preparations for the test

shipment.  Landji and Adamu – who were in Mali conducting last-minute inspections and

adjustments to the plane (Tr. 514-15) – each remained in close contact with Fofana, exchanging

dozens of calls with him in October 2018 alone.  (See GX 502O (Landji); 503L (Adamu); see

also Tr. 810)  Landji's and Adamu's Whatsapp communications with Fofana make clear that

Fofana continued to be an intermediary between them and Cardona-Cardona throughout this

period.

      In an October 10, 2018 Whatsapp exchange, Fofana told Landji, "I am in

position" and "I am waiting to meet with David [Cardona-Cardona]."  Several hours later, Landji

reported to Fofana that "it is all good.  I spoke to our friend." (GX 501Y10-T)

      Fofana confirmed that Cardona-Cardona would meet Landji and Adamu when

they landed with the test shipment.  In an October 20, 2018 exchange, for example, Adamu asked

Fofana "[i]s david coming back before we depart," and Fofana responded "[y]ou will see him

there . . . [a]t the appointment." (GX 503N6)

      At about this time, Cardona-Cardona informed Landji and Adamu (through

Fofana) that Cardona-Cardona had changed the final destination of the test shipment from

Montenegro to Zagreb, Croatia, in a further effort to avoid detection.  (See Tr. 519-20; GX 402-

T) Cardona-Cardona then travelled to Zagreb to wait for Landji and Adamu to arrive with the one-kilogram test shipment. (Tr. 514) On October 18, 2018, Fofana reported to Landji that "David is there today." (GX 501Y11-T)

During this time, Croatian law enforcement authorities intercepted a number of phone calls between Cardona-Cardona and Fofana. In October 21, 2018 telephone calls, Fofana told Cardona-Cardona that he was having trouble finding someone to transport a single "diamond stone" – coded language for the one-kilogram test shipment of cocaine – because it was such a small quantity. (Tr. 517-22; GX 402-T, 403-T ("[F]inding a one-stone transporter is complicated. If it is a lot, it is quickly done.")) Cardona-Cardona and Fofana also discussed the need to obtain new "papers" because the flight plan Landji had prepared listed Montenegro as the destination. (See Tr. 519-20; GX 402-T, at 3, 6; GX 403-T, at 6; GX 406-T, at 2-4) In an October 26, 2018 telephone call, Cardona-Cardona instructed Fofana to tell Landji that, after Landji landed in Zagreb, he was to "leave the stone in the car" – code language for leaving the one kilogram of cocaine in the plane – and that Cardona-Cardona would retrieve the cocaine from the plane later in the evening. (Tr. 523-24; GX 407-T, at 5)

In the days leading up to Landji's and Adamu's flight to Zagreb, Adamu and Fofana exchanged text messages regarding the status of the flight. On October 28, 2018, Fofana informed Adamu that they would have to "pay for the delay" and that there was a "problem," and Adamu asked whether the "meeting" would be "cancelled." (GX 503N6) Fofana stated that he was conferring with "David," and asked whether Adamu could "move tomorrow." (Id.) Adamu responded: "Yes. We are going for a test flight now." (Id.)

On October 29, 2018, Adamu told Fofana that he was "[t]opping up oxygen" and "doing [a] flight plan," and that he was "with jc" – referring to Landji. (Id.) Soon thereafter,

Fofana messaged Adamu asking for an update ("[t]ell me something"), and Adamu responded with a photograph of him and Landji inspecting the plane. (Id.; GX 503N6C; see also GX 503W; Tr. 515-16)  At about this time, Fofana told Cardona-Cardona that the one kilogram of cocaine had arrived in Mali and that – according to Adamu – Landji had hidden the cocaine on the plane. (Tr. 525-28)

### 6.    The Arrest of Cardona-Cardona, Landji, and Adamu in Zagreb

On October 29, 2018, Cardona-Cardona was arrested by Croatian authorities in Zagreb. (Tr. 86, 528)  On the evening of October 30, 2018, Landji, Adamu, and a flight instructor took off from Mali on board the Gulfstream II and flew the plane – which contained the one-kilogram test shipment of cocaine – to Zagreb. (Tr. 87, 127-28, 515-16, 612)  Shortly after landing, Landji and Adamu identified themselves at passport control, and Croatian authorities arrested them. (Tr. 89)  Croatian authorities then took Landji back to the plane and secured it. (Tr. 90-91, 93-98, 128-29; GX 601A1 to 601A13, 602A1 to 602A15)  The following morning, members of Croatian law enforcement searched the Gulfstream II and recovered a white plastic bag with red and yellow markings in the plane's cargo area. (Tr. 95, 99, 141-47, 178-79; GX 102-03, 223-27, 241)  Inside the white bag was a black bag, and inside the black bag was a rectangular-shaped package containing a white powdery substance "with characteristics of cocaine." (Tr. 143-45, 179-85; GX 228-34)  Croatian law enforcement weighed the rectangular package and determined that it weighed approximately one kilogram. (Tr. 143, 147; GX 234)  The Croatian authorities also seized various electronic devices, including Landji's and Adamu's cell phones. (Tr. 139-41, 148; see GX 104-06)

Shortly after his arrest in Zagreb, Adamu was questioned by DEA agents. (Tr. 706-07)  During questioning, Adamu stated that he knew Cardona-Cardona and Fofana, and that

Fofana had told Adamu that Cardona-Cardona was in Europe. (Tr. 707-08) Adamu also admitted that he knew that Cardona-Cardona was involved in drug trafficking, and that Cardona-Cardona used planes for drug trafficking. (Tr. 708-10) Adamu told the agents that he had previously worked with Cardona-Cardona, including by attempting to broker an airplane sale for Cardona-Cardona and by piloting flights for him. (Tr. 708-09) Adamu stated that he had been paid $3,000 to pilot a Boeing 727 from West Africa to Panama, and that he was aware that that same aircraft later crash-landed in Mali while loaded with drugs. (Id.)

On October 17, 2019 – nearly a year after their arrest – Landji and Adamu were extradited from Croatia to the United States. (GX 1001)

**B.    The Defense Case**

Landji and Adamu did not testify and did not call any witnesses.

Landji introduced a Gabon passport issued to him in 2015. (See DX A, S-A) The passport has a 2020 expiration date. Landji argued that the passport demonstrates that he did not travel to (1) Togo in 2016 or 2017 to meet with Cardona-Cardona; (2) the Western Sahara in September 2017 to research possible landing strips; or (3) Sierra Leone in 2018 to meet with Cardona-Cardona. (Tr. 902-03, 906, 1047, 1056-57) Landji also introduced a stipulation stating that Okland Aviation was formed in 2016. (Tr. 903-04; DX S-B) Landji argued that this stipulation showed that Landji had not leased a plane through Okland Aviation during the alleged drug operation in 2009. (Tr. 1056) Landji also introduced a stipulation showing that Okland Aviation – during the time period alleged in the Indictment – had leased three planes registered in Morocco. (Tr. 904-06; DX S-C) Landji argued that his access to three Moroccan-registered planes made it implausible that he would have agreed to use a U.S.-registered plane to smuggle cocaine into Croatia. (Tr. 1021-23, 1046)

Adamu did not offer any evidence.  (Tr. 906)

\*         \*         \*         \*

At the close of the evidence, Landji and Adamu moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, arguing that there was insufficient evidence to support a conviction.  (Tr. 953-54)  The Court reserved decision on their motions.  (Tr. 955)

In Landji's summation, counsel argued that Landji had never agreed to transport cocaine for Cardona-Cardona, and that Cardona-Cardona, Fofana, and Rambo were just "spitballing ideas" with Landji at the May 2018 meetings in Lomé, Togo.  (Tr. 1028 ("We are not arguing that Mr. Landji was not aware that [transporting drugs] was a subject of conversation.  He is savvy.  He is a hustler, . . . and he is no fool.  He heard them out.  He talked the talk.  But that is not a crime.  It is not a crime to talk to criminals.  It is not a crime to discuss transporting drugs."); see also Tr. 1008, 1016-18, 1024-25)  Both Adamu and Landji argued that Cardona-Cardona was not a credible witness, given his prior crimes, which included acts of violence.  (Tr. 1008, 1012, 1052-66, 1070, 1072-78)  Landji and Adamu also argued that someone else – possibly Fofana (according to Landji) or Croatian law enforcement authorities (according to Adamu) – had planted cocaine on the Gulfstream II aircraft.  (Tr. 1006, 1014-15, 1037, 1049-51, 1067, 1082-85)

## DISCUSSION

## I.  LEGAL STANDARDS

### A.  Rule 29 Motions

Federal Rule of Criminal Procedure 29(a) provides that a court shall, upon a defendant's motion, "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).

"In evaluating a sufficiency challenge, [a court] 'must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'" United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012) (quoting United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008)); see also United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984) ("The court should not substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury." (citation omitted)).  In assessing a sufficiency challenge, "[t]he evidence is to be viewed 'not in isolation but in conjunction.'" Mariani, 725 F.2d at 865 (quoting United States v. Geaney, 417 F.2d 1116, 1121 (2d Cir. 1969)).  "So long as the inference is reasonable, 'it is the task of the jury, not the court, to choose among competing inferences.'" United States v. Kim, 435 F.3d 182, 184 (2d Cir. 2006) (quoting United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995)).

"The Second Circuit has observed that '[t]hese strict rules are necessary to avoid judicial usurpation of the jury function.'" United States v. DiPietro, No. S502 Cr. 1237 (SWK), 2005 WL 1863817, at *1 (S.D.N.Y. Aug. 5, 2005) (quoting Mariani, 725 F.2d at 865) (alterations in DiPietro).  "[T]he task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court." United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001) (citation omitted).  Given this standard, "[a] defendant bears a 'very heavy burden' in challenging a conviction based on insufficient evidence." United States v. Goldstein, No. S2 01 Cr. 880 (WHP), 2003 WL 1961577, at *1 (S.D.N.Y. Apr. 28, 2003) (quoting United States v. Brewer, 36 F.3d 266, 268 (2d Cir. 1994)).

**B.**   **Rule 33 Motions**

Pursuant to Federal Rule of Criminal Procedure 33, a court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992). Courts may not only grant a Rule 33 motion where the evidence is legally insufficient, see United States v. Leslie, 103 F.3d 1093, 1100-01 (2d Cir. 1997), but also where a jury's verdict is contrary to the weight of the evidence, see United States v. Ferguson, 246 F.3d 129, 136 (2d Cir. 2001). Moreover, in contrast to the analysis under Rule 29, a district court considering a Rule 33 motion need not view the evidence in the light most favorable to the Government. United States v. Lopac, 411 F. Supp. 2d 350, 359 (S.D.N.Y. 2006) (citing United States v. Ferguson, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999), aff'd, 246 F.3d 129 (2d Cir. 2001)).

The Second Circuit has explained that

> [t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. There must be a real concern that an innocent person may have been convicted. Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.

Ferguson, 246 F.3d at 134 (quotation marks and citations omitted).

Under Rule 33, "[i]n the exercise of its discretion, the court may weigh the evidence and credibility of witnesses." United States v. Autuori, 212 F.3d 105, 120 (2d Cir. 2000) (citing Sanchez, 969 F.2d at 1413). However, "[t]he district court must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role

of the jury." Ferguson, 246 F.3d at 133 (quoting Autuori, 212 F.3d at 120) (second alteration in

Ferguson). "Because the courts generally must defer to the jury's resolution of conflicting

evidence and assessment of witness credibility, '[i]t is only where exceptional circumstances can

be demonstrated that the trial judge may intrude upon the jury function of credibility

assessment.'" Id. at 133-34 (quoting Sanchez, 969 F.2d at 1414) (alteration in Ferguson). Such

"exceptional circumstances" may exist "where testimony is 'patently incredible or defies

physical realities.'" Id. at 134 (quoting Sanchez, 969 F.2d at 1414).

## II.   ANALYSIS

### A.   Motions for a Judgment of Acquittal

Landji and Adamu contend that there is insufficient evidence that (1) they

participated in the charged conspiracy; or (2) the conspiracy involved five kilograms or more of

cocaine.[3]  In arguing insufficiency, Defendants' primary argument is that Cardona-Cardona was

not a credible witness.  (Landji Br. (Dkt. No. 638) at 46-49; Adamu Br. (Dkt. No. 639) at 3-9;

Landji Reply Br. (Dkt. No. 648) at 5-7)

At trial, the Government's case centered on Cardona-Cardona's testimony.  As

the head of the alleged drug trafficking conspiracy, Cardona-Cardona was ideally situated to

testify regarding the roles that Landji and Adamu played in that conspiracy.

Cardona-Cardona testified that on four occasions in 2009 and 2010 he had

attempted to traffic cocaine with Landji and Adamu.  (Tr. 271-80, 286-90, 326-39, 342-47)

None of those efforts was successful.  In 2016 – after Landji acquired the Gulfstream II aircraft –

---

[3]  The jury concluded that each Defendant had had personal involvement with five kilograms or
more of cocaine, or that it was reasonably foreseeable to him that the conspiracy involved five
kilograms or more of cocaine.  (Verdict (Dkt. No. 605))

he contacted Cardona-Cardona to discuss a new plan to traffic in cocaine. The two men met in Lomé, Togo shortly thereafter to discuss their plan to distribute cocaine using the Gulfstream II. (Tr. 261-62, 348-53) Cardona-Cardona testified that he and Landji met in Lomé again in 2016 or 2017 – this time with Adamu – and at that meeting, they all agreed to transport ton-quantities of cocaine from South America to West Africa. (Tr. 353-61) Cardona-Cardona also testified about Landji's and Adamu's preparations for this plan, including undergoing pilot training, performing maintenance on the Gulfstream II, and researching potential landing strips in the Western Sahara. (Tr. 363-74, 385-86)

Cardona-Cardona also testified that, during additional meetings held in May 2018 in Lomé, Togo, Landji agreed to transport a test shipment of one kilogram of cocaine to Europe as part of a larger scheme to traffic in cocaine with Rambo and others. (Tr. 416-18, 451-54, 457, 461, 492-93) Although Adamu did not attend these meetings in Lomé, Cardona-Cardona testified that Fofana updated Adamu as to the discussions in Lomé, and that Fofana kept Cardona-Cardona apprised of Landji's and Adamu's preparations leading up to the test shipment flight. (Tr. 253-54, 374, 504-05) Cardona-Cardona also testified that he and Landji met in Sierra Leone in late 2018 to discuss the status of the operation, and that Cardona-Cardona – at Landji's request – provided Landji with an additional $300,000 for maintenance costs associated with the Gulfstream II and for costs associated with changing the registration of the plane. (Tr. 511-13) Cardona-Cardona further testified that – through co-conspirator Fofana – he notified Landji and Adamu that the one-kilogram of cocaine test shipment would be transported to Zagreb, Croatia rather than Montenegro; that they should leave the cocaine in the plane after landing in Zagreb; and that Cardona-Cardona would himself retrieve the cocaine from the plane.

(Tr. 519-20, 523-24)  Finally, Cardona-Cardona testified about his arrest in Zagreb on October 29, 2018.  (Tr. 528)

Cardona-Cardona's detailed testimony about Landji's and Adamu's involvement in the charged conspiracy – if credited by the jury – is sufficient on its own to sustain their convictions for conspiring to distribute five kilograms or more of cocaine.  See United States v. Truman, 688 F.3d 129, 139 (2d Cir. 2012) ("[E]ven the testimony of a single accomplice witness is sufficient to sustain a conviction, provided it is not incredible on its face, or does not defy physical realities." (quotation marks, alteration, and citations omitted)).

Landji and Adamu argue that Cardona-Cardona's history of "deceit" and "perjury" renders his testimony incredible as a matter of law.  (See Landji Br. (Dkt. No. 638) at 47-49; Adamu Br. (Dkt. No. 639) at 3-4, 6; see also Landji Reply Br. (Dkt. No. 648) at 5)  In this regard, Defendants argue that Cardona-Cardona lied to (1) Italian authorities in order to obtain a lesser sentence in a cocaine trafficking case in Italy; and (2) authorities in Mali – and subsequently bribed government officials in Mali – in order to obtain a lesser sentence for murdering a competing drug dealer.  (Landji Br. (Dkt. No. 638) at 47; Adamu Br. (Dkt. No. 639) at 3-4; see Tr. 281-86, 640-45)  Landji also argues that Cardona-Cardona's testimony that he had only committed one murder since he began trafficking drugs in the 1990s, and that he had given Landji "over one million dollars to conduct fruitless drug trafficking operations in Venezuela," is "patently incredible."  (Landji Br. (Dkt. No. 638) at 47; see Tr. 541-42, 544-45, 555-57, 563, 572-75, 580-82)

The matters now cited by counsel were the subject of extensive cross-examination and argument before the jury, and the issue of Cardona-Cardona's credibility was for the jury. Truman, 688 F.3d at 139 ("The proper place for a challenge to a witness's credibility is in cross-

23

examination and in subsequent argument to the jury, not in a motion for judgment of acquittal."
(quotation marks, alteration, and citations omitted)).  Defense counsel questioned Cardona-
Cardona extensively about the perjury, drug trafficking, bribery, and murder offenses he had
committed in the past, and elicited from Cardona-Cardona that he was testifying against Landji
and Adamu in order to obtain a more lenient sentence.  (E.g., Tr. 541-42, 545-46, 559-563, 652-
58, 676)  Cardona-Cardona's alleged lack of credibility was also the centerpiece of the defense
jury addresses.  Defense counsel argued that Cardona-Cardona was a "psychopath" and a
"sociopath," and they urged the jury not to credit his testimony.  (E.g., Tr. 65-66, 75, 1005, 1008,
1052-54, 1066, 1068, 1072-73, 1077-78)  Moreover, in the jury charge, the Court instructed the
jury that the "testimony of a cooperating witness [like Cardona-Cardona] must be scrutinized
with special care and caution."  (Tr. 1133-36)  In short, the issue of Cardona-Cardona's
credibility or lack of credibility was squarely put to the jury.  Indeed, it was the central issue at
trial.

      The Government offered ample evidence corroborating Cardona-Cardona's
testimony.  The corroborating evidence included the following:  (1) video and audio recordings
of the May 2018 meetings in Lomé, Togo in which Landji agreed to transport ton-quantities of
cocaine on planes with Adamu (see, e.g., GX 301A, 301C, 302A-T, 302C, 302D, 302E, 302F,
303B, 303C, 303D, 303E, 303F, 303G, 303H, 303I-T, 303J-T, 303K-T, 303L, 303M, 303N-T,
303O-T, 303P, 303Q-T, 303S-T, 303T, 303U-T, 304A, 304B, 304C, 304D, 305A, 305B-T,
305C-T, 305D-T); (2) photographs and videos from Landji's phone showing that Landji had
inspected remote landing strips in West Africa (GX 502Q, 502X, 502Y); (3) text messages
between Landji and Adamu and between Landji and Cardona-Cardona regarding Adamu's pilot
training (GX 501U1, 501Z1-T); (4) text and telephone records showing Landji's and Adamu's

continued coordination with each other and with Fofana and Cardona-Cardona in advance of the one-kilogram of cocaine test shipment (GX 501Y4-T, 501Y7-T, 501Y10-T, 501Y11-T, 501Z5-T, 503L, 503N4, 503N5, 503N6, 502O, 503R3, 503T); (5) recordings of intercepted telephone calls between Cardona-Cardona and Fofana in October 2018 in which Cardona-Cardona and Fofana discuss the difficulties in obtaining the one-kilogram sample of cocaine, and in which Cardona-Cardona instructs Fofana that Landji and Adamu should leave the cocaine in the plane after landing in Zagreb (see GX 401-T, 402-T, 403-T, 404-T, 405-T, 406-T, 407-T); (6) testimony from Croatian law enforcement officers that approximately one kilogram of a white powdery substance with "characteristics of cocaine" was found on the Gulfstream II when the plane landed in Zagreb (Tr. 143-45, 147, 179-85; GX 102-03, 234); and (7) Adamu's post-arrest statements, in which he admitted that he knew that Cardona-Cardona used planes to traffic cocaine, and that Adamu had previously piloted a plane to Panama that was later found loaded with cocaine (Tr. 708-10).

Landji argues, however, that (1) the video recordings of the May 2018 meetings are "ambiguous" and "incomprehensible," because the individuals in these recordings were "speaking over each other in multiple languages"; (2) there is no "reliable interpretation" of the text messages extracted from Landji's and Adamu's cell phones; and (3) the Government did not prove that the white powdery substance recovered from the Gulfstream II was in fact cocaine. (Landji Br. (Dkt. No. 638) at 46-47)

As to the video recordings, the parties stipulated to the accuracy of the English translations of the French portions of these recordings, and these English translations were admitted into evidence.  (GX 1002; Tr. 377-82, 1129)  A rational jury could have found that the English translations show:  (1) Landji agreeing that the Gulfstream II's registration in the United

States would have to be changed in order to avoid criminal liability in the United States (GX 303J-T, 303K-T, 303N-T, 303O-T, 305A-T); (2) Landji proposing that Adamu do the "dirty work" for the cocaine trafficking operation under the guise of Okland Aviation (GX 303Q-T, 303S-T); and (3) Landji agreeing to use an encrypted phone for further communications with Cardona-Cardona and other members of the conspiracy (GX 305D-T).

As to the English language portions of the recordings, defense counsel had ample opportunity to challenge their significance at trial, and did so.[4]  Viewed in a light most favorable to the Government, the English language portions of the recordings show, inter alia, (1) Landji agreeing to fly two tons of "paper" – code for cocaine – while keeping the seats of the Gulfstream II in place (GX 301C; Tr. 410-12); (2) Landji agreeing to fly a test shipment to show investors that the "line is open" (GX 303B, at 9; Tr. 452-54); (3) Landji agreeing that they could "do two" tons of cocaine every two weeks,[5] and that "[m]ore flights" means "[m]ore money" (GX 303B, at 7-8; Tr. 451-52); and (4) Landji stating that they could transport "[o]ne ton" of "dope" on the King Air 350, which would be used for black flights (GX 303L, 304C; Tr. 463-66, 486-90).

In sum, while the recorded evidence presented challenges both as to intelligibility and ambiguity at certain points, it nonetheless constitutes compelling corroboration of Cardona-Cardona's testimony.

---

[4]  In his closing, Landji's lawyer argued that the video evidence is "incomprehensible" and "ambiguous." (See Tr. 1018-19)

[5]  Landji argues that this exchange is "vague" as to the quantity of drugs involved in the alleged conspiracy, because the conspirators only address "the weight that various airplanes could carry and the frequency with which flights could occur." (Landji Br. (Dkt. No. 638) at 48 (emphasis in original))  But the jury could have concluded otherwise, given Landji's responses during this discussion ("Okay"; "Yeah, we can do two") and Cardona-Cardona's testimony at trial. (See GX 303B, at 8; Tr. 451-52)

Landji also complains that the Government was "incapable of establishing any reliable interpretation" of text messages among and between Landji, Adamu, and Fofana, because these messages were introduced through Enrique Santos – an investigative analyst employed by the U.S. Attorney's Office, who "was not competent to testify as to the meaning of [the] messages." (Landji Br. (Dkt. No. 638) at 46-47) But Santos did not testify as to the meaning of the messages. Instead, a reasonable jury could have discerned the meaning of the messages as a result of Cardona-Cardona's testimony. Cardona-Cardona explained the roles of Landji, Adamu, and Fofana in the conspiracy, and his testimony provided a chronology that assisted the jury in understanding the text messages. (See, e.g., GX 503R3 (May 27, 2018 message from Adamu to Landji asking what the "next plan" is, to which Landji responds, "standby[, ]we are in meeting"); GX 503N4 (May 29, 2018 Adamu message to Fofana complaining that "jc is not contact" and that Adamu does not know "his program," and Fofana's response that he and Adamu should meet to discuss the "programme")) Given Cardona-Cardona's testimony that he, Landji, Adamu, and Fofana commonly used coded language in order to avoid detection (see Tr. 384-85, 388-89, 411-12, 485-86, 503-04, 517-19, 524-26, 622-23), the use of what appears to be purposely cryptic language in the text messages is indicative of guilt.

Landji also complains that the Government did not establish that the white powdery substance that Croatian law enforcement authorities found onboard the Gulfstream II aircraft after it landed in Zagreb was in fact cocaine. (Landji Br. (Dkt. No. 638) at 47; see Tr. 429-41 (bench ruling excluding purported cocaine on chain-of-custody grounds); Tr. 184 (Milunic testifying that Croatian law enforcement personnel performed field test on the white powdery substance, but not disclosing the results of the test))

As an initial matter, defense counsel introduced during the cross-examination of

DEA Special Agent Anton Kohut two DEA Form 7 Report[s] of Drug Property Collected,

Purchased or Seized (see DX AAA, DX BBB) stating that the white, powdery substance found

on the Gulfstream II was in fact cocaine. (Tr. 229-41, 243)   DX AAA states:

> Exhibit 1 consists of approximately one kilogram of cocaine.  Exhibit 1 was discovered
> by Croatian officials inside a Gulfstream IIB jet which landed at Zagreb International
> Airport on 10-30-2019.  Jean Claude OKONJO LANDJI and Jibril Bala ADAMU were
> taken into custody following this seizure.  Croatian police maintained custody of Exhibit
> 1 and processed it as evidence in accordance with host country policies and procedures.

(DX AAA (emphasis in original))[6]

DX BBB states:

> Exhibit 1a consists of a white powdery substance contained in a clear plastic bag.  The
> exhibit was previously reported for information only under [redacted] as Exhibit 1; that
> exhibit was maintained by the Croatian National Police as evidence in a foreign
> prosecution.  However on 06-24-2020, Inspector Ivica Sestak of the Croatian National
> Police transferred custody of the exhibit to Special Agent Anton Kohut of the DEA
> Zagreb Country Office for future domestic prosecution in SDNY.  As the exhibit had
> since been analyzed, the precise weight determined (992.23 grams) and then physically
> turned over to DEA for the first time, this report documents the re-designation of the
> exhibit as Exhibit 1a.

(DX BBB)  DX BBB indicates that Exhibit 1a contains 992.23 grams of cocaine hydrochloride.

(Id.)

In any event, in order to demonstrate that the Defendants had conspired with

Cardona-Cardona and Fofana to distribute and possess with intent to distribute five kilograms or

more of cocaine, the Government was not required to prove that the one-kilogram "white

powdery substance" found on the Gulfstream II was in fact cocaine.  The elements of conspiracy

---

[6]  In introducing DX AAA, defense counsel highlighted typographical errors regarding, inter alia,
the date of the seizure. (Tr. 229-31, 238-39)  While Agent Kohut's report refers to a seizure on
October 30, 2019 (DX AAA), the seizure actually took place on October 31, 2018. (See Tr. 110,
133-34, 137, 145, 229-31)

to distribute or possess with intent to distribute a controlled substance are: (1) an agreement between two or more people to distribute or possess with intent to distribute a controlled substance; and (2) the defendant's knowing and intentional participation in that conspiracy. See United States v. Dupree, 870 F.3d 62, 78 (2d Cir. 2017); United States v. Santos, 541 F.3d 63, 70-71 (2d Cir. 2008). The essence of this offense is an unlawful agreement, and the defendant's knowing and intentional participation in the conspiracy. See United States v. Svoboda, 347 F.3d 471, 476 (2d Cir. 2003) ("'The gist of conspiracy is, of course, agreement.'" (quotation marks and citation omitted)); see also United States v. Fabian, No. 16-CR-131 (DLI), 2022 WL 1085243, at *4 (E.D.N.Y. Apr. 11, 2022) ("The essence of conspiracy is an agreement among two or more persons to join in a concerted effort to accomplish an illegal purpose." (quotation marks, alteration, and citation omitted)).

Accordingly, the Government was required to prove that Landji and Adamu entered into an unlawful agreement with Cardona-Cardona and Fofana to distribute and possess with intent to distribute five kilograms or more of cocaine. While the presence of cocaine on the Gulfstream II would tend to support the Government's allegation that Landji and Adamu had entered into an unlawful agreement with Cardona-Cardona to distribute and possess with intent to distribute cocaine, the presence of cocaine on the Gulfstream II plane was not a prerequisite for a conspiracy conviction. See United States v. Pauling, 924 F.3d 649, 660 (2d Cir. 2019) ("Proof of drug quantity may be established through proof of an agreement to distribute or possess with intent to distribute, regardless of whether the substantive act was actually completed." (citing United States v. Jackson, 335 F.3d 170, 181 (2d Cir. 2003))); Jackson, 335 F.3d at 181 ("A member of a conspiracy is . . . liable for an act he agreed to and intended to commit in furtherance of the conspiracy regardless of whether he ultimately committed the

substantive act."). Indeed, in countless narcotics conspiracy cases – including "reverse cases" in which law enforcement agents pose as drug traffickers – there is never any actual controlled substance. This presents no impediment to the Government proving the crime of narcotics conspiracy.

In sum, Landji's argument that the Government did not introduce into evidence the one-kilogram of cocaine allegedly found on the Gulfstream II does not demonstrate insufficiency.

Adamu likewise raises several arguments challenging the sufficiency of the Government's evidence. Adamu first contends that the Government did not demonstrate that Cardona-Cardona and Adamu were in contact with each other regarding the plan to traffic in cocaine, or that Fofana served as a "bridge" between Cardona-Cardona and Adamu. In this regard, Adamu points out that (1) Fofana did not testify at trial; and (2) the Government did not introduce recordings of telephone calls between Adamu and Cardona-Cardona, or between Adamu and Fofana. (Adamu Br. (Dkt. No. 639) at 4)

As discussed above, however, the Government offered ample evidence of Adamu's guilt, including the following: (1) Cardona-Cardona's testimony regarding his discussions with Adamu in 2010 about transporting tons of cocaine from South America to West Africa (Tr. 271-80, 354, 708-09); (2) Cardona-Cardona's testimony regarding his discussions with Landji in 2016 about using Adamu as a pilot to transport drugs, and the training Adamu would need to pilot the Gulfstream II for this purpose (Tr. 348-50, 354); (3) Cardona-Cardona's testimony that he, Landji, Adamu, and Fofana met in Lomé, Togo in 2016 or 2017 to discuss the air transport of huge quantities of cocaine from South America to West Africa, and that Adamu requested during these meetings that he be paid $250,000 per flight (Tr. 353-61); (4) text

messages among Adamu and Landji and Fofana discussing the progress of the operation and Adamu's training to pilot the Gulfstream II (GX, 501U1, 503N4, 503R3; see also Tr. 350, 374, 385-86, 409-10, 807); (5) text messages between Adamu and Fofana discussing that "David" would meet Adamu "[a]t the appointment" (GX 503N6); (6) Cardona-Cardona's testimony that Adamu told Fofana that the kilogram of cocaine was hidden on the Gulfstream II (Tr. 525-28); and (7) Adamu's post-arrest statements acknowledging that he knew that Cardona-Cardona was a drug trafficker, that Adamu had flown a plane to Panama for Cardona-Cardona, and that that plane later crashed in Mali while loaded with five tons of cocaine (Tr. 707-10).

As to the flight to Panama, Adamu argues that this evidence does not establish a connection between him and Cardona-Cardona's drug trafficking, because Adamu was not aware at the time of his flight to Panama that the plane would later be used to traffic drugs. (Adamu Br. (Dkt. No. 639) at 4) Adamu further argues that his post-arrest statement – in which he acknowledged that Cardona-Cardona is a drug trafficker – "is not surprising," given the "widespread publicity" regarding the crashing of the plane in Mali, and the discovery that it was loaded with drugs. (Id. at 6) These arguments – which Adamu also made to the jury (Tr. 1078-79) – are not persuasive. Cardona-Cardona testified that Adamu was fully aware that the plane he piloted to Panama – and was expected to fly back to West Africa – was intended to carry cocaine. According to Cardona-Cardona, at the last minute, "the owners of the drugs decided to switch pilots." (Tr. 278-29) Cardona-Cardona also testified that Adamu later demanded that Cardona-Cardona pay him $20,000 for his role in flying the plane to Panama, even though Adamu had not been chosen to fly the plane during the remainder of the operation. (Tr. 279)

As noted above, Cardona-Cardona also testified that he and Adamu had discussed purchasing a King Air 350 or Cessna Conquest II to traffic between 800 kilograms and one ton

of cocaine at a time.  (Tr. 271-77)  This testimony was corroborated by Adamu's post-arrest

statement acknowledging that he had helped broker airplane sales for Cardona-Cardona, and that

he knew that Cardona-Cardona used such planes for "drug smuggling."  (Tr. 709-10)

        In sum, there was ample evidence of Adamu's knowledge and intent to assist

Cardona-Cardona in a plot to transport huge quantities of cocaine from South America, to West

Africa, and on to Europe.

        Adamu argues, however, that Cardona-Cardona's arrest in Zagreb the day before

the test flight "undercut[s]" Cardona-Cardona's testimony and that of the Croatian police

officers.  According to Adamu, he and Landji would not have flown the cocaine to Zagreb if they

had been "unable to contact a major cog on the distribution chain."  (Adamu Br. (Dkt. No. 639)

at 5-6)  Adamu appears to be arguing that the Croatian National Police planted the cocaine on the

Gulfstream II, and then falsely testified that they discovered the cocaine onboard the plane,

because "they [had] placed their investigation in great jeopardy" by prematurely arresting

Cardona-Cardona.  (Id. at 5-6)  Adamu made this argument to the jury (Tr. 78, 111-12, 1081-85),

and it was rejected.  It provides no basis for this Court to find the evidence insufficient.

        Adamu also contends that there is insufficient evidence that the Gulfstream II was

registered in, or owned by a citizen of, the United States.  (Adamu Br. (Dkt. No. 639) at 3)  This

argument likewise fails.  At trial, the parties stipulated that Landji was a citizen of the United

States during the relevant time period; that he purchased the Gulfstream II in 2016 and has

owned it since that time; and that the Gulfstream II was registered in the United States since at

least 2016. (GX 1000; see Tr. 895-96) This evidence was sufficient to establish the necessary

nexus with the United States. See 21 U.S.C. § 959(c).[7]

Landji's and Adamu's motions for a judgment of acquittal pursuant to Rule 29

will be denied.

## B.   Rule 33 Motions for New Trial

Landji and Adamu argue that they are entitled to a new trial under Fed. R. Crim.

P. 33 because (1) this Court admitted extractions from the Defendants' cell phones through the

testimony of Enrique Santos – an analyst at the U.S. Attorney's Office – who did not himself

perform the extractions; and (2) the venire and petit jury did not reflect a fair cross-section of the

community. (Landji Br. (Dkt. No. 638) at 33-40, 42-44; Landji Reply Br. (Dkt. No. 648) at 7-

18; Adamu Br. (Dkt. No. 639) at 9-14) Landji further contends that (1) he was prejudiced by the

presence of the alleged cocaine in the courtroom, because the Court ruled in the course of the

trial that the alleged cocaine was inadmissible; and (2) Landji's conditions of confinement during

trial deprived him of a meaningful opportunity to participate in his defense. (Landji Br. (Dkt.

No. 638) at 40-42, 44-45)

### 1.   Cell Phone Extractions

#### a.   Background

At trial, the Government introduced three cell phones that had been seized from

Landji and Adamu at the time of their arrest in Zagreb (GX 104-06), along with excerpts from

---

[7] 21 U.S.C. § 959(c) provides that "[i]t shall be unlawful for any United States citizen on board
any aircraft, or any person on board an aircraft owned by a United States citizen or registered in
the United States, to – (1) manufacture or distribute a controlled substance or listed chemical; or
(2) possess a controlled substance or listed chemical with intent to distribute."

the extraction reports concerning the contents of these cell phones.[8]  The excerpts from the

extraction reports were introduced through Enrique Santos, an investigative analyst and mobile

phone forensics examiner at the U.S. Attorney's Office.

While Croatian analysts – and not Santos – had performed the cell phone

extractions, the Government argued that Santos was competent to testify regarding the process

used to perform the extractions because, inter alia, (1) Santos used Cellebrite – the forensic

software program employed by the Croatian analysts to perform the extractions – each day

during his work at the U.S. Attorney's Office; (2) the Cellebrite software makes a forensic copy

of the contents stored on a cell phone that cannot be altered or edited; and (3) the Cellebrite

software extraction report reveals the unique IMEI number for each source cell phone, which can

be matched to the actual cell phone.  (See Oct. 13, 2021 Govt. Ltr. (Dkt. No. 585) at 3-10; Tr.

117-25)

Defendants objected to the cell phone extractions, arguing that (1) Santos could

not authenticate the cell phone extractions, because he had not performed the extractions; and (2)

Landji's and Adamu's Sixth Amendment Confrontation Clause rights would be violated because

they had no opportunity to cross-examine the Croatian analysts who had performed the

extractions.  (Oct. 11, 2021 Jt. Def. Ltr. (Dkt. No. 583) at 2; Oct. 13, 2021 Jt. Def. Ltr. (Dkt. No.

586) at 2-5; Tr. 117-25)

---

[8]  GXs 104 and 105 are, respectively, an Apple iPhone 7 Plus and Samsung Galaxy S9+ cell
phone that allegedly belonged to Landji.  (Tr. 790, 830-31; see, e.g., Tr. 797-98, 800-01, 835-37
(describing attribution data contained on those devices))  GX 106 is a Samsung Galaxy J7 cell
phone that allegedly belonged to Adamu.  (Tr. 853; see, e.g., Tr. 856-57 (describing attribution
data contained on this device))  GX 500 is a hard drive containing forensic images and reports
regarding the contents of these phones.  (Tr. 736-37)  GX 500A is the extraction report
corresponding to GX 104; GX 500B is the extraction report corresponding to GX 105; and GX
500C is the extraction report corresponding to GX 106.  (Tr. 788, 831, 853)

While Defendants' objections to the cell phone extractions were pending, the jury heard testimony regarding the seizure of Defendants' phones. Tomislav Milunic – a Croatian National Police officer – testified that, during his search of the Gulfstream II on October 31, 2018, he recovered a bag that contained two cell phones. (Tr. 139) Landji told Milunic that the bag belonged to him. (Tr. 140-41) Milunic also recovered two cell phones belonging to Adamu. (Tr. 148) Later that day, Milunic gave the phones to Inspector Ivica Sestak of the Croatian National Police. (Tr. 148-49)

Agent Kohut testified that, on October 15, 2019, he took custody of the cell phones and other evidence seized from the Gulfstream II. (Tr. 206) Sestak gave Agent Kohut the evidence – which was sealed in evidence bags – along with a detailed inventory of the evidence. (Tr. 206-09) Kohut later unsealed these evidence bags at the U.S. Attorney's Office for the Southern District of New York, and he confirmed that the evidence bags contained the cell phones and the hard drive listed in the inventory. (Tr. 209-10)

On October 14, 2021 – in the midst of trial – this Court issued a bench ruling denying Defendants' motions to exclude the cell phone extractions. (Tr. 303-15) Relying on the Government's offer of proof regarding Santos's anticipated testimony (see Oct. 13, 2021 Govt. Ltr. (Dkt. No. 585) at 3-10), this Court concluded that neither Fed. R. Evid. 901, nor the Confrontation Clause, prohibited the admission of the cell phone extractions. (Tr. 307-15) In so ruling, this Court noted that

> (1) Government Exhibit 500A, 500B, and 500C are reports concerning the extraction of data from cell phones; (2) the extraction reports are forensic images that were created through the use of Cellebrite, a software tool with which [Santos is] familiar; (3) Cellebrite creates an exact copy of data from cell phones, and the image[s] this program contains are not subject to editing or alteration; (4) each cell phone has an [International Mobile Equipment Identifier ("IMEI")] number which is unique; (5) each of the three cell phones at issue has an IMEI number that Santos has identified; (6) the forensic image created by the Cellebrite software reveals the IMEI number for the source cell phone; and

35

(7) by comparing the IMEI numbers, Santos has matched each of the forensic reports with one of the three cell phones.

(Tr. 310-11) This Court further noted that Santos would testify that certain "attribution" data found in the extraction reports – including "selfies" and email addresses containing the Defendants' names – provided further confirmation that the cell phones on which the extraction reports were based belonged to the Defendants. (Tr. 311)

In rejecting Defendants' motion to exclude the cell phone extractions, this Court cited United States v. Gayle, No. 16 Cr. 361 (CS) (S.D.N.Y.), in which Judge Seibel had admitted cell phone extractions through Santos's testimony, even though Santos had not performed the extractions. (Tr. 311-12 (citing Oct. 13, 2021 Govt. Ltr., Ex. 1 (Sept. 14, 2017 Gayle transcript) (Dkt. No. 585-1)) As to Defendants' Confrontation Clause argument, this Court noted that Santos would testify – based on the above-stated facts – that data presented in the extraction reports had been extracted from the Defendants' cell phones, and that he could be cross-examined as to the basis for his conclusions. (Tr. 314) This Court also distinguished cases cited by Defendants – including Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009) and United States v. Hajbeh, 565 F. Supp. 3d 773 (E.D. Va. Oct. 5, 2021) – because they involved the admissibility of affidavits or certifications regarding forensic analysis. (Tr. 312-14)

On October 20, 2021 – after the Court's ruling – the Government called Santos to testify. (See Tr. 726) Santos testified that he had received approximately 160 hours of formal classroom training in mobile device forensics; that he had attended numerous conferences and workshops related to forensics; that he belongs to a number of forensics-related associations; and that he is trained and certified in a number of mobile device forensic tools, including the Cellebrite forensics software program. (Tr. 728-29) Santos has used the Cellebrite software tool "every single day since 2014" during his work at the U.S. Attorney's Office; has performed more

than 2,000 cell phone extractions using the Cellebrite program; and has analyzed Cellebrite cell phone extractions performed by others approximately fifty times. (Tr. 729, 747)

Santos explained in detail the three-step process by which a Cellebrite cell phone extraction is performed, including "acquisition," "analysis," and "reporting." (Tr. 730-31) During the acquisition stage, cell phone data is downloaded and preserved as a "forensic image" – a compilation of data that cannot be altered or edited.[9] (Tr. 730-33, 750) Although the data contained in a cell phone can be manipulated before a forensic image is created – for example, by placing a call or sending a text message – "[i]n most cases" any changes made to the contents of a cell phone device prior to an extraction would be apparent through a "timestamp" indicating the last action(s) taken with that device. (Tr. 750-51)

When using the Cellebrite software program to perform an extraction, the user must select a "profile" on Cellebrite that matches the make and model of the phone. Once a profile is selected, the analyst must choose which type of extraction to perform, and the Cellebrite tool can then download the data. (Tr. 747-49) A "unique qualifying number[]" is recorded in the forensic image to ensure that the forensic image can be matched to the physical cell phone. (Tr. 733) An International Mobile Equipment Identifier ("IMEI") is an example of a "unique qualifying number" for cell phones that can be used to correlate a forensic image with a particular cell phone. (Tr. 733-36; see also Tr. 753)

---

[9] Santos testified that the capabilities of the Cellebrite software have evolved over time, as cell phone manufacturers introduce new security features that can affect the types of data that can be retrieved from cell phones. In January 2019 – when the extractions in this case were performed – the Cellebrite software was able to recover "a lot of the data" commonly stored on cellphones, including "call histories, messages, photos, videos, web browsing history, notes, [and] voice messages." (Tr. 748-49; see also Tr. 791, 859, 881-82 (testifying that a forensic image is not a copy of all data stored on a phone, unless a "physical extraction" is performed); Tr. 792, 832-33, 855 (testifying about the types of extractions performed on cell phones, and noting that a physical extraction had only been performed on the Samsung Galaxy J7 cell phone (GX 106)))

During the "analysis" stage, an analyst parses through the data recorded in the forensic image and can separate that data into different categories. (Tr. 730-31) "[F]or example, all the different chats would be put together, all the different images, the videos, web browsing history, and the like." (Tr. 731)

The third and final stage of a Cellebrite extraction involves "creat[ing] a report that gets turned over to . . . a prosecutor or agent." (Id.) At this stage in the extraction process, a user "can never . . . modify the content of a message" or "edit anything" within the report. A user of the Cellebrite software can, however, "exclude certain items from a report," as either "entire categories of data, or . . . very specific records." (Tr. 752)

In connection with the instant case, Santos examined three cell phones and a hard drive containing forensic images and extraction reports created by the Croatian National Police. (Tr. 737-38) Santos determined that the forensic images found on the hard drive were created in January 2019 using the Cellebrite forensic software program, and that the forensic images could not have been altered after they were generated. (Tr. 737-38, 749) By comparing the IMEI numbers listed on the extraction reports to those engraved on the cell phones, Santos was able to match each extraction report to the corresponding cell phone. (Tr. 738) Santos confirmed Landji's and Adamu's use of the seized cell phones from certain identifying data contained in the extraction reports.[10] (Tr. 739-40) Santos also compared the size of the data in each extraction report with the size of the data in the corresponding forensic image, and he concluded that each extraction report reflected the contents of each forensic image. (Tr. 753-54)

---

[10] As discussed below, Santos testified that such identifying data, or "attribution" data, includes, inter alia, photos or "selfies" of the Defendants, as well as email addresses and user accounts associated with them. (See Tr. 796-801, 833-37, 856-57)

During Santos's testimony, the Government offered excerpts from the extraction reports, including certain text messages, photos, and videos.[11] (Tr. 739-41)  Landji – joined by Adamu – renewed his Rule 901 objections to this evidence at sidebar, offering a variety of arguments.  (See Tr. 742-46, 755-66)  Landji first argued that Santos had not adequately addressed whether the data on the cell phones could be altered before the forensic image was made or during the process of creating the forensic image.  (Tr. 742-45)  Landji later argued that (1) Santos was not competent to testify whether the forensic image reflects a "full copy" of all the data on the cell phones; and (2) the forensic image of the data on a cell phone might contain exculpatory material not reflected in the extraction report.  (Tr. 757-60)

In response to Landji's arguments, this Court commented that

> the principal issue here[] . . . is whether the material on the phone could have been edited or manipulated in some fashion such that what we are going to be seeing is not an accurate representation of what was actually on the phone, and in fact is a fabrication. . . . [T]o the extent the objection is that not all of the data on the phone was extracted, to me, that sounds like the kind of objection that goes to the weight of the evidence rather than its admissibility.

(Tr. 765; see also Tr. 756-59)

The next morning, this Court overruled Defendants' objection to the cell phone extraction evidence.  (Tr. 776-84)  In so ruling, this Court noted that Santos had "testified in a

---

[11] See GX 501, 501A, 501B, 501C, 501D, 501E, 501F, 501G, 501H, 501I, 501J, 501K, 501L, 501M, 501N, 501O, 501P, 501Q, 501R, 501S, 501T, 501U1, 501U2, 501U3, 501U4, 501V, 501W, 501X, 501AA, 501CC, 501DD, 501EE, 501FF, 502, 502A, 502B, 502C, 502D, 502E, 502F, 502G, 502H, 502I, 502J, 502K, 502L, 502M, 502N, 502O, 502P, 502Q1, 502R, 502S, 502T, 502U, 502V, 502W, 502X1, 502Z1, 502AA, 502AA1, 503, 503A, 503B, 503C, 503D, 503E, 503F, 503G, 503H, 503I, 503J, 503K, 503L, 503M, 503M1, 503N1, 503N2, 503N3, 503N4, 503N4A, 503N4B, 503N5, 503N5A, 503N5B, 503N5C, 503N5D, 503N5E, 503N5F, 503N5G, 503N5H, 503N5I, 503N6, 503N6A, 503N6B, 503N6C, 503O, 503P, 503Q, 503R1, 503R1A, 503R2, 503R3, 503R3A, 503R3B, 503R4, 503R4A, 503R5, 503S, 503T, 503U, 503X, 503Y, 503Z, and 503AA; see also GX 501Y1 to 501Y12, 501Z1 to 501Z5, 501BB, 502Q, 502X, 502Y, 502Z, 503V, 503W (exhibits that were already in evidence).

manner that was generally consistent with the [G]overnment's proffer" underlying the Court's earlier ruling. Santos had deviated from the Government's proffer only to the extent that he testified that the Cellebrite software does not necessarily result in a copy of all data from a cell phone.[12] (Tr. 776, 782) This fact did not require the Court to alter its analysis, because the Government had sufficiently demonstrated that the forensic images are "what they purport to be": "a compilation of data from the phones." (Tr. 782-83)

With respect to the possible manipulation of the data on a cell phone, this Court noted that Santos had testified that

> (1) . . . any such manipulation would likely be revealed on the extraction report because of the timestamp feature; (2) once the forensic image is created, it's not possible to alter its contents or to edit its contents; and (3) the data size of the forensic image matches the data size of each extraction report, indicating that each extraction report reflects all of the data contained in the forensic image.

(Tr. 783)

This Court also noted that there would be "ample evidence" – based on the data extracted from the cell phones – that each phone was is in fact associated with the Defendants. (Id.)

"In light of the low threshold for authenticity that applies pursuant to Federal Rule of Evidence 901," this Court concluded that any objection premised on the forensic image not capturing all the data on the Defendants' phones "goes to the weight of this evidence and not to its admissibility." (Tr. 784)

Following this ruling, Santos's testimony continued, and the relevant excerpts from the Defendants' cell phones were admitted into evidence. (Tr. 786-87) During his

---

[12] See Tr. 782 ("Mr. Santos' testimony indicates that the Cellebrite software may not have resulted in an exact copy of data from the cell phones and that certain material on the cell phones may not have been reproduced in the forensic image.").

testimony, Santos pointed out that the IMEI number contained in the extraction reports matched those printed on the cell phones.[13]  (Tr. 787-89, 794-96, 831-32, 835, 853-54, 856)  He explained what kinds of extractions were performed on each of the Defendants' phones, and what kind of data were retrieved during these extractions.  (Tr. 789-92, 794, 832-33, 854-55)  According to Santos, "logical extractions," "file system extractions," and "physical extractions" are three types of extractions that can be performed on a cell phone, and "[n]ot every phone model supports every type of extraction."  (Tr. 791)  A logical extraction – "the most widely supported type of extraction" – captures "mostly just live data, data that you can see on your phone and navigate to."  (Id.)  A file system extraction is "less supported," but captures more data, including the "file structure of a phone."  (Id.)  A physical extraction is "the least supported type of extraction," but captures "all the data" on a phone, including some deleted data.  (Tr. 791, 855, 859, 882)  Santos testified that logical and file system extractions had been performed on each of the Defendants' phones, and that a physical extraction had been performed on Adamu's Samsung Galaxy J7 phone, GX 106.[14]  (Tr. 792, 832-33, 855)

Santos further testified that the data reflected in each forensic image were not altered or modified in any way, and that the excerpts of the corresponding reports accurately reflect the data contained in those forensic images.  (Tr. 793, 833, 855-56)

Santos also testified about "attribution evidence" included in the cell phone extractions, including identifying email addresses, user account names, profile photos of Defendants, "selfies" taken by Defendants, and instances of Defendants referring to themselves

---

[13] Defendants also stipulated to this fact.  (Tr. 795-96, 835, 854)
[14] "Screenshots" had also been manually extracted from GXs 104-05.  (Tr. 792, 832-33)

in text messages.[15] (E.g., Tr. 796-801, 833-37, 856-57) Santos also testified about various excerpts from the extraction reports, including contact list entries, call logs, text messages, voice notes, photographs, and videos, as well as the metadata associated with each of these items. (Tr. 796-830, 835-53, 856-76)

During cross-examination, defense counsel elicited from Santos that he had not examined the contents of the cell phones (Tr. 878-79, 881); that certain data, such as the name of a contact, could be changed on a cell phone without necessarily being reflected with a timestamp (Tr. 880-81); and that he did not know who had custody of the phones prior to his receipt of them (Tr. 879-80). Santos also acknowledged that the fact that a forensic image and extraction report contain the same amount of data does not conclusively establish that the data in each are the same. (Tr. 885)

Santos also testified that "[a] PDF from a Cellebrite report is usually read-only" and cannot be easily manipulated. (Tr. 882-83) A user cannot "backspace and delete stuff [as one can with a Word document]." (Tr. 883) Santos also stated that the extraction reports he reviewed indicated that none of the data had been altered or modified. (Tr. 884)

Landji and Adamu renewed their Rule 901 objection to the admissibility of the cell phone extractions based on Santos's testimony during cross-examination. (Tr. 898) This Court overruled their objections, reiterating that the issues identified by Defendants "go[] to the

---

[15] For example, the email addresses "backlandaviation@yahoo.fr," "jclandji@oklandaviation.com," and/or "oklandaviation@gmail.com" were associated with GXs 104 and 105, and "jjibril@gmail.com" was associated with GX 106 (Tr. 797, 836, 856; GX 501A, 502B, 502C, 503C); "selfies" of Landji were found on GX 104 and GX 105, and one such "selfie" was used as the profile photo of the Whatsapp account on GX 104 (Tr. 798-801, 836; GX 501B, 501D, 502E to 502H); an incoming message on GX 105 states "Bonjour M LANDJI" (Tr. 835; GX 502A); documents with Landji's name – including a photo of Landji's passport – were found on GX 104 and GX 105 (Tr. 800-01, 837; GX 501C, 502J); and the Whatsapp ID name on GX 106 is "Jibril Adamu" (Tr. 856-57; GX 503B).

42

weight of the evidence rather than the admissibility." (Tr. 898-99) This Court also noted that it "view[ed] the [cell phone extraction] evidence as quite marginal in terms of its significance to the jury," and that it "believe[d] the case [would] turn on the jury's estimate of Mr. Cardona's credibility." (Tr. 899)

### b.   Whether the Cell Phone Extractions Were Properly Admitted Under Rule 901

In support of his Rule 33 motion, Landji contends that the cell phone extractions from his and Adamu's cell phones were improperly admitted under Rule 901. Landji argues that (1) the cell phone data could have been manipulated prior to the creation of the forensic image; and (2) the cell phone data, as reflected in the extraction reports, could have been manipulated after the creation of the forensic image. (Landji Br. (Dkt. No. 638) at 34-38; Landji Reply Br. (Dkt. No. 648) at 8-16)

Under Fed. R. Evid. 901, the Government was required to provide an evidentiary basis from which the jury could find that the cell phone extractions offered by the Government are what they purport to be: a compilation of data extracted from the Defendants' cell phones. The Second Circuit has summarized the legal standard for demonstrating authenticity as follows:

> The bar for authentication of evidence is not particularly high. United States v. Dhinsa, 243 F.3d 635, 658 (2d Cir. 2001). "The requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Generally, a document is properly authenticated if a reasonable juror could find in favor of authenticity. United States v. Tin Yat Chin, 371 F.3d 31, 38 (2d Cir. 2004). The proponent need not "rule out all possibilities inconsistent with authenticity, or [] prove beyond any doubt that the evidence is what it purports to be." United States v. Pluta, 176 F.3d 43, 49 (2d Cir. 1999).

United States v. Gagliardi, 506 F.3d 140, 151 (2d Cir. 2007) (first alteration in Gagliardi).

With respect to potential manipulation of the cell phone data prior to the creation of the forensic image, Santos testified that, "[i]n most cases," any manipulation of the data on a

cell phone would be reflected through a "timestamp" on the phone. (Tr. 750-51)  While Santos

conceded that certain information – such as the name of a contact – could be changed without

such a timestamp (Tr. 880), Landji has never argued that any of the cell phone extractions

admitted at trial were actually altered.  And, as discussed above, there was ample evidence that,

for example, the Landji, Adamu, and Fofana Whatsapp messages introduced at trial were sent by

them based on the profile photos, account usernames, and phone numbers associated with these

messages.[16]  (E.g., Tr. 798-803, 811, 826, 839-40, 856-58)

   Landji also contends that – if prior extractions were performed on the cell phones

– the data contained on the cell phones could have been altered.  (Landji Br. (Dkt. No. 638) at

37; see also Tr. 891-93)  There is, of course, no evidence that prior extractions were performed

on the cell phones.  Moreover, Santos testified that, if such prior extractions had been performed,

a forensics analyst "would potentially see artifacts of the first extraction." (Tr. 892)  In short, a

reasonable jury could have concluded that the data contained on the cell phones were not altered

before the forensic images were created.

   As to possible manipulation of the data after the creation of the forensic images,

Landji points out that Santos did not examine the forensic images or compare their contents to

those contained in the corresponding extraction reports.  (Landji Br. (Dkt. No. 638) at 37; see Tr.

883, 889-90)  Santos testified, however, that, in converting the forensic image into an extraction

report, a user "can never . . . modify the content of a message," or "edit anything." (Tr. 752)

---

[16]  While the phone numbers themselves do not indicate who sent each message, when the phone
numbers are considered together with the attribution data for each phone or Whatsapp account,
the author of each Whatsapp message is clear. (See, e.g., Tr. 798, 801-02, 806, 812-13, 825-26,
839-40, 857 (testimony regarding phone numbers associated with Defendants' cell phones,
Whatsapp accounts, and Whatsapp messages))

Landji argues, however, that the extraction reports can be altered at a later date, and cites Santos's testimony that the extraction reports are PDFs that can be made "editable." (Landji Br. (Dkt. No. 638) at 36-37; Landji Reply Br. (Dkt. No. 648) at 11-12)  But Santos's testimony was more limited than Landji suggests.  Although Santos testified that someone using "the right software" could make a PDF extraction report editable, he also testified that the "default option" for Cellebrite PDF reports is that they are "read-only." (Tr. 882-83)  He explained that the only way to edit such a PDF is to "writ[e] over" the content in the PDF "like . . . a typewriter," but that "it's not like a Word document where you can . . . backspace and delete stuff." (Tr. 883)  Moreover, Santos repeatedly emphasized that the extraction reports he reviewed did not appear to have been altered or modified in any way, and thus accurately reflected the data contained in the corresponding forensic images.  (Tr. 792-93, 833, 855-56, 884)  Santos also testified that the amount of data contained in the extraction reports matches the amount of data contained in the forensic images (Tr. 753-54, 885), indicating that the extraction reports reflect the data in the corresponding forensic images.  In short, a reasonable jury could have concluded that the extraction reports had not been altered after the forensic images were created.

Landji also argues that the Government did not demonstrate that the forensic images and extraction reports were in fact derived from the Defendants' cell phones, noting Santos's testimony that the SIM card tray for iPhones – on which the unique IMEI number is printed – can be removed and replaced.[17]  (Landji Br. (Dkt. No. 637) at 37; see also Tr. 881)  As discussed above, however, the "attribution evidence" found in the extraction reports provided a

---

[17]  This argument implicates only one of the three cell phones at issue – Landji's Apple iPhone 7 Plus.  The IMEI numbers for Landji's Samsung Galaxy S9+ and Adamu's Samsung Galaxy J7 are printed on each phone near the USB port or behind the battery.  (Tr. 734-36)

compelling basis for the jury to conclude that the extractions reports were in fact derived from data stored on the Defendants' cell phones. (See Tr. 796-801, 833-37, 856-57)

The Court concludes that the Government offered evidence sufficient to demonstrate that the cell phone extractions are what they "purport[] to be." Pluta, 176 F.3d at 49. There was ample evidence that the cell phones belonged to the Defendants, and that the extraction reports reflect data that were stored on the Defendants' cell phones. There is no evidence that the evidence derived from the Defendants' cell phones was altered or manipulated in any way. Given that "[t]he bar for authentication of evidence is not particularly high," Gagliardi, 506 F.3d at 151, and that the Government need not "rule out all possibilities inconsistent with authenticity," Pluta, 176 F.3d at 49, the cell phone extractions were properly admitted. (See Oct. 13, 2021 Govt. Ltr., Ex. 1 (Sept. 14, 2017 transcript in United States v. Gayle, No. 16 Cr. 361 (CS)) (Dkt. No. 585-1) (admitting cell phone extractions through the testimony of Santos, who had not performed the extractions))

> **c.      Whether the Admission of the Cell Phone Extractions Violated Defendants' Rights Under the Confrontation Clause**

Defendants argue that the admission of the cell phone extractions violated their rights under the Sixth Amendment's Confrontation Clause. (Landji Br. (Dkt. No. 638) at 38-40; Landji Reply Br. (Dkt. No. 648) at 16-18; Adamu Br. (Dkt. No. 639) at 13-14)

The Confrontation Clause bars admission of "testimonial statements" in a criminal case where the defendant does not have the opportunity to cross-examine the author of such statements. See Crawford v. Washington, 541 U.S. 36 (2004). The Supreme Court has applied the "primary purpose" test in defining whether a given statement is "testimonial," which requires that "the statement was made or procured with a primary purpose of 'creating an out-of-court substitute for trial testimony.'" Washington v. Griffin, 876 F.3d 395, 404 (2d Cir. 2017)

(quotation marks and alteration omitted) (quoting Ohio v. Clark, 576 U.S. 237, 245 (2015)); see also Garlick v. Lee, 1 F.4th 122, 129 (2d Cir. 2021) (defining the "'core class'" of testimonial statements as those involving (1) "'ex parte in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially'"; (2) "'extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions'"; and (3) "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial'" (quoting Crawford, 541 U.S. at 51-52)).

Landji contends that, under the Confrontation Clause, he was entitled to cross-examine the "technician who conducted the extractions."  (Landji Br. (Dkt. No. 638) at 38-39; Landji Reply Br. (Dkt. No. 648) at 16-18)  In support of his Confrontation Clause claim, Landji cites Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), Bullcoming v. New Mexico, 564 U.S. 647 (2011), and United States v. Hajbeh, 565 F. Supp. 3d 773 (E.D. Va. Oct. 5, 2021). (Landji Br. (Dkt. No. 638) at 38-39; Landji Reply Br. (Dkt. No. 648) at 16-18)  These cases all involve an effort to substitute a certification or affidavit for live testimony regarding the results of a laboratory or forensic examination.  None of these cases is on point, because the proof here did not involve an effort to offer proof by certification or affidavit.  Instead, the Government offered a witness with specialized knowledge concerning Cellebrite, a cell phone forensic tool, and that witness testified about his own observations concerning the Cellebrite extraction reports and the conclusions that he could draw from those reports.

47

In Melendez-Diaz, the defendant objected to the admission of "certificates of analysis" stating that certain evidence seized from the defendant contained cocaine. The Supreme Court held that the trial court's admission of these "certificates" showing the results of a forensic analysis violated the defendant's Confrontation Clause rights, and that the laboratory personnel who performed the analysis should have been required to testify in court regarding their findings. Melendez-Diaz, 557 U.S. at 307-09, 311. In so holding, the Supreme Court emphasized that the "certificates of analysis" "fall within the 'core class of testimonial statements,'" because, inter alia, they were "solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact." Id. at 310 (quotation marks and citation omitted). The Court also rejected the State's analogy to certain records that were admissible at common law – including "clerk[] certificate[s] authenticating an official record[] or a copy thereof" – noting that, unlike the certificates at issue in Melendez-Diaz, the clerk certificates did not provide any interpretation of the record, or "certify to its substance or effect." Id. at 322.

Melendez-Diaz has no application here. That case involved an attempt to introduce the results of a laboratory analysis through a certification. Here, the Government offered live testimony from a witness with extensive experience in the use of Cellebrite and the cell phone extraction reports that it creates. As discussed above, the witness explained in detail why the extraction reports reflected data stored on the Defendants' phones. Santos's observations were based on, inter alia, his own comparison of the IMEI numbers contained on the cell phones and the extraction reports, the attribution data he found in the extraction reports, and his familiarity with the Cellebrite forensic tool and the extraction reports that Cellebrite generates. Defendants were free to, and did, cross-examine Santos regarding the bases for his conclusions.

48

In Bullcoming, the Supreme Court addressed the admissibility of a laboratory report certifying the results of a blood alcohol test. The analyst who certified the results did not testify. The prosecution instead offered the laboratory report through the testimony of an analyst who had not performed the test, but who was familiar with the process. Bullcoming, 564 U.S. at 651-52. The state court held that the report's admission did not violate the Confrontation Clause because the certifying analyst "was a mere scrivener who simply transcribed the results generated by the gas chromatograph machine," and the testifying analyst could testify regarding the machine and procedures used to perform the test. Id. at 657, 659-61 (quotation marks and citation omitted). The Supreme Court rejected this argument, noting that the analyst's certification went beyond that of a scrivener because it addressed, among other things, (1) the integrity of the blood sample at issue, (2) that the sample number and the report number corresponded to each other, (3) that the analyst performed a particular test, and (4) that the analyst adhered to certain protocols in performing that test. Id. at 660. The Court also held that "surrogate testimony" of an analyst who had not certified the results of the test could not satisfy the Confrontation Clause because such an analyst "could not convey what [the certifier of the report] knew or observed about the events [the] certification concerned." Id. at 661; see also id. at 663 ("[W]hen the State elected to introduce [the] certification, [the author of the certification] became a witness [the defendant] had the right to confront."). The Court also rejected the State's argument that the laboratory report was not "testimonial," noting that the report included a "certificate concerning the results of [the] analysis" and that the certificate was "'formalized in a signed document.'" Id. at 663-65 (quotation marks and citations omitted).

Bullcoming is not on point for many of the same reasons discussed in connection with Melendez-Diaz. Unlike the laboratory analyst in Bullcoming, Santos was not certifying the

accuracy of a forensic analysis performed by someone else. He did not make representations about the quality or the accuracy of the work performed by his counterpart in the Croatian National Police. Santos instead testified about his own knowledge of the Cellebrite forensic tool, the extraction reports it generates, and his own conclusions from his review of the extraction reports. He explained his reasons for concluding that (1) the cell phones belonged to the Defendants; (2) the extraction reports reflect data that were stored on the Defendants' cell phones; and (3) the evidence derived from the Defendants' cell phones was not altered or manipulated in any way. Santos's conclusions are not premised on the accuracy or quality of the forensic work done in Croatia. Accordingly, his testimony is not comparable to that of a laboratory worker affirming that a test conducted by another laboratory worker is accurate and properly performed.

Landji also cites <u>United States v. Hajbeh</u>, a child pornography case from the Eastern District of Virginia in which the prosecution, relying on Fed. R. Evidence 902, sought to authenticate images and videos obtained from the defendant's phones through the affidavits of two agents who performed extractions on the defendant's phones. <u>Hajbeh</u>, 565 F. Supp. 3d at 774-75. The court rejected the prosecution's effort to offer these images and videos through the agents' affidavits, finding that the affidavits were clearly testimonial and that their admission would "undoubtedly give rise to a Confrontation Clause issue." <u>Id.</u> at 776. In so ruling, the court noted that "the affidavits fill an important evidentiary . . . gap in this matter: namely, to establish that the [child pornography] exhibits are indeed portions of the contents of Defendant's iPhones." <u>Id.</u> (quotation marks and citation omitted). The court concluded that, in order to admit the images and videos, the prosecution would have to call the authors of these affidavits as witnesses. <u>Id.</u> at 777.

Here, by contrast, the Government offered live testimony from Santos, a witness with extensive expertise in Cellebrite, the forensic tool used to prepare the extraction reports. Because of his expertise with Cellebrite, the witness recognized the extraction reports as having been generated from the Cellebrite forensic tool. Because of his knowledge of Cellebrite and the extraction reports that it generates, and his knowledge of the unique identifying numbers associated with each cell phone, Santos could testify regarding whether the cell phones at issue belonged to Defendants; whether the extraction reports were derived from these cell phones; and the likelihood as to whether the data contained on these cell phones had been altered or manipulated. In doing so, Santos did not make representations about the accuracy or quality of the forensic work performed in Croatia, or any findings made by his counterpart in Croatia. Cf. Bullcoming, 564 U.S. at 661 ("[S]urrogate testimony of the kind [the surrogate witness] was equipped to give could not convey what [the certifying analyst] knew or observed about the events his certification concerned, i.e., the particular test and testing process he employed.").

In sum, the admission of the cell phone extractions did not violate the Defendants' Sixth Amendment rights.

*    *    *    *

Because the extractions from the Defendants' cell phones were properly admitted under Fed. R. Evidence 901 and the Sixth Amendment's Confrontation Clause, Defendants' motions for a new trial on this basis will be denied.

## 2.    <u>Jury Selection</u>

Landji and Adamu argue that they are entitled to a new trial because the venire and petit jury did not reflect a fair cross-section of the community, in violation of the Sixth

Amendment and the Jury Selection and Service Act of 1968 (the "JSSA"), 28 U.S.C. § 1861.

(Landji Br. (Dkt. No. 638) at 42-44; Adamu Br. (Dkt. No. 639) at 9-13)

**a.    Background**

Jury selection began on October 6, 2021. On that day, the Defendants filed a joint

letter "to advise the Court of a concern" that, "[b]ased on defense counsel's observations," the

venire "significant[ly] underrepresent[s] . . . Black jurors." (Oct. 6, 2021 Jt. Ltr. (Dkt. No. 581)

at 1-2) Counsel acknowledged that "the issue is not yet ripe" because additional potential jurors

would be seated the next day to replace jurors who had been excused.[18] (Id.) Jury selection

continued on October 7, 2021, and Landji's counsel then challenged the racial composition of the

venire. (Voir Dire Tr. 238) Landji's counsel complained that "about six of the 52 jurors appear

to be black jurors, and that amounts to 11.5 percent of the venire." (Voir Dire Tr. 238-39)

Counsel went on to argue that, based on the eligible jury population in the Southern District of

New York, "there is between a 9 and 10 percent absolute disparity," which "raises a violation of

the defendants' Sixth Amendment rights." (Voir Dire Tr. 239) Counsel requested that the venire

"be struck until an appropriately representative venire can be composed." (Id.) This Court

rejected this argument, citing its recent opinion in United States v. Lawrence, No. 21 Cr. 127

(PGG), which addressed similar arguments that Blacks and Hispanics are underrepresented in

grand juries in this District. (Voir Dire Tr. 239-40; see United States v. Lawrence, No. 21 Cr.

127 (PGG), Dkt. No. 27. The Court then completed the jury selection process. (Voir Dire Tr.

240-45)

---

[18] Because of COVID-19 safety protocols, jury selection took place in the Jury Assembly Room
at 500 Pearl Street, and only 42 venire members could be examined at any one time. Because
that number of venire members is inadequate to select a jury in a criminal case of this nature,
jury selection proceeded over two days with excused venire members being replaced by new
panel members.

### b.   **Applicable Law**

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." Berghuis v. Smith, 559 U.S. 314, 319 (2010) (citation omitted).  The JSSA provides that

> all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. . . .  [A]ll citizens shall have the opportunity to be considered for service on grand and petit juries . . . and shall have an obligation to serve as jurors when summoned for that purpose.
>
> No citizen shall be excluded from service as a grand or petit juror . . . on account of race, color, religion, sex, national origin, or economic status.

28 U.S.C. §§ 1861-62.  Under the JSSA, a "defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of [the JSSA] in selecting the grand or petit jury." 28 U.S.C. § 1867(a).

In Duren v. Missouri, 439 U.S. 357 (1979), "[the Supreme] Court described three showings a criminal defendant must make to establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement":

> He or she must show:  "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."

Berghuis, 559 U.S. at 319 (quoting Duren, 439 U.S. at 364).  "The Duren test 'governs fair cross section challenges under both the [JSSA] and the sixth amendment.'" United States v. Rioux, 97 F.3d 648, 660 (2d Cir. 1996) (quoting United States v. LaChance, 788 F.2d 856, 864 (2d Cir. 1986)) (alteration in Rioux).

c.    **Analysis**

Defendants contend that Blacks and Hispanics were underrepresented in the

venire, and that statistics submitted to this Court in United States v. Lawrence demonstrate that

Blacks and Hispanics are underrepresented in the overall Manhattan jury pool for this District.

(Landji Br. (Dkt. No. 638) at 43-44 (citing Lawrence, No. 21 Cr. 127 (PGG), Dkt. No. 13-2

(Martin Decl.)); Adamu Br. (Dkt. No. 639) at 12 (citing Lawrence, No. 21 Cr. 127 (PGG), Dkt.

No. 13-2 (Martin Decl.)))  Defense counsel also complains that this District's jury summons

process is based on voter registration lists, and that Black people are "systematically

underrepresented in voter registration lists as compared to the jury-eligible population."  (Landji

Br. (Dkt. No. 638) at 43-44)  Landji's counsel further states that, as a result of the

underrepresentation of Blacks and Hispanics in the venire, "only one Black juror and possibly

one Hispanic juror" served on the jury.  (Landji Br. (Dkt. No. 638) at 44)

The Government argues that Defendants have not made a prima facie showing of

underrepresentation under the second Duren prong, because their claims are premised on (1)

their personal observations of the venire and petit jury in this case – an inadequate sample size;

and (2) outdated statistics from 2017 that this Court previously rejected as insufficient in

Lawrence.  (Govt. Opp. (Dkt. No. 643) at 61, 63-65)  The Government also argues that, under

the third Duren prong, any underrepresentation of Blacks or Hispanics in the venire or petit jury

is due to an external factor – namely, the different rates in voter registration across different

races and ethnicities – and is not a feature of the jury selection process itself.  (Id. at 61, 65-66)

In United States v. Lawrence, this Court addressed the defendant's claim that this

District's practices in creating the grand jury pool from voter registration lists cause the

systematic exclusion of Blacks and Hispanics, in violation of the Sixth Amendment and the

JSSA. <u>United States v. Lawrence</u>, 553 F. Supp. 3d 131 (S.D.N.Y. 2021). Lawrence argued that (1) the "master list" of eligible jurors is created from voter registration rolls, "which underrepresent jury-eligible Black and Latino New Yorkers," (2) the master list is only "refill[ed] . . . every four years," which arbitrarily excludes 18-21 year olds from the prospective jury pool and disproportionately impacts Black and Hispanic voters, (3) the District removes inactive voters from the list, which also disparately impacts Black and Hispanic voters, and (4) the jury administrator did not reach out to prospective jurors who did not receive or respond to questionnaires that are used to determine juror eligibility. <u>Id.</u> at 143-44 (quotation marks and citations omitted). This Court rejected these arguments, holding that such practices "are facially neutral" or are the result of factors external to the jury selection process. <u>Id.</u> at 144-46. Concluding that Lawrence had not shown any systematic underrepresentation under the third <u>Duren</u> prong, this Court denied his motion to dismiss the indictment. <u>Id.</u> at 146.

Defendants in the instant case raise the same arguments and rely on the same statistical study regarding the Manhattan jury pool that this Court considered and rejected in <u>Lawrence</u>. Neither Defendant has made a meaningful effort to distinguish <u>Lawrence</u>, however, or to explain why this Court should rule differently here. (Landji Br. (Dkt. No. 638) at 43-44 (citing <u>Lawrence</u>, No. 21 Cr. 127 (PGG), Dkt. No. 13-2 (Martin Decl.); Adamu Br. (Dkt. No. 639) at 12 (citing <u>Lawrence</u>, No. 21 Cr. 127 (PGG), Dkt. No. 13-2 (Martin Decl.)))

For the reasons explained in <u>Lawrence</u>, 553 F. Supp. 3d at 142-46, this Court concludes that Defendants have not made a sufficient showing of systematic underrepresentation

of Blacks and Hispanics under the Duren test.[19]  To the extent that Defendants' motion for a new

trial is premised on that claim, their motion will be denied.

### 3.    The Presence of the Cocaine Evidence at Trial

Landji argues that he is entitled to a new trial because the package containing the

alleged cocaine recovered from the Gulfstream II – GX 101 – was in the courtroom during trial

until the Court ruled that the alleged cocaine was inadmissible because of a lack of evidence

concerning chain of custody.  (Landji Br. (Dkt. No. 638) at 40-42; see also Tr. 429-41 (bench

ruling excluding purported cocaine on chain-of-custody grounds))

### a.    Background

On October 11, 2021 – the day before opening statements and long after the

September 16, 2021 deadline for filing motions in limine (see Dkt. No. 536; see also Dkt. No.

467) – Landji moved to exclude the alleged cocaine (GX 101) recovered from the Gulfstream II.

(Oct. 11, 2021 Jt. Def. Ltr. (Dkt. No. 583) at 1-2)  In support of his motion, Landji cited the 20-

month break in the chain of custody from October 31, 2018 – when the Croatian National Police

officers who had recovered the alleged cocaine delivered it to Inspector Ivica Sestak of the

Croatian National Police (Tr. 149, 185) – to June 24, 2020, when DEA Special Agent Kohut took

custody of the alleged cocaine from Sestak (Tr. 99-100, 206, 210).  (Oct. 11, 2021 Jt. Def. Ltr.

(Dkt. No. 583) at 1)

The Court reserved decision on Landji's application (Tr. 49-55), and the parties

proceeded to opening statements.  During Landji's opening, counsel conceded that the Croatian

---

[19]  With respect to Landji's argument that "only one Black juror and possibly one Hispanic juror"
served on the jury (Landji Br. (Dkt. No. 638) at 44), the Court notes that defense counsel
exercised a peremptory challenge as to a Black female juror, and asked that another Black panel
member be excused for cause.  (See Voir Dire Tr. 233-37, 241-45)

National Police had recovered a kilogram of cocaine from Landji's Gulfstream II. Counsel told

the jury that Cardona-Cardona had "smuggled a kilo of cocaine onto Mr. Landji's plane without

Mr. Landji's knowledge"; that the jury was "going to see a kilogram of cocaine"; that "[a] lab

analyst will explain that . . . it is indeed cocaine"; and that "[w]e're not disputing that. We're not

denying it. That is real, hard evidence." (Tr. 66, 68)

    After opening statements, Officer Tomislav Milunic of the Croatian National

Police testified about the arrest of Landji and Adamu and the subsequent search of Landji's

Gulfstream II. (Tr. 139) Milunic testified that Croatian police recovered a white plastic bag with

red and yellow markings in the cargo area of the plane. (Tr. 141-43) Inside the white bag was a

black bag, and inside the black bag was a rectangular package wrapped in brown tape. (Tr. 142-

43) Milunic testified that the package contained "a white powder substance with characteristics

of cocaine." (Tr. 143) Milunic identified GX 102 and GX 103 as – respectively – the original

packaging of the alleged cocaine and the Croatian lab packaging of the alleged cocaine. (Tr.

143-44, 149-57, 179-85) Although the prosecutor showed GX 101 to Milunic during his

testimony, he was not questioned about this exhibit. (Tr. 143) During Milunic's testimony, the

Government introduced certain photographs taken by Croatian police officers; the photos show

the white powder substance, its packaging, its weight, and the location on the plane where the

package was found. (Tr. 145-47; GX 223-234)

    Agent Kohut testified after Milunic. Kohut testified that he received "just under

one kilogram of cocaine and some packaging" from Inspector Sestak in Zagreb on June 24,

2020. (Tr. 210; see also Tr. 211 ("I received a white powdery substance in a sealed Ziploc bag

that was contained within some brown wrapping. I also received some other bags and packaging

that was contained in some brown paper wrapping. . . . [O]ne of [the bags] had some markings

on it, labeling, indicating that it had come from a forensic examination center in Zagreb.'"))
Kohut identified GX 101 as "the evidence bag in which I sealed the cocaine that I received on
the 24th of June in Zagreb, Croatia." (Tr. 214; see also Tr. 215)  Kohut identified GX 102 and
103 as packaging for GX 101.  (Tr. 215-19, 227-28)

      As discussed above, during the cross-examination of Agent Kohut, defense
counsel introduced two DEA Form 7 reports stating that a package containing 992.23 grams of
cocaine hydrochloride had been recovered from Landji's Gulfstream II aircraft at Zagreb
International Airport.  (DX AAA, DX BBB)

      On October 18, 2021, in the midst of trial, this Court granted Landji's motion to
exclude GX 101, ruling that "the [G]overnment has not offered an evidentiary foundation
sufficient to demonstrate that the white powder found by the Croatian National Police on
October 31, 2018 at the Zagreb airport is the same powder that has been marked as Government
Exhibit 101."  (Tr. 429-41)

      After the Government rested (Tr. 899), counsel for Landji and Adamu requested
that the Court give the following instruction to the jury:

> You heard reference in Special Agent Kohut's testimony to an item received from the
> Croatian National Police and sent to a DEA laboratory.  I caution you that there is no
> evidence in the record establishing that that item was recovered during the search of the
> aircraft.  Nor is there any evidence of testing of that item to determine whether it is or is
> not a controlled substance.  With respect to this item, I remind you of my instruction that
> to the extent the parties marked an exhibit for identification, but the exhibit was not
> received into evidence, it should not enter into your deliberations and you may not
> consider it in any way.

(Tr. 949)

      Landji's counsel commented that he had "wrestled" with whether to request such
an instruction, because "this is one of those situations where as a defense attorney you question
[whether you] want to draw attention to this or not."  (Tr. 945; see also Tr. 947-48, 952)

In response to counsel's remark, the Court shared its perspective concerning the proposed instruction:

> There was a clear plastic DEA evidence bag in the courtroom on the government table for some period of time. Within that clear plastic DEA evidence bag there was a white opaque plastic bag, which allegedly contained the powder that allegedly is cocaine. But having examined the bag closely myself, honestly, you couldn't tell what was in the bag. The powder itself was not visible because it was enclosed within an opaque white plastic bag.
>
> So while it's true that the evidence bag was in the courtroom for some period of time, and it was sitting on the government's desk for several days, I suspect, I am not sure that anybody focused on it.
>
> So what I am telling you, for what it's worth, from my perspective, the presence of that bag in the courtroom seems innocuous to me, and I'm not sure anyone even remembers that it was here at this point because a lot of time has gone by since we heard from these witnesses from Croatia.
>
> So, from my perspective, and of course it's ultimately defense counsel's decision, from my perspective, to draw the jury's attention to the fact that the bag was in the courtroom at an earlier point in the trial, I am not sure that that is in the interest of the defendants.

(Tr. 946)

The Government objected to defense counsel's proposed curative instruction, because it incorrectly stated that there was no evidence that cocaine had been recovered from the Gulfstream II aircraft. (Tr. 949-51) The Government noted that the defense had offered "two DEA evidence documents" – DX AAA and DX BBB – stating that a package containing 992.23 grams of cocaine had been recovered from the Gulfstream II aircraft after it landed in Zagreb. (Tr. 949-51) Defense counsel then acknowledged that the Government "may be right that those exhibits require some modification of the language [defense counsel had requested]." (Tr. 951) The Court took a recess to permit counsel to consider the matter more fully. (Tr. 953) When defense counsel returned from the recess, they informed the Court that they were "going to withdraw our request for the instruction." (Tr. 956)

During his summation, Landji's counsel reminded the jury that Milunic had

testified that he tested the white powder found on the Gulfstream II, but that

> he did not tell you what the result of that test was. So you don't know what the result
> was, and you don't know whether that was, in fact, cocaine. Nor did the government ever
> present you with the cocaine that was found on the plane. In fact, in this drug case,
> strangely, there are no actual drugs in evidence.

(Tr. 1035)

Landji's counsel also addressed the concession in the defense opening that the

Gulfstream II had contained a kilogram of cocaine (Tr. 1035-36):

> . . . we were not in a position to dispute that because Mr. Landji did not know, and does
> not know, anything about these drugs. But as it turns out, the government didn't actually
> do their job of showing you the drugs that were supposedly discovered on the plane. . . .
> The test result, as I said, is not in evidence. There is no forensic proof in this case that
> what is depicted in these exhibits was actually determined forensically to be cocaine.
> The government's investigation was inadequate because, of course, they relied
> exclusively on Cardona. But getting back to the white powdery substance that was
> found, whether or not it tested positive for cocaine, this item was actually found on the
> plane. We are not disputing that. You could see it for yourself in the photos and you
> heard about it in the testimony.

(Tr. 1036)

While the defense conceded that a package containing a "white powdery

substance" had been recovered from Landji's Gulfstream II aircraft, Landji and Adamu argued to

the jury that someone else had planted the "cocaine" or "drugs" on Landji's plane without their

knowledge. (See, e.g., Tr. 1006, 1014-15, 1037, 1049-51, 1067, 1082-85)

By contrast, the theme of the Government's summation and rebuttal was that the

jury need not conclude that the Defendants possessed cocaine in order to find the Defendants

guilty of the charged narcotics conspiracy. (Tr. 962-63 ("You know there was cocaine on that

plane, but let me be clear, even without that test shipment, even if that test shipment flight had

never occurred or even if the defendants somehow did not know what was on board that test

flight, the defendants still would be guilty. That is because they conspired for years about how to ship massive amounts of cocaine by plane. That is because they agreed to ship ton after ton of cocaine on the G-II airplane. That is enough because they are charged with a conspiracy, which is just an agreement."); Tr. 985 ("[E]ven if the defendants didn't actually know there were drugs on board the plane at this time, or even if there weren't actually any drugs on board the plane when it landed in Croatia, it doesn't matter. The defendants are still guilty."); Tr. 1107 ("But you don't need that flight to find the defendants guilty because they had made an agreement prior to that flight to distribute and possess with the intent to distribute tons of cocaine on board U.S. registered aircraft, aircraft owned by a U.S. citizen, and an aircraft on which a U.S. citizen would be present."); Tr. 1108 ("Assume for a moment that the test kilogram was not actually on board the aircraft. The point of that flight was really not the single kilogram. The cost of the flight alone exceeded that. That flight was proof of concept. The purpose of that flight was to convince the potential buyers in Europe that Cardona and Fofana and Landji and Adamu could do what they said they would do and traffic drugs using that plane and others."))

In the jury charge, this Court instructed the jury that "[t]he only exhibits that are evidence in this case are those that were received in evidence. Exhibits marked for identification but not admitted are not evidence. . . ." (Tr. 1124) An index reflecting all exhibits that were admitted into evidence was also provided to the jury. (Tr. 1156-57) As set forth above, GX 101 was not received in evidence.

### b.     **Analysis**

Landji argues that the presence of GX 101 in the courtroom was unfairly prejudicial because it "suggest[ed] that it was in fact the cocaine recovered from the plane." (Landji Br. (Dkt. No. 638) at 40) This argument fails for numerous reasons.

As an initial matter, in Landji's opening, counsel conceded that a kilogram of cocaine had been recovered from Landji's Gulfstream II. (Tr. 68)

Moreover, as discussed above, defense counsel introduced exhibits stating that the package recovered from Landji's Gulfstream II contained 992.23 grams of cocaine hydrochloride. (Tr. 229-33, 238-40; DX AAA, DX BBB)

And, as the Court noted, the package that for a time sat on the Government's counsel table revealed only an opaque white plastic bag. No white powder was visible. (See Tr. 946 ("[Y]ou couldn't tell what was in the bag. The powder itself was not visible because it was enclosed within an opaque white plastic bag. . . . [T]he presence of that bag in the courtroom seems innocuous to me, and I'm not sure anyone even remembers that it was here at this point because a lot of time has gone by since we heard from [the Croatian] witnesses. . . .")) Landji's counsel echoed the Court's observations, stating that he did not want to "draw attention" to GX 101 through his proposed instruction. (Tr. 945; see also Tr. 947-48 (stating that the Court had presented "one side of our thinking" as to whether a curative instruction would draw attention to the alleged cocaine)) As discussed above, Landji's counsel ultimately withdrew his request for a curative instruction concerning GX 101. (Tr. 956)

Given this record, Defendants have not demonstrated that they suffered unfair prejudice as a result of the presence of GX 101 in the courtroom during part of the trial.

Indeed, the Government's inability to introduce GX 101 worked to its detriment. In the defense summations, counsel emphasized that no cocaine had been received in evidence. (Tr. 1035-36) And, as noted above, this Court instructed the jury that it could consider only exhibits that had been received in evidence. (Tr. 1124) There is no reason to believe that the jury did not follow this instruction. See United States v. Jones, 16 F.3d 487, 493 (2d Cir. 1994)

("[J]urors are presumed to follow instructions from the court." (citing United States v. Gilliam, 994 F.2d 97, 100 (2d Cir. 1993))); United States v. Taveras, 584 F. Supp.2d 535, 541 (E.D.N.Y. 2008) ("'[W]e normally presume that a jury will follow an instruction. . . .'" (quotation marks and alteration omitted) (quoting Greer v. Miller, 483 U.S. 756, 767 n.8 (1987))).

In sum, the presence of GX 101 in the courtroom for part of the trial did not deprive Defendants of a fair trial.

### 4.    **Conditions of Confinement**

Landji contends that he is entitled to a new trial because – as a result of the conditions of his confinement – he was denied a meaningful opportunity to participate in his defense. Landji complains that (1) at points during the trial he temporarily did not have access to his legal documents and discovery materials; and (2) on certain trial days he did not receive breakfast.[20]  (Landji Br. (Dkt. No. 638) at 44-45)

Landji and Adamu were housed at the Metropolitan Correctional Center (the "MCC") when jury selection began on October 6, 2021.  On October 13, 2021, in the midst of trial, defense counsel informed the Court that the MCC was shutting down, and that Landji and Adamu would be moved to the Metropolitan Detention Center (the "MDC").  (Tr. 222-23) Defense counsel also informed the Court that, in anticipation of the move to the MDC, the Bureau of Prisons ("BOP") had packed all of the Defendants' belongings, including their legal papers.  (Tr. 223-24)  This Court directed the Government to contact the BOP to ensure that the Defendants' legal papers were returned to them, and the Government assured the Court that it would look into the matter promptly.  (Tr. 223-25)

---

[20]  At trial, the Court sat from 9:30 a.m. to 2:30 p.m.  (Tr. 29)

The next day – October 14, 2021 – the jury did not sit, but the Court met with the parties. (See Tr. 296)  At that conference, Landji's counsel informed the Court that the Defendants had not yet been moved to the MDC because of a "security issue."  Landji's counsel stated that Landji "has one envelope of legal papers," but that certain "discovery materials" had not yet been returned to him.  (Tr. 315)  The Government stated that it had made arrangements for the Defendants' legal papers to be returned to them when they arrived at the MDC.  The Government stated that it would seek to determine when the Defendants would be moved to the MDC, and whether Defendants' legal papers could be returned to them while they remained at the MCC.  (Tr. 316-17)  Adamu's counsel responded that Adamu's legal papers had already been returned to him, and Landji's counsel stated that he expected that Landji's remaining legal papers would be returned to him that day.  (See Tr. 317-18)

Later that day, Landji's counsel submitted a letter stating that Landji had not received breakfast or lunch "on any of the trial days" due to a staffing shortage at the MCC. (Oct. 14, 2021 Landji Ltr. (Dkt. No. 592))  The letter stated that the lack of food "compromises [Landji's] ability to focus during the trial and meaningfully participate in his own defense."  (Id.) This was the first time Landji's counsel had raised an issue concerning Landji's access to food.

The following day – October 15, 2021 – Landji's counsel informed the Court that "the issue[s] of the paperwork and the food . . . with everyone working together . . . are getting resolved." (Tr. 320)  The parties did not raise any issue regarding these matters over the next several days.

On October 18, 2021, Adamu's counsel informed the Court that the Defendants would be moving to the MDC that night and that "a good majority of their legal papers have been left behind." (Tr. 441)  Counsel stated that he would submit a proposed order later that day

"in reference to trying to get those legal materials over to MDC." (Id.) No such proposed order was ever submitted to the Court, however, and Defendants did not make any complaint regarding access to legal papers for the remainder of the trial.

On October 21, 2021, in discussing whether the Defendants could be brought to court by 9:00 a.m. (rather than 9:30 a.m.), Landji's counsel reported that "the MDC[] . . . [does not] serve breakfast until 8:00, and if [the Defendants] are being prepared to be transported here on the early side, . . . the MDC simply skips breakfast." (Tr. 928) The Court directed the Government to coordinate with the BOP to ensure that Defendants received breakfast. (Tr. 929)

On October 22, 2021, prior to closing arguments, Landji's counsel informed the Court that his client was "not given breakfast" that day. (Tr. 956) Adamu's counsel likewise reported that Adamu had not been given breakfast that day. (Id.) The Court offered Defendants granola bars, and the Marshals permitted Defendants to eat food they had brought with them for lunch. (Tr. 956-57)

The Government argues that neither the occasional lack of breakfast, nor Landji's temporary lack of access to some of his legal documents, denied Landji a meaningful opportunity to participate in his defense. (Govt. Opp. (Dkt. No. 643) at 68-69) While the Government acknowledges that Landji faced "certain challenges during trial" – given the pandemic and the closure of the MCC – the Government contends that Landji has not "identif[ied] with any particularity how his ability to participate in his defense was actually curtailed." (Id. at 68)

This Court finds that Landji's occasional lack of breakfast, and his occasional lack of access to his legal papers, did not deprive Landji of a fair trial. The record shows that when defense counsel raised issues regarding food or access to legal papers, the Court directed

the Government to work with the BOP to address these issues, and those issues were resolved. (See Tr. 223-25, 316-18, 320, 441, 929-30, 956-57) While it is regrettable that Landji sometimes missed breakfast, and occasionally did not have continuous access to his legal papers, there has been no showing that these issues deprived Landji of his right to assist in his defense.

To the extent that Landji argues that he is entitled to a new trial because the conditions of his confinement prevented him from meaningfully participating in his defense, Landji's motion for a new trial will be denied.

## CONCLUSION

For the reasons stated above, Defendants' motions for a judgment of acquittal under Fed. R. Crim. P. 29, or for a new trial under Fed. R. Crim. P. 33 (Dkt. Nos. 638-39), are denied.

Dated: New York, New York
          June 27, 2022

SO ORDERED.

Paul G. Gardephe
United States District Judge